1   COOLEY LLP
    BOBBY GHAJAR (198719)
2   JOHN HEMANN (165823)
    JUDD D. LAUTER (290945)
3   3 Embarcadero, 20th Floor
    San Francisco, CA 94111-4004
4   Telephone:    (650) 843-5000
    Email: bghajar@cooley.com
5          jhemann@cooley.com
           jlauter@cooley.com
6
    DAVID CHIU (189542)
7   City Attorney
    JESSE SMITH (122517)
8   Chief Assistant City Attorney
    YVONNE R. MERÉ (173594)
9   Chief Deputy City Attorney
    JULIE VEIT (209207)
10  CHRISTOPHER STUART (262399)
    Deputy City Attorneys
11  City Hall
    1 Dr. Carlton B. Goodlett Place
12  San Francisco, California 94102-4682
    Telephone:    (415) 554-4700
13  Facsimile:    (415) 554-4757
    Email: Cityattorney@sfcityatty.org
14         Jesse.Smith@sfcityatty.org
           Yvonne.Mere@sfcityatty.org
15         Julie.Veit@sfcityatty.org
           Christopher.Stuart@sfcityatty.org
16
    Attorneys for Plaintiff
17  CITY AND COUNTY OF SAN FRANCISCO

18
19                  **UNITED STATES DISTRICT COURT**

20              **NORTHERN DISTRICT OF CALIFORNIA**

21  CITY AND COUNTY OF SAN FRANCISCO,        Case No. 3:24-cv-02311-TSH

22              Plaintiff,                    **PLAINTIFF CITY AND COUNTY OF
                                              SAN FRANCISCO'S NOTICE OF
23       v.                                   MOTION AND MOTION FOR
                                              PRELIMINARY INJUNCTION
24  CITY OF OAKLAND AND PORT OF               ENJOINING DEFENDANTS;
    OAKLAND,                                  MEMORANDUM OF POINTS AND
25                                            AUTHORITIES IN SUPPORT THEREOF**
                Defendants.
26  ————————————————————                      Date: October 24, 2024
                                              Time: 10:00 AM
27  AND RELATED COUNTERCLAIM                  Courtroom: E – 15th Floor
                                              Trial Date: (None Set)
28

1    **TO THE COURT, ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

2          PLEASE TAKE NOTICE that on October 24, 2024 at 10:00 AM or as soon thereafter as

3    the matter may be heard before Magistrate Judge Thomas S. Hixson in Courtroom E of Phillip

4    Burton Federal Building & United States Courthouse, 450 Golden Gate Avenue, San Francisco,

5    CA 94102, Plaintiff City and County of San Francisco ("the City" or "Plaintiff") will and does

6    hereby move for a preliminary injunction against Defendants City of Oakland ("Oakland

7    Defendant") and Port of Oakland ("Port Defendant" or the "Port", and together referred to as

8    "Oakland" or "Defendants").

9          Plaintiff seeks a preliminary injunction enjoining and prohibiting Oakland, and their

10   officers, directors, employees, agents, and representatives, and all other persons acting in concert

11   or participating with them (including their partner airlines) (collectively, the "Enjoined Parties")

12   who receive actual notice of the injunction order by personal or other service, to be immediately

13   prohibited and restrained anywhere in the U.S. from: (1) using, displaying, or registering the name

14   or trademark SAN FRANCISCO BAY OAKLAND INTERNATIONAL AIRPORT in connection

15   with any products or services, including in connection with advertising, marketing, or other

16   promotion, distribution, offering for sale, or sale, of any products or services; and (2) using,

17   displaying, or registering any other colorable imitation of the City's registered SAN FRANCISCO

18   INTERNATIONAL AIRPORT® name and trademark.

19         Plaintiff's motion is based on this Notice of Motion, Plaintiff's Memorandum of Points and

20   Authorities in Support of Motion for Preliminary Injunction, and the Declarations of Jessica

21   Williams, Ivar Satero, Melissa Andretta, Charles Schuler, Doug Yakel, Chris Birch, and Sarah

22   Butler, and exhibits thereto, all filed concurrently herewith, as well as all of the pleadings, files,

23   and records in this proceeding, all matters of which this Court may take judicial notice, and any

24   argument or evidence that may be presented to, or considered by, this Court prior to its ruling and

25   at any argument at the hearing on this motion.

26

27

28

1

**TABLE OF CONTENTS**

2

**Page**

3    I.      INTRODUCTION ......................................................................................... 1

4    II.     STATEMENT OF RELEVANT FACTS ...................................................... 2

5            A.    SAN FRANCISCO INTERNATIONAL AIRPORT® Is a World-Class
                   Airport, Widely Recognized for Its Award-Winning Services .............. 2

6            B.    The SAN FRANCISCO INTERNATIONAL AIRPORT® Trademark ................. 4

7            C.    Oakland and the OAKLAND INTERNATIONAL AIRPORT Trademark ........... 4

             D.    After Years of Jabbing at SFO, Oakland Copies the SF Mark .............. 5

8            E.    SFO Files Suit to Protect the Public and the Valuable SF Mark .......... 7

9            F.    Oakland's Use of the Infringing Mark Has Caused Consumer Confusion
                   and Irreparable Harm to the SF Mark. ................................................. 9

10   III.    LEGAL STANDARD ................................................................................. 11

11   IV.     THE CITY IS LIKELY TO SUCCEED ON ITS TRADEMARK CLAIMS ................. 11

             A.    The City's Mark Is Valid and Protectable ......................................... 11

12           B.    Oakland's Use of the Infringing Mark Is Causing and Is Likely to Cause
13                 Consumer Confusion ......................................................................... 12

                   1.    The City's Mark Is Strong ......................................................... 12

14                 2.    The Parties Offer Identical Services: Airports ........................ 14

15                 3.    The Airport Marks Are Highly Similar .................................... 15

16                 4.    Evidence of Actual Confusion Demonstrates that Confusion Is
                         Likely ...................................................................................... 17

17                 5.    The City's Survey Confirms that Confusion Is Likely ............ 19

18                 6.    Shared Marketing Channels Make Confusion Likely ............... 19

19                 7.    The Degree of Consumer Care Does Not Reduce Confusion .... 20

                   8.    Oakland's Intent Makes Confusion Likely .............................. 21

20                 9.    Oakland's Likelihood of Expansion Makes Confusion Likely ... 22

21           C.    The City Is Entitled to a Presumption of Irreparable Harm ................. 22

22           D.    The Public Interest Favors An Injunction ......................................... 23

             E.    The Balance of Hardships Favors an Injunction ................................ 24

23   V.      IF ANY BOND IS REQUIRED, IT SHOULD BE MINIMAL ......................... 25

24   VI.     CONCLUSION ......................................................................................... 25

25

26

27

28

# TABLE OF AUTHORITIES

**Page**

**Cases**

*adidas Am., Inc. v. Skechers USA, Inc.*,
  890 F.3d 747 (9th Cir. 2018) ............................................................ 13, 23

*All. For the Wild Rockies v. Cottrell*,
  632 F.3d 1127 (9th Cit. 2011) ................................................................ 22

*Am. Rena Int'l Corp. v. SisJoyce Int'l Co. Ltd.*,
  534 F. App'x 633 (9th Cir. 2013) ........................................................... 24

*AMF Inc. v. Sleekcraft Boats*,
  599 F.2d 341 (9th Cir. 1979)........................................................... *passim*

*Anheuser-Busch, Inc. v. Customer Co.*,
  947 F. Supp. 422 (N.D. Cal. 1996) ......................................................... 19

*Automated Pet Care Prod., LLC v. PurLife Brands, Inc.*,
  670 F. Supp. 3d 946 (N.D. Cal. 2023) ..................................................... 15

*BGC Inc. v. Robinson*,
  2022 WL 2915703 (N.D. Cal. July 25, 2022)........................................... 17

*Boldface Licensing + Branding v. By Lee Tillett, Inc.*,
  940 F. Supp. 2d 1178 (C.D. Cal. 2013) ...................................... 17, 18, 22

*Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.*,
  174 F.3d 1036 (9th Cir. 1999)..................................... 11, 12, 20, 21

*Century 21 Real Est. Corp. v. Century Life of Am.*,
  970 F.2d 874 (Fed. Cir. 1992) ................................................................ 15

*Century 21 Real Estate Corp. v. Sandlin*,
  846 F.2d 1175 (9th Cir. 1988)................................................... 13, 14, 15

*Citibank, N.A v. City Bank of San Francisco*,
  1980 WL 30239 (N.D. Cal. Mar. 23, 1980)............................................. 13

*Coachella Music Festival, LLC v. Simms*,
  2018 WL 6074556 (C.D. Cal. Sept. 10, 2018)........................................ 14

*Disney Enters., Inc. v. VidAngel, Inc.*,
  869 F.3d 848 (9th Cir. 2017).................................................................. 24

*Entrepreneur Media, Inc. v. Smith*,
  279 F.3d 1135 (9th Cir. 2002)................................................................ 12

**TABLE OF AUTHORITIES**
(continued)

Page

*Faizi v. Temori*,
  2022 WL 7094259 (N.D. Cal. Oct. 12, 2022) ......................................................... 25

*Fiji Water Co., LLC v. Fiji Min. Water USA, LLC*,
  741 F. Supp. 2d 1165 (C.D. Cal. 2010) .............................................................. 19

*Fleischmann Distilling Corp. v. Maier Brewing Co.*,
  314 F.2d 149 (9th Cir. 1963) .......................................................................... 20

*GoTo.com, Inc. v. Walt Disney Co.*,
  202 F.3d 1199 (9th Cir. 2000) ................................................................... 12, 15

*Greater L.A. Softball Ass'n v. Ryan*,
  2017 WL 8292779 (C.D. Cal. Sept. 21, 2017) ....................................................... 23

*Greater Orlando Aviation Auth. v. Sanford Airport Auth.*,
  2023 TTAB LEXIS 87 (TTAB Mar. 14, 2023) ................................................. 15, 16

*Hansen Beverage Co. v. Cytosport, Inc.*,
  2009 WL 5104260 (C.D. Cal. Nov. 4, 2009) ....................................................... 19

*Henry Schein, Inc. v. Cook*,
  191 F. Supp. 3d 1072 (N.D. Cal. 2016) ............................................................ 24

*Johnson v. Couturier*,
  572 F.3d 1067 (9th Cir. 2009) ...................................................................... 25

*La Quinta Worldwide LLC v. Q.R.T.M., S.A. de C.V.*,
  762 F.3d 867 (9th Cir. 2014) ....................................................... 13, 15, 20, 21

*Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*,
  638 F.3d 1137 (9th Cir. 2011) ...................................................................... 22

*New Kids On The Block v. New Am. Pub'g, Inc.*,
  971 F.2d 302 (9th Cir. 1992) ........................................................................ 23

*Niantic, Inc. v. Global++*,
  2019 WL 8333451 (N.D. Cal. Sept. 26, 2019) ..................................................... 23

*North American Aircoach v. North American Aviation*,
  231 F.2d 205 (9th Cir. 1955) .................................................................. 14, 16

*Off. Airline Guides, Inc. v. Goss*,
  6 F.3d 1385 (9th Cir. 1993) ............................................................... 17, 19, 21

*Online Partners.com, Inc. v. Atlanticnet Media Corp.*,
  2000 WL 101242 (N.D. Cal. Jan. 18, 2000) ......................................................... 17

**TABLE OF AUTHORITIES**
(continued)

Page

*Opticians Ass'n of Am. v. Indep. Opticians of Am.*,
    920 F.2d 187 (3d Cir. 1990).............................................................................................. 22

*Pangea Legal Servs. v. U.S. Dep't of Homeland Sec.*,
    512 F. Supp. 3d 966 (N.D. Cal. 2021) ............................................................................... 11

*Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*,
    469 U.S. 189 (1985)........................................................................................................... 12

*Perfumebay.com Inc. v. eBay Inc.*,
    506 F.3d 1165 (9th Cir. 2007).................................................................................... 16, 18

*Playboy Enters., Inc. v. Baccarat Clothing Co.*,
    692 F.2d 1272 (9th Cir. 1982).......................................................................................... 23

*Playboy Enters., Inc. v. Netscape Commc'ns Corp.*,
    354 F.3d 1020 (9th Cir. 2004).......................................................................................... 20

*Pom Wonderful LLC v. Hubbard*,
    775 F.3d 1118 (9th Cir. 2014)................................................................................... 15, 19

*Quality Semiconductor, Inc. v. QLogic Corp.*,
    1994 WL 409483 (N.D. Cal. May 13, 1994) ................................................................... 18

*Rearden LLC v. Rearden Com., Inc.*,
    683 F.3d 1190 (9th Cir. 2012)..................................................................................... 18, 21

*SunEarth, Inc. v. Sun Earth Solar Power Co.*,
    846 F. Supp. 2d 1063 (N.D. Cal. 2012) ...................................................................... 18, 23

*Tari Labs, LLC v. Lightning Labs, Inc.*,
    2023 WL 2480739 (N.D. Cal. Mar. 13, 2023)................................................................. 18

*Valenzuela v. City of Anaheim*,
    2020 WL 10731248 (C.D. Cal. Apr. 20, 2020) ............................................................... 25

*Vineyard House, LLC v. Constellation Brands U.S. Operations, Inc.*,
    515 F. Supp. 3d 1061 (N.D. Cal. 2021) ........................................................................... 22

*Wells Fargo & Co. v. ABD Ins. & Fin. Servs., Inc.*,
    758 F.3d 1069 (9th Cir.2014)........................................................................................... 18

*Winter v. Nat. Res. Def Council, Inc.*,
    555 U.S. 7 (2008).............................................................................................................. 11

**Statutes**

**TABLE OF AUTHORITIES**
(continued)

**Page**

15 U.S.C. § 1057(b) ................................................................................................ 11

15 U.S.C. §1065 ............................................................................................... 4, 11

15 U.S.C. § 1114(1) ............................................................................................... 11

15 U.S.C. § 1115(a)-(b) ......................................................................................... 11

15 U.S.C. § 1115(b)(4) ........................................................................................... 17

15 U.S.C. § 1116(a) ........................................................................................... 2, 22

15 U.S.C. § 1125(a) ............................................................................................... 11

Trademark Modernization Act, 15 U.S.C. § 1116(a) .......................................... 2, 22

**Other Authorities**

Fed. R. Civ. P. 65(c) .............................................................................................. 25

5 MᶜCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 32:188 (5th ed.) .......................... 19

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## I.      INTRODUCTION

Oakland has a trademark for its airport. It should stay away from the City's.

For nearly 100 years, the City's airport ("SFO") has been known worldwide as SAN FRANCISCO AIRPORT or SAN FRANCISCO INTERNATIONAL AIRPORT®, having adopted the latter trademark in 1954 (the "SF Mark"). The SF Mark is famous, federally registered, and incontestable. Over many decades, SFO has grown into one of the country's busiest airports, welcoming tens of millions of worldwide travelers annually, winning numerous awards and accolades, attracting leading airlines and service providers, and earning praise from travelers and industry insiders for its customer service, retail, food, and facilities.

Oakland also has an airport. For decades, it has used OAKLAND INTERNATIONAL AIRPORT as a trademark to identify that airport. Under new leadership, Oakland recently decided to run away from its identity and adopt a new trademark that centers on the City's name:

**SAN FRANCISCO BAY OAKLAND INTERNATIONAL AIRPORT** (the "Infringing Mark").

"***Why would they do this?***" That's the question posed by one of many travelers bewildered by Oakland's effort to abandon its own brand in favor of the City's. Oakland did not, as it has publicly stated, pick a new brand to "help" travelers know where its airport is located. Although the Oakland airport services many of the same Bay Area travelers as SFO, it receives far fewer of them. What better way to attract new customers, service providers, and airlines than by adopting a copycat brand? Predictably, although its rollout has only just begun, Oakland's new brand has already caused confusion: people who traveled to SFO intending to go to the Oakland airport, online confusion over the names, inadvertent geo-tagging of one airport intending to tag the other, or online accounts of confusion occurring at Oakland (the extent to which Oakland has shielded).

***All*** of the relevant factors considered in a trademark infringement analysis (the "*Sleekcraft*" factors) weigh decidedly in the City's favor: (1) the presence of actual confusion; (2) survey evidence demonstrating levels of confusion **over 20%**; (3) the SF Mark is strong, registered, and legally incontestable; (4) the marks are highly similar; (5) the services (airports) are identical; (6) the marketing channels, including airline websites and Online Travel Agencies ("OTAs") like Expedia, Priceline, and Booking.com, are identical; and (7) the consumer base is identical.

Oakland's bad faith is also on display. Just 30 minutes before its public announcement of the Infringing Mark, Oakland informed the City of its planned name change. The City objected, *repeatedly*, warning that travelers would mix up the parties' airports, resulting in all manner of travel mishaps from purchasing the wrong plane tickets, to selecting the wrong Uber destination, to reserving a rental car at the wrong airport. *Airlines* and foreign travel agencies voiced their concerns over name confusion. Oakland residents voiced concerns. Those concerns were ignored, literally, as Oakland avoided the City's outreach and instead rushed headlong to make the change. All the while, Oakland gloated about the new change – even taunting City officials with sophomoric social media posts. Oakland may not take the City's rights seriously, but the City certainly does.

The City filed this trademark infringement lawsuit in April but continued its outreach to try to find an alternative to litigation, to no avail. Then, at Oakland's insistence, the Parties agreed to engage in a formal mediation in late August (stipulating that the interim period could not be used to argue delay). That mediation was not fruitful.

The City is entitled to immediate injunctive relief because it is likely to succeed on the merits of its trademark infringement claim, in turn, giving it a presumption of irreparable injury. 15 U.S.C. § 1116(a). The Infringing Mark threatens to compromise the City's reputation, goodwill in, and ability to control the SF Mark, harm the public, and harm service providers and those who make a living assisting those traveling to airports. And although confusion is just beginning, it will inevitably increase as Oakland and OTAs (which still feature the OAKLAND INTERNATIONAL AIRPORT mark) continue to transition to the Infringing Mark. Unless Oakland is enjoined, travelers will book the wrong flights, return rental cars to the wrong locations, and get dropped off by rideshare services at the wrong airport – all to the detriment of both those consumers and SFO.

Many have urged Oakland to stop using the confusing trademark. Oakland will not listen. The City asks the Court to grant immediate injunctive relief to stop Oakland's infringement.

## II.   STATEMENT OF RELEVANT FACTS

### A.   SAN FRANCISCO INTERNATIONAL AIRPORT® Is a World-Class Airport, Widely Recognized for Its Award-Winning Services

In May 1927, the City inaugurated the Mills Field Municipal Airport of San Francisco,

which formally rebranded as the SAN FRANCISCO AIRPORT in 1931, and again as SAN FRANCISCO INTERNATIONAL AIRPORT in 1954. Declaration of Melissa Andretta ("Andretta Decl.") ¶ 3. SFO has always been a major west coast hub airport serving travelers to and from the Bay Area, and over time it has grown to become one of the busiest airports in the United States. *Id*. ¶ 4. Every year, SFO welcomes tens of millions of travelers from around the world, including approximately *50 million* in 2023 alone – more than twice the number of travelers serviced by the neighboring airports in Oakland and San Jose combined. *Id*. ¶¶ 4-5. By passenger count, it is among the top 12 busiest airports in the United States. *Id*. ¶ 4, Ex. A. This has translated into average annual operating revenues of approximately $1 billion over the past five years. Declaration of Jessica Williams ("Williams Decl.") ¶¶ 2, Ex. A.

SFO's success is no accident. The City has made thoughtful and costly investments in the airport's infrastructure and facilities to attract and support airlines, and to ensure that travelers are comfortable and well-served throughout their journey. Declaration of Charles Schuler ("Schuler Decl.") ¶ 4. The airport boasts nearly 70 restaurants, many of them quick service versions of leading Bay Area establishments, alongside trendy destinations such as Boudin Bakery and Portero Grill. *Id*. Befitting an airport of its stature, SFO features high-end shopping options to serve its consumers, from Gucci to Burberry to L'Occitane, among many others. *Id*. ¶ 5. The airport also boasts several prestigious club lounges and a luxury hotel, the Grand Hyatt at SFO. *Id*. ¶ 6. The airport even has a fully accredited museum (the first in an international airport) and hosts the Bay Area Sports Hall of Fame. *Id*. ¶ 7.

Decades of time, effort, and money have made SFO and the SF Mark instantly and widely recognized among passengers and the travel industry for the airport's world class services. *Id*. ¶¶ 8, 10. For example, the Wall Street Journal ranked SFO the best overall airport in the United States in 2022, and among the top ten airports in the U.S. in 2023; readers of Food & Wine magazine recently voted SFO the best airport for food in the U.S.; in 2022, the Airports Council International recognized SFO with an award for best customer experience; and SFO has also been endorsed as the best U.S. airport for kids and for having the fastest internet. *Id*., Ex. B. SFO has also received numerous other awards lauding its services across a variety of metrics. *Id*. ¶ 9, Ex. C.

### B.    The SAN FRANCISCO INTERNATIONAL AIRPORT® Trademark

Every traveler making their way through SFO has encountered the SF Mark in some form, whether in the process of purchasing a plane ticket in person, online, or through a travel agent; or on a plane ticket, baggage claim sticker, or the walls of the airport itself. Schuler Decl. ¶ 11. Annually, the City invests *millions* of dollars annually to promote its airport services under the SF Mark, with over $20 million spent in the last ten years alone. *Id*. ¶ 12. Public advertising of the SF Mark includes prominent display on the airport's website www.flysfo.com (which receives nearly a half million unique visitors per month), in commercial print and digital advertising, on social media, and at public outreach events. *Id*. ¶¶ 13-14. The SF Mark also receives significant indirect promotion by countless third parties who utilize the mark to facilitate their own services. *Id*. ¶ 15. For example, on their own websites and apps, airlines and OTAs all display departures and destinations by airport name, including the SF Mark. *Id*. The same is true of car rental services, rideshare apps, navigation apps, and the many hotels and other services that have a symbiotic economic relationship with SFO. *Id*. ¶ 16. The SF Mark has also been referenced in countless news articles, travelogues, and blogs discussing the City's airport. Williams Decl. ¶¶ 2-4, Exs. B-D.

The SF Mark is an asset of tremendous value and represents goodwill belonging to the City. The City's investment has made the SF Mark among the strongest airport brands in the world, routinely ranked among the top 25 by Brand Finance, a respected independent evaluator of international brands. Schuler Decl. ¶ 17.

Beyond its extensive common law trademark rights, the City owns a 2012 registration for the SF Mark covering "airport services" in Class 39 (the "Registration"). Williams Decl. ¶ 6. The Registration received incontestable status, following the City's submission of a Section 15 Declaration of Incontestability[1] in August 2017. *Id*. ¶ 7.

### C.    Oakland and the OAKLAND INTERNATIONAL AIRPORT Trademark

The Oakland airport was also established in 1927 and has been known by the name and

---

[1] Between the fifth- and sixth-year anniversary of registering a trademark, a trademark owner can file for "incontestable" status, after which a defendant wishing that challenge that trademark has limited defenses. 15 U.S.C. § 1065.  The City did so here.  Williams Decl. ¶ 6, Ex. E.  Filing the affidavit of incontestability increases the evidentiary value of the registration from a presumption of the registrant's exclusive right to use the mark to "**conclusive evidence**" of such a right.

trademark OAKLAND INTERNATIONAL AIRPORT since at least as early as 1963. *Id*. ¶¶ 8-9. *That* is Oakland's brand – the public facing name of its airport. And *that* is the name that Oakland registered with the USPTO, claiming in filings that due to its "substantially exclusive and continuous use of the mark in commerce" for "at least five years," it has acquired distinctiveness (meaning it has "secondary meaning") pointing exclusively to Oakland. *Id*. ¶ 10, Ex. H.

The Oakland airport sits in the southern part of the city of Oakland in the East Bay. Andretta Decl. ¶ 6. Relatively speaking, the Oakland airport is much smaller than SFO, with more limited infrastructure to support airlines. *Id*. ¶ 7. As a result, the airport services far fewer passengers than SFO, around 11.2 million in 2023. *Id*. In comparison to SFO, the airport ranked near the bottom in overall customer satisfaction among travelers to large airports in the U.S. *Id*. ¶ 8.

Though much smaller than SFO, the airport shares several of the same airlines, including Alaska, Delta, and Southwest, and services many of the same travelers. *Id*. ¶¶ 11-13. To wit, OTAs and airline ticketing features typically identify Oakland's airport as a "nearby" alternative to SFO and vice versa, and flights to and from each airport can often be searched together. *Id*. ¶ 12.

### D.    After Years of Jabbing at SFO, Oakland Copies the SF Mark

For years – and owing nothing to the City's actions in relation to Oakland or its airport – Oakland has perceived itself to be in a rivalry with the City over airlines and passengers. *Id*. ¶ 14. Oakland has struggled to maintain and/or expand airline routes, in particular during and after the pandemic, with widely reported losses of British Airways, Norwegian Air, and JetBlue. *Id*. ¶ 15. Oakland appears to blame *the City* for its problems, believing the City to have taken opportunities from it. *Id*. ¶ 16. In response, Oakland has taken to marketing the Oakland International Airport to airlines by *denigrating SFO*, e.g., by misrepresenting the extent to which the airport suffers from fog and delays. *Id*. ¶ 17. In one incident, the Port hosted an event for airlines that featured fortune cookies containing the fortune "SFO? Just say no." *Id*. Oakland's fixation on and negativity toward SFO is exemplified by a pre-pandemic video ad campaign titled "Inferiority Complex," which features "stereotypical" San Franciscans touting the superiority of the Oakland airport. *Id*.

Far from another sophomoric jab at SFO, on March 29, 2024, the Port Defendant issued a press release announcing that it was rebranding to SAN FRANCISCO BAY OAKLAND

INTERNATIONAL AIRPORT. *Id*. ¶ 18. In a tacit acknowledgement of obvious concerns around the planned rebrand, the Port Defendant contacted SFO's Airport Director, Ivar C. Satero – but only 30 minutes before the release was published. Declaration of Ivar Satero ("Satero Decl.") ¶ 2. Mr. Satero objected to the name, expressed serious concern about the similarities between the Infringing Mark and the SF Mark, and requested additional information from Defendant Port of Oakland. *Id*. ¶¶ 3-4. Following that call, the Port never followed up. *Id*.

After the March 29 announcement, Mr. Satero, other City officials, domestic and international airlines, travel industry and tour operating companies, and regional stakeholders have formally expressed opposition to or serious concerns about the proposed name change *Id*. ¶¶ 5-7; Declaration of Doug Yakel ("Yakel Decl."), ¶¶ 3-20. For example, Japan, United, and Vietnam Airlines issued letters to the Port opposing the name change. *Id*. ¶¶ 15-17, Exs. L-N. Each voiced concerns over name confusion, harming domestic and international travelers (particularly those with connecting flights). *Id*. Vietnam Airlines, for example, expressed "great concern that the Metropolitan Oakland International Airport is considering changing its name to San Francisco Bay Area Oakland International Airport, which will create huge confusions, especially to our travelers." *Id*., Ex. N. Travel agencies objected, too. *Id*. ¶¶ 11-14. The City and regional stakeholders repeatedly offered to engage in a constructive dialogue to seek concrete alternatives to the Infringing Mark, but their overtures were ignored. *Id*. ¶¶ 3-10. *See also*, Satero Decl., Ex. B.

On April 11, 2024, at the Oakland Board of Port Commissioners' meeting, the Port heard public comment both opposing and supporting a proposal to change the name of its airport to the Infringing Mark. Williams Decl. ¶ 12. Some members of the commission proposed a continuance due to the rushed process and the lack of sufficient public outreach on the proposal. *Id*. The Port paid lip service to stakeholder engagement but, despite repeated requests to collaborate and to consider alternatives, the Port refused to engage with the City in the weeks immediately following the announcement of its renaming plan and through the Port's month-long process to purportedly gather stakeholder input. Yakel Decl. ¶¶ 3-20. The Port approved the first reading of the ordinance to adopt the Infringing Mark on April 11, 2024, and voted to approve the second reading of the ordinance on May 9, 2024, which is the date the new name became effective. Williams Decl. ¶ 12.

**E.     SFO Files Suit to Protect the Public and the Valuable SF Mark**

Because of Oakland's failure to respond to the City's concerns, and its continued expressed intention to use the Infringing Mark, the City was compelled to file this lawsuit on April 18, 2024. On May 3, 2024, the City filed a first amended complaint to name the Port as a separate defendant, and on May 9, 2024, the Port filed its answer with multiple threadbare affirmative defenses and a counterclaim seeking a declaratory judgment of non-infringement. ECF No. 15. The Port countered the City's allegations by contending that, in context, the parties' marks are distinguishable. *See, e.g.*, *id.* at Counterclaim ¶¶ 2-3, 64. It highlighted Oakland airport's logo design and represented that Oakland will continue to use "OAK" as the airport's three-letter IATA code. *Id.*

Setting aside the relevance of whether Oakland might on its own initiative *sometimes* display the Infringing Mark with an IATA code, Oakland does not always do so (Williams Decl. ¶ 14) and has no control over how *others* display the Infringing Mark. For example, third-party publications and oral communications will ***not*** include Defendant's IATA code, and articles and press will not include Oakland's logo. And while Booking.com foregrounds IATA codes next to airport names, many other ticketing and car rental services do not or put it at the end. *Id.* ¶ 15.

Although Oakland's rollout of the Infringing Mark is not complete, consumers searching for SAN FRANCISCO BAY AIRPORT online now encounter the Infringing Mark with the City's name and trademark mark abutted by listings for the City's airport. *Id.* ¶ 16 (**Figure 1**).



**Figure 1 – Google Search Results for "San Francisco Bay airport"**

And in other contexts, Oakland airport's full name is often obscured, which will almost certainly occur with greater frequency on smart phones and in apps (where the screen surface is smaller) – resulting in near-identical presentations of the parties' marks. *Id.* ¶¶ 17-18 (**Figure 2**).

 

**Figure 2 – App and Mobile Screenshots Showing Truncated Display of Infringing Mark**

After the City filed suit, Oakland finally engaged with the City, and insisted on a formal mediation rather than informal discussions that, in the City's view, would have been more expedient. Giving Oakland the benefit of the doubt, the City agreed, and the mediation was scheduled for late August before former Magistrate Judge LaPorte. Williams Decl. ¶ 36. The parties stipulated to a continuance of all deadlines pending mediation, including an acknowledgement that the extension could not be used to argue that the City delayed in seeking preliminary injunctive relief. ECF No. 32. In the meantime, Oakland has slowly rolled out the Infringing Mark. For example, although the Infringing Mark appears on the Oakland airport's website, social media handles, and search engine results, and has made its way to Booking.com and a few airline websites' ticketing features, most OTAs continue to display the OAKLAND INTERNATIONAL AIRPORT mark. Andretta Decl. ¶¶ 20-22. The City was thus hopeful that Oakland would work with the City to reach an amicable compromise at the mediation. The August 27 mediation led to no resolution, however. *Id.* ¶ 23.[2] The City files this motion three weeks later.

---

[2] Meanwhile, the Port appears to be relishing in the publicity around this dispute, as evidenced by

1
2

**F.      Oakland's Use of the Infringing Mark Has Caused Consumer Confusion and Irreparable Harm to the SF Mark.**

3

Unsurprisingly, Oakland's scheme to free ride on the City's name and success has caused

4

actual confusion. For example, in July a reddit user posted about having "picked the wrong airport"

5

due to Oakland's name change, lamenting, rhetorically, "Why would they do this[?]" (showing the

6

two confusing names atop each other). Williams Decl. ¶ 20 (**Figure 3**).

7
8
9
10
11
12



13

**Figure 3 – Reddit Post from Traveler**

14

Multiple travelers have also inquired on social media – and specifically on Oakland airport's

15

own account – about whether Oakland's airport is the City's airport. *Id.* ¶¶ 21-22 (**Figure 4**).

16
17
18
19
20
21
22
23
24
25



26

**Figure 4 – Social Media Posts Confused About Relationship Between Airports**

27
28

recent pictures of the new President of the Oakland Port Board of Commissioners donning a t-shirt with a "joke" about the lawsuit.  Williams Decl. ¶ 8, Ex. F.

There have also been several instances in which visitors located at SFO have posted pictures to Instagram mistakenly tagging Oakland's Infringing Mark, which would lead viewers to believe that the pictures depict Oakland's airport, when it is the City's. *Id.* ¶ 23 (**Figure 5**).



**Figure 5 – Social Media Posts Tagging Wrong Airport (San Francisco Bay Oakland Int'l Airport)**

Separately, the City is aware of over a dozen individuals that were dropped off at SFO intending to go to "San Francisco Bay Oakland International Airport" or catch a flight on an airline like Spirit Airlines, which flies out of the Oakland airport but not SFO. Declaration of Christopher Birch ("Birch Decl.") ¶ 6, Ex. A. This is likely to increase in occurrence if Oakland is allowed to fully implement the name change across platforms and via apps and third parties. *Id.* ¶ 7.[3]

Undoubtedly, Oakland airport is experiencing similar confusion, too. But despite the City's public information requests, Oakland has not been forthcoming with that information; several of the records it produced were suspiciously cut-off. Yakel Decl. ¶¶ 21-22, Ex. R.

Following publication of a recent article about this litigation in *SFGATE*, a news website based in San Francisco, numerous members of the public have posted online about additional, previously unknown examples of confusion of every type imaginable. William Decl. Exs. O-W. One individual described having witnessed a woman at SFO who was having a hard time

---

[3] Given the City's concerns about the Oakland airport rebrand, in June 2024, SFO asked information booth staff to document instances of confusion in the normal course of business.

1  understanding that she unwittingly purchased a ticket to depart from Oakland, *id*. Ex. T; while

2  another commenter detailed how a non-native-English speaking member of his partner's family got

3  confused trying to book tickets to SFO for a wedding, and had to be picked up from the Oakland

4  airport. *Id*. Ex. U. Yet another individual explained how someone they know "is flying into town

5  tomorrow for the first time and accidentally went to sfo [sic] instead of Oakland." *Id*. Ex. V at 1.

6  And in other instances, commenters described a situation in they or their friends and family were

7  directed to the wrong airport by digital assistants and rideshare apps. *Id*. Ex. W at 2.

8  ### III.   LEGAL STANDARD

9   A preliminary injunction is proper if a plaintiff shows: (1) it is likely to succeed on the

10 merits, (2) it is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance

11 of equities tips in its favor, and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def*

12 *Council, Inc.*, 555 U.S. 7, 20 (2008). Courts in this Circuit have also applied an alternative "sliding

13 scale" approach, in which "a stronger showing of one element may offset a weaker showing of

14 another." *Pangea Legal Servs. v. U.S. Dep't of Homeland Sec.*, 512 F. Supp. 3d 966, 972 (N.D.

15 Cal. 2021) (citation omitted). Each of these elements is satisfied.

16 ### IV.   THE CITY IS LIKELY TO SUCCEED ON ITS TRADEMARK CLAIMS

17  The record demonstrates that the City has "a fair chance of success on the merits, or

18 questions [exist] serious enough to require litigation." *Pangea Legal Servs.*, 512 F. Supp. 3d at 972

19 (citation omitted). To establish infringement of its registered trademark under Section 32 or false

20 designation of origin under Section 43(a), the City must show that (1) it has a valid, protectable

21 interest in a trademark; and (2) Oakland is using a mark similar to the City's trademark in a manner

22 likely to cause confusion. 15 U.S.C. §§ 1114(1), 1125(a); *Brookfield Commc'ns, Inc. v. W. Coast*

23 *Ent. Corp.*, 174 F.3d 1036, 1046 (9th Cir. 1999). Below, the City proves both.

24  **A.** **The City's Mark Is Valid and Protectable**

25  The City's incontestable federal trademark registration for the SF Mark is "*conclusive*

26 evidence" that cannot be rebutted of (1) the validity of the SF Mark; (2) the City's ownership of

27 that mark; and (3) the City's exclusive right to use it for the services specified in its registration. 15

28 U.S.C. §§ 1057(b), 1065 and 1115(a)–(b) (emphasis added). The City's Registration for the SF

Mark issued over 12 years ago, and it became incontestable over seven years ago. Williams Decl. ¶¶ 6-7, Ex. F. Moreover, because the Registration includes a claim of acquired distinctiveness, it also "serves as conclusive proof that the mark has secondary meaning." *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1142 n.3 (9th Cir. 2002) (citing *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 205 (1985)). As discussed in Section II.A, the City has marketed and used the SF Mark for many decades – long before Oakland adopted the Infringing Mark. The validity of the City's trademark rights in the SF Mark is indisputable, giving it the exclusive right to use its mark in connection with "airport services."

### B. Oakland's Use of the Infringing Mark Is Causing and Is Likely to Cause Consumer Confusion

Courts in the Ninth Circuit assess likelihood of confusion using the eight non-exclusive factors established in *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir. 1979), namely: (1) strength of the plaintiff's mark; (2) proximity or relatedness of the parties' services (3) similarity of the marks; (4) marketing channels used; (5) type of services and the degree of care likely to be exercised by the purchaser; (6) evidence of actual confusion; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the product line. *Id*. To prevail, a plaintiff need not show that each factor weighs in its favor. Here, they do.

### 1. The City's Mark Is Strong

A trademark's strength determines the level of protection it is given. *Brookfield*, 174 F.3d at 1058. "The stronger a mark—meaning the more likely it is to be remembered and associated in the public mind with the mark's owner—the greater the protection it is accorded by the trademark laws." *Id*. Strength is evaluated in terms of both conceptual and commercial strength. *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1207 (9th Cir. 2000). Conceptual strength refers to a mark's inherent distinctiveness (i.e., whether the mark is fanciful, arbitrary, suggestive, or descriptive), whereas commercial strength refers to "actual marketplace recognition" of the mark. *Brookfield*, 174 F.3d at 1058.

Backed by many ***decades*** of prominent, exclusive use, the SF Mark is famous and unquestionably strong, with one publication ranking the SF Mark among the top 25 strongest airport

brands in the world. Schuler Decl. ¶ 17. SFO is highly-acclaimed worldwide and routinely receives awards and other recognition from travelers and national publications for the quality of its facilities, the superiority of its customer service, the caliber of its food, and, more generally, for being the best or among the best airports in the U.S. *See supra* § II.A; Schuler Decl. ¶¶ 8-9. The mark's strength is reinforced by extensive direct and indirect advertising. For example, the City invests millions of dollars annually to market and promote SFO, including over $5 million in 2023 and just over $34 million dollars over the last decade. *Id*. ¶ 12. And third parties (like OTAs, airlines, and other that participate in the airport's ecosystem, from rideshare apps to hotels and restaurants), all display the SF Mark to actual and prospective travelers. *Id*. ¶¶ 14-16. Consumers researching flights to San Francisco, car rentals near the airport, or an Uber to catch their flight will inevitably encounter the SF Mark. *Id*.

SFO also receives considerable unsolicited media attention. Since the City's adoption of the SF Mark in 1954, tens of thousands of news articles, travel guides, travelogues, magazine articles, and blog posts, among other publications, have featured or referenced SFO and the SF Mark. Williams Decl. ¶¶ 3-5. The sheer volume of third-party references is additional, compelling evidence that the SF Mark is widely recognized and strong. *See adidas Am., Inc. v. Skechers USA, Inc.*, 890 F.3d 747, 754–56 (9th Cir. 2018) (finding "tremendous commercial success and market recognition" based on "considerable amount of unsolicited media coverage").

Any argument by Oakland that the SF Mark is weak because it is descriptive is unavailing. "The fact that a mark was originally descriptive of a geographical location will not prevent it from becoming strong by virtue of secondary meaning." *Citibank, N.A v. City Bank of S.F.*, 1980 WL 30239, at *10 (N.D. Cal. Mar. 23, 1980); *La Quinta Worldwide LLC v. Q.R.T.M., S.A. de C.V.*, 762 F.3d 867, 875 (9th Cir. 2014) (finding LA QUINTA mark descriptive but strong with "significant secondary meaning and a large presence in the hotel marketplace"). Even descriptive marks may accrue considerable strength through "extensive advertising, length of time in business, public recognition, and uniqueness," among other factors. *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1179 (9th Cir. 1988). The SF Mark easily meets this requirement.

Many cases are illustrative and support this conclusion; the City highlights two. In

*Coachella Music*, the court held that the geographically descriptive trademark COACHELLA, corresponding to the outdoor concert located in the Coachella Valley, was strong. The court relied on $84 million in sales, a lineup of pop stars, more than 750,000 attendees in a single year, and national media coverage. *Coachella Music Festival, LLC v. Simms*, 2018 WL 6074556, at *4 (C.D. Cal. Sept. 10, 2018). Similarly, in *North American Aircoach v. North American Aviation*, the Ninth Circuit considered whether the plaintiff, an aerospace manufacturer, had developed sufficient rights in "NORTH AMERICAN" for aviation *products* (e.g., airplanes) such that it could prevent the defendant's use of NORTH AMERICAN as a trademark for *airline services*. 231 F.2d 205, 210 (9th Cir. 1955). The Ninth Circuit *affirmed* the lower court's injunction, finding that, notwithstanding the descriptiveness of "NORTH AMERICAN," "[t]he proof is irrefutable that 'North American' in connection with aviation means the plaintiff solely and exclusively," and the plaintiff's mark should be "afforded as complete protection as if it were a 'strong mark at the inception." *Id*. at 209-10.

The field of air travel, in particular, is well acquainted with strong descriptive marks. Three of the five largest airlines in the U.S. (AMERICAN AIRLINES, SOUTHWEST AIRLINES, and ALASKA AIRLINES) bear descriptive trademarks, as do three of the five largest airports in the U.S. (DALLAS/FORT WORTH INTERNATIONAL AIRPORT, DENVER INTERNATIONAL AIRPORT, and LOS ANGELES INTERNATIONAL AIRPORT). Williams Decl. ¶¶ 29-35. Yet each is undoubtedly well-known and accorded broad rights. *See, e.g.*, *Century 21*, 846 F.2d at 1179.

Over decades of use, billions in revenues, tens of millions in marketing, tens of millions of travelers, and extensive media exposure, the SF Mark symbolizes a brand associated with the go-to airport for travelers to and from the Bay Area. Eclipsing the renown and strength in *North American* and *Coachella* examples above, the SF Mark is indisputably strong and entitled to broad protection. This factor favors a finding that confusion is likely.

### 2.     The Parties Offer Identical Services: Airports

Both parties use their respective marks in connection with an airport and related services. "Where the [parties'] . . . services are directly competitive, as they are here, the degree of similarity required to prove a likelihood of confusion is less than in the case of dissimilar products."

*Automated Pet Care Prods., LLC v. PurLife Brands, Inc.*, 670 F. Supp. 3d 946, 951 (N.D. Cal. 2023) (cleaned up). Relatedly, SFO's Registration is in Class 39 and covers "airport services," which is precisely what Oakland offers and what is covered by the OAKLAND INTERNATIONAL AIRPORT registration, too. As the parties' services are identical, this factor weighs heavily for the City.

### 3.    The Airport Marks Are Highly Similar

In evaluating similarity, "first, the marks must be considered in their entirety and as they appear in the marketplace; second, similarity is adjudged in terms of appearance, sound, and meaning; and third, similarities are weighed more heavily than differences." *GoTo.com*, 202 F.3d at 1206 (citations omitted). "As the similarities between two marks increase, so too does the likelihood of confusion." *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1127 (9th Cir. 2014). Because both parties offer the exact same services (airports), "where marks appear on virtually identical . . . services, the **degree of similarity necessary** to support of conclusion of likely confusion **declines**." *Century 21 Real Est. Corp. v. Century Life of Am.*, 970 F.2d 874, 877 (Fed. Cir. 1992) (emphasis added) (affirming likelihood of confusion between CENTURY LIFE OF AMERICA and CENTURY 21); *La Quinta*, 762 F.3d at 875-76 (same) (citing *Century 21* and other cases).

Here, the first thing that any consumer encountering Oakland's Infringing Mark reads is "San Francisco" – the City's name. The Infringing Mark wholly subsumes the entire SF Mark, merely adding "Bay" and appending "Oakland" before "International Airport" (bold added):

**SAN FRANCISCO INTERNATIONAL AIRPORT**

**SAN FRANCISCO** BAY OAKLAND **INTERNATIONAL AIRPORT**

By any measure, and under relevant case law, the marks are similar. The U.S. Patent & Trademark Office Trademark Trial and Appeal Board (the "Board") recently had occasion to consider an analogous situation, in which the owner of the ORLANDO INTERNATIONAL AIRPORT mark successfully challenged an application to register the mark ORLANDO SANFORD INTERNATIONAL AIRPORT filed by the operator of the Sanford, Florida airport. *Greater Orlando Aviation Auth. v. Sanford Airport Auth.*, 2023 TTAB LEXIS 87, *45-47 (TTAB

Mar. 14, 2023). The Board found that "[b]ecause [Sanford's] mark encompasses the literal elements of [Orlando's] mark, the marks are similar in sight and sound, have generally the same meaning and make similar commercial impressions." *Id*. The Board also found that the "presence of the geographically descriptive term SANFORD does not distinguish the marks because Sanford is in such close proximity to Orlando, as the parties' airports are only thirty-one miles apart." *Id*.

As in *Greater Orlando*, the Parties share the same market, and their marks create similar commercial impressions. Like the "ORLANDO" marks, the interspersed words "BAY" and "OAKLAND" do not distinguish the Infringing Mark from the SF Mark. As explained (*supra* § II.F.), consumers will simply mistakenly believe that Oakland's airport is SFO, affiliated with SFO, or is an extension of SFO and/or the City's airport services.

The fact that the Infringing Mark frontloads "SAN FRANCISCO" weighs heavily in the analysis because "SAN FRANCISCO" has been uniquely associated with the City's airport services for nearly 100 years. *See N. Am. Aircoach*, 231 F.2d at 210 (affirming finding that, in the context of airplanes and the aviation industry, the term "NORTH AMERICAN" was exclusively associated with the plaintiff, North American Aviation). Moreover, it is exceedingly rare for a major airport to bear the name of a different city than the one that owns it. Andretta Decl. ¶ 24.

Oakland will likely argue that the occasional presence of the IATA code OAK or its "logo" might eliminate confusion or distinguish the marks. That argument is both unavailing and discredited by the City's actual confusion evidence and survey (*infra* § IV.B(4)), as well as objections from various airlines regarding their concerns over name confusion (Yakel Decl., Exs. L-Q); *see Perfumebay.com Inc. v. eBay Inc.*, 506 F.3d 1165, 1174 (9th Cir. 2007) (finding marks similar and confusion likely despite discrete differences between the marks and defendant's use of a distinctive logo). As shown in the examples above (*supra* § II.D-E), the Infringing Mark is ***not*** always displayed with a logo in third party apps, text, or websites. Certainly, oral communications would not incorporate Oakland's logo or IATA code and Oakland has no control over how third parties such as OTAs or consumers convey the mark. Many third parties will not display logos or "OAK" in written content either, especially in articles, blogs, and other publications. Williams Decl. Ex. L at 17-31. Also, many OTA services and other online booking services, such as car

rentals, display Oakland's IATA code only after airport names, where it is less likely to be seen, let alone make a commercial impression, and may be left out entirely. *Id*. at 1-16. This includes Budget, Enterprise, and Southwest, among many others. *Id*. Significantly, on smart phone browsers and mobile apps, because the Infringing Mark frontloads "San Francisco," the mark may be truncated or obscured – resulting in near-identical presentations of the marks. *Id*. ¶¶ 17-18; *see BGC Inc. v. Robinson*, 2022 WL 2915703, at *4 (N.D. Cal. July 25, 2022) (finding that parties' marks were similar on motion for preliminary injunction, in part because defendant's use of a distinguishing logo was inconsistent); *Boldface Licensing + Branding v. by Lee Tillett, Inc.*, 940 F. Supp. 2d 1178, 1187 (C.D. Cal. 2013) (noting that defendants' personal names, which defendants argued distinguish the marks, do not always appear next to infringing mark, and issuing injunction).

Finally, as to Oakland's anticipated argument that Oakland airport is, as a technical matter, located "on the San Francisco Bay," that is no defense to infringement. "Descriptive" use is a defense to infringement only where a party uses a term "otherwise than as a mark[.] " 15 U.S.C. § 1115(b)(4). Here, Oakland is very clearly using SAN FRANCISCO BAY OAKLAND INTERNATIONAL AIRPORT as a trademark. Indeed, it is the ***replacement*** for, and is being used in the same manner as, the registered OAKLAND INTERNATIONAL AIRPORT mark (*supra* § II.C). Had Oakland chosen to describe the "Oakland International Airport" as being "located on the San Francisco Bay," instead of renaming it with the Infringing Mark, this lawsuit would not have been necessary. Oakland is not merely "describing" a location, and its trademark use cannot be credibly disputed.

This factor also weighs in the City's favor.

### 4. Evidence of Actual Confusion Demonstrates that Confusion Is Likely

"Evidence of actual confusion is strong evidence that future confusion is likely[.]" *Off. Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1393 (9th Cir. 1993); *Online Partners.com, Inc. v. Atlanticnet Media Corp.*, 2000 WL 101242, at *7 (N.D. Cal. Jan. 18, 2000) ("Courts have uniformly recognized that actual confusion is the best evidence of likelihood of confusion."). Given the usual "difficulties in gathering [such] evidence," trademark infringement does **not** require proof of actual confusion, and its absence at the preliminary injunction stage is of especially minimal importance.

1   *Perfumebay.com*, 506 F.3d at 1176 (citation omitted); *Wells Fargo & Co. v. ABD Ins. & Fin. Servs.,*

2   *Inc.*, 758 F.3d 1069, 1072–73 (9th Cir. 2014) (same). Thus, even when "evidence of actual

3   confusion is not overwhelming," because it "is hard to come by at this stage," it "favor[s] finding

4   likely confusion." *Boldface Licensing*, 940 F. Supp. 2d at 1193–94; *Quality Semiconductor, Inc. v.*

5   *QLogic Corp.*, 1994 WL 409483, at *3 (N.D. Cal. May 13, 1994) (crediting a single example of

6   confusion – a request of defendant for a product sold by plaintiff – as "some evidence that future

7   consumers are likely to associate" the parties' products"); *SunEarth, Inc. v. Sun Earth Solar Power*

8   *Co.*, 846 F. Supp. 2d 1063, 1079 (N.D. Cal. 2012) (finding that "some evidence" of confusion

9   favored plaintiffs at the preliminary injunction stage).

10      Actual confusion is actively occurring in a variety of contexts. Individuals have booked

11   flights to SFO intending to travel to Oakland (Williams Decl., Ex. U), and vice versa. *Id*. Exs. T,

12   V. Others have been directed to the wrong airport by digital assistants, navigation apps, and

13   rideshare services. *Id*. Exs. O, V-W. These and other examples (*supra* § II.F) are probative of likely

14   confusion. *See id*. Exs. P-R.  In June, SFO began keeping a travel log of individuals who showed

15   up to SFO and shared with an airport representative that they intended to depart from Oakland.

16   Birch Decl. ¶ 6, Ex. A. Between June 18 and August 23, SFO logged 15 such incidents. *Id*.

17   Separately, a number of travelers have questioned the relationship between the Parties' airports

18   (Williams Decl. Exs. P-Q), and several have geotagged the wrong airport on social media. *Id*. Ex.

19   R. *See Tari Labs, LLC v. Lightning Labs, Inc*., 2023 WL 2480739, at *9 (N.D. Cal. Mar. 13, 2023)

20   (granting injunction, finding that evidence of mistyping a name (Tari vs. Taro) favored plaintiff);

21   *Rearden LLC v. Rearden Com., Inc.*, 683 F.3d 1190, 1214–15 (9th Cir. 2012) (recognizing that

22   "non-consumer confusion can properly factor into the 'likelihood of confusion' inquiry," both as a

23   proxy for consumer confusion and a contributor to it).

24      This is only the beginning. Typically, evidence of actual confusion is hard to come by

25   because individuals rarely report it, whether out of embarrassment, a sense that it would be

26   meaningless to do so, or some other reason. That is especially likely in the context of the parties'

27   airport services, as any confused individuals in the airport are in transit and often pressed for time,

28   especially if they've arrived at the wrong airport. Oakland is undoubtedly experiencing similar

PLAINTIFF'S MOTION FOR PRELIMINARY
INJUNCTION Case No. 3:24-cv-02311-TSH          18

incidents. So far, it has declined to disclose them, largely flouting public records requests made by the City, and producing partial documents – raising further suspicions. Yakel Decl. ¶¶ 21-22, Ex. R. The growing actual confusion evidence is a powerful indicator that confusion is likely.

### 5.     The City's Survey Confirms that Confusion Is Likely

Surveys are "often [] used as evidence of actual confusion and/or evidence of likelihood of confusion." *Anheuser-Busch, Inc. v. Customer Co.*, 947 F. Supp. 422, 425 (N.D. Cal. 1996). In May, the City commissioned a survey from Sarah Butler, a survey expert from the NERA firm with 20 years of experience, whose surveys have been accepted by numerous courts. Declaration of Sarah Butler ("Butler Decl.") ¶ 2, Ex. A at 30-49. Her survey showed net name confusion **exceeding 20%,** which is comfortably within the range that courts find supports a likelihood of confusion. *Id.* ¶ 47 (collecting cases) *See e.g.*, *Anheuser-Busch*, 947 F. Supp. at 425 (collecting cases crediting surveys identifying 15-23% confusion rates); *Fiji Water Co. v. Fiji Min. Water USA, LLC*, 741 F. Supp. 2d 1165, 1179 (C.D. Cal. 2010) (granting injunction upon a showing of 24.3% net confusion rate); *Hansen Beverage Co. v. Cytosport, Inc.*, 2009 WL 5104260, at *16 (C.D. Cal. Nov. 4, 2009) (finding 12.5% net confusion rate probative of likelihood of confusion and granting injunction); *see also* 5 McCarthy on Trademarks and Unfair Competition § 32:188 (5th ed. 2024). Considering the tens of millions of travelers and consumers who interact with the parties, and the many opportunities for confusion to occur, the survey's net confusion rate extrapolates to a massive volume of confusion in the marketplace. This, too, favors a finding that confusion is likely.

### 6.     Shared Marketing Channels Make Confusion Likely

"Convergent marketing channels increase the likelihood of confusion*." Official Airline*, 6 F.3d at 1394 (citation omitted). "In assessing marketing channel convergence, courts consider whether the parties' customer bases overlap and how the parties advertise and market their products." *Pom Wonderful*, 775 F.3d at 1130. Here, the parties' airport services are marketed and sold to the same consumers, namely, airline passengers traveling to and from the Bay Area, and via the same mediums, *i.e.*, wherever airline tickets are sold, and accessed through OTAs, ride share apps and services, and the like. *See* Andretta Decl. ¶ 12. There is strong evidence that the parties' marketing and trade channels overlap completely – also weighing in the City's favor.

### 7.        The Degree of Consumer Care Does Not Reduce Confusion

This factor looks at the type of service offered and the degree of care one would expect from "the typical buyer exercising ordinary caution." *Sleekcraft*, 599 F.2d at 353. "Low consumer care . . . increases the likelihood of confusion." *See Playboy Enters., Inc. v. Netscape Commc'ns Corp.*, 354 F.3d 1020, 1028 (9th Cir. 2004). Where services are marketed both to discriminating and casual buyers, courts must consider the likelihood of confusion as it pertains to *both* classes of consumers. *See Brookfield*, 174 F.3d at 1060 (considering entertainment professionals against "movie devotees, who will be more easily confused[.]"). "The law is not made for the protection of experts, but for the public – that vast multitude which includes the ignorant, the unthinking and the credulous, who, in making purchases, do not stop to analyze, but are governed by appearance and general impressions." *Fleischmann Distilling Corp. v. Maier Brewing Co*., 314 F.2d 149, 156 (9th Cir. 1963).

Here, the parties service travelers of widely varying levels of sophistication, from first-time fliers to well-seasoned explorers, or travelers whose first language is not English. *See* Andretta Decl. ¶ 19. Multiple airlines underscored to Oakland the risk of confusion among international travelers (Yakel Decl., Exs. L-Q), which includes those whose first language is not English, and others unfamiliar with the Bay Area. The views of airlines may be particularly probative, as it's their business to know their customers. Travel agencies echoed these concerns, too. *Id.* ¶¶ 11-14.

Consumer care also varies greatly depending on the circumstances and type of consumer, for example, business travelers also rely on *others* to make reservations for them. And while some ticket purchases may be undertaken with planning and consideration (e.g. arranging a dream vacation or a honeymoon), this is often not the case, with many flights arranged last minute or otherwise in haste. Andretta Decl. ¶ 19. Moreover, the cost of airfare ranges significantly from flight to flight, with round trip tickets to and from Oakland as low as $52. *Id*. ¶ 9. More generally, Oakland's average airfare ranks in the bottom half of major metropolitan airports. *Id*. ¶ 10. In sum, many of the parties' consumers are neither careful nor discerning. *See La Quinta*, 762 F.3d at 877 (considering an average $439 hotel stay a "modest sum," weighing for plaintiff).

The way airline tickets are purchased lends itself to mistake where – as here –two airport

brands are so similar and displayed in such close proximity to one another at the point of purchase. Most airline ticket purchases today occur online, either directly via airline websites or apps, or OTAs like Priceline.com and Expedia. Andretta Decl. ¶ 12. This process begins by entering an airport name or location into a search tab, which automatically returns a list of corresponding airports. *Id*. As anyone who has traveled to or from the Bay Area knows, travelers searching for tickets to San Francisco already encounter (and often consider) opportunities to purchase tickets to Oakland as a "nearby" airport and vice versa. *Id*. With the Infringing Mark, it is all too easy for consumers to mistakenly purchase tickets to one party's airport intending to select the other (*e.g.*, with some travelers seeing "San Francisco..." and reading no further) (*e.g. supra* Fig. 2).

Finally, airline bookings are just one of several vectors for consumer confusion. *Rearden LLC*, 683 F.3d at 1216–19 (discussing relevance of those "very well influenc[ing] the purchasing decisions of consumers."). Oakland airport-adjacent hotels may promote their location with the Infringing Mark, leading travelers to book hotels near the Oakland airport rather than SFO. Rideshare passengers and travelers picking up or returning rental cars, or those seeking parking at nearby parking lots may be even less likely to exercise care in those contexts and select the wrong location, scuttling travel plans and potentially missing flights. Any resulting frustration will inure to the detriment of the City and the goodwill associated with the SF Mark. *Id*.

### 8.   Oakland's Intent Makes Confusion Likely

A defendant's bad faith intent is not necessary to demonstrate likelihood of confusion, and its absence is "largely irrelevant." *Brookfield*, 174 F3d at 1059. However, "[w]hen an alleged infringer knowingly adopts a mark similar to another's, courts will presume an intent to deceive the public." *Official Airline Guides*, 6 F.3d at 1394.

Oakland adopted the Infringing Mark with actual and constructive knowledge of the SF Mark and Registration. Williams Decl. ¶ 6; Andretta Decl. ¶¶ 14-17. *See Brookfield*, 174 F.3d at 1059. When told to stop by the City and major airlines, among others, (Yakel Decl., ¶ 3), it pressed forward. Under similar circumstances, the district court in *Boldface Licensing* granted a preliminary injunction, finding that the intent factor weighed in favor of confusion because the defendant was "unquestionably aware" of plaintiff's rights and in spite of plaintiff's objection, rolled out its

products. 940 F. Supp. 2d at 1195. Oakland may try to frame its intent in terms of communicating its airport's proximity to San Francisco, but in the context of airport names, cities have trademark significance – as Oakland well knows. Andretta Decl. ¶ 24 It is implausible that Oakland was unaware that by frontloading and making "SAN FRANCISCO" prominent in the Infringing Mark, it is implying that its airport services are provided by or endorsed by the City. *Id*. The City anticipates that discovery will show that Oakland *knew* it was creating risk of consumer confusion and either welcomed it or didn't care. This factor supports the City, too.

### 9. Oakland's Likelihood of Expansion Makes Confusion Likely

The expansion of product lines factor does not carry much weight here because the parties already directly compete. *See Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1153 (9th Cir. 2011) (finding expansion factor "unimportant" because parties already directly competed). In any event, the addition of routes from airlines shared by the parties' airports, or the attraction of new airlines to Oakland's airport that already service SFO, will only exacerbate the risk that consumers will mistake the parties' airports marks or will associate the Oakland airport with the City and its airport.

*          *          *

Evaluation of the *Sleekcraft* factors establishes that the City is likely to prevail on the merits, or, at minimum, that it has raised "'serious questions' on the merits[.]" *All. For the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1137 (9th Cir. 2011).

### C. The City Is Entitled to a Presumption of Irreparable Harm

A trademark owner's "mark is [its] authentic seal . . . [i]f another uses it, [they] borrow[] the owner's reputation, whose quality no longer lies within [its] own control." *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 195 (3d Cir. 1990) (citation omitted). Under the Trademark Modernization Act ("TMA"), 15 U.S.C. § 1116(a), trademark holders who have established a likelihood of confusion are entitled to a *presumption* of irreparable harm. Because the City has shown a likelihood of success on the merits, irreparable injury is presumed. 15 U.S.C. § 1116(a); *Vineyard House, LLC v. Constellation Brands U.S. Operations, Inc.*, 515 F. Supp. 3d 1061, 1081 n.16 (N.D. Cal. 2021).

Even if Oakland could somehow rebut that presumption, substantial evidence shows irreparable harm will continue absent relief. "The Ninth Circuit has recognized that the potential loss of good will or the loss of ability to control one's reputation may constitute irreparable harm[.]" *SunEarth*, 846 F. Supp. 2d at 1083 (citation omitted) (granting preliminary injunction enjoining use of infringing mark); *see also Greater L.A. Softball Ass'n v. Ryan*, 2017 WL 8292779, at *8 (C.D. Cal. Sept. 21, 2017) (granting preliminary injunction enjoining use of infringing mark where parties had competing softball tournaments under the same name). Accordingly, both actual confusion evidence and favorable survey evidence demonstrate harm to goodwill, and support entry of an injunction. *See adidas*, 890 F.3d at 756–57 (holding that survey evidence supported showing of irreparable harm and affirming preliminary injunction); *SunEarth*, 846 F. Supp. 2d at 1083.

Here, the City's reputation and goodwill will be irreparably harmed if Oakland's infringement continues. The Oakland airport experiences low customer satisfaction, in particular relative to SFO. Andretta Decl. ¶¶ 8, 27. Any problems that travelers have with Oakland's airport will be mistakenly attributed to the City and the SF Mark. When travelers go to the wrong airport and miss their connecting flights due to mistaken bookings to the "SAN FRANCISCO BAY…" airport, that will irreparably damage the City's trademark rights and unfairly enrich Oakland. Those concerns were echoed by multiple airlines and travel agencies, all of which urged Oakland to change the Infringing Mark to protect domestic and international travelers. Yakel Decl., ¶¶ 11-20.

### D.  The Public Interest Favors An Injunction

The public interest is best served by "vindicating intellectual property rights" and "prohibiting unfair competition." *Niantic, Inc. v. Global++*, 2019 WL 8333451, at *9 (N.D. Cal. Sept. 26, 2019) (citation omitted). In trademark cases, this is not an abstract concern; the very purpose of trademarks is to protect the public. *See New Kids On The Block v. News Am. Publ'g, Inc.*, 971 F.2d 302, 305 (9th Cir. 1992); *Playboy Enters., Inc. v. Baccarat Clothing Co.*, 692 F.2d 1272, 1275 (9th Cir. 1982) (beyond harm to the trademark owner, "the consuming public is equally injured by an inadequate judicial response to trademark infringement.").

Oakland's use of the Infringing Mark has misled and will continue to mislead the public regarding the relationship between the Oakland airport and SFO or the City. As described above,

misled by the Infringing Mark, air travelers will fly into Oakland's airport believing that they are arriving at the City's airport, only to find that they have made rental car and hotel accommodations closest to the City's airport. Among many more examples, others will arrive at the City's airport for flights that actually depart from Oakland's airport (as has already occurred), or may purchase tickets to or from Oakland's airport under the mistaken assumption that it is operated by or associated with the City or SFO. Consumers may book a flight to SFO correctly but a rental car at the "San Francisco Bay …" airport, only to be stuck without a car at the airport, or later having to return the car to the wrong airport. It is in the public's interest to prevent such confusion. *Am. Rena Int'l Corp. v. Sis-Joyce Int'l Co.*, 534 F. App'x 633, 636 (9th Cir. 2013) (affirming preliminary injunction). The public interest weighs in favor of an injunction.

### E.    The Balance of Hardships Favors an Injunction

In considering the balance of hardships, a court evaluates the degree of harm to each party if the injunction is improperly granted or denied. The balance of equities favors the City because its requested relief seeks "no more than requir[ing] Defendant[s] to comply with . . . laws." *Henry Schein, Inc. v. Cook*, 191 F. Supp. 3d 1072, 1077 (N.D. Cal. 2016) (citation omitted). As an unauthorized junior user, Oakland never had a right to use the Infringing Mark in the first place, so there is no disservice to it in preliminarily enjoining their continued use. Any hardship that Oakland may claim is entirely self-inflicted, especially given the multiple warnings by the City and the refusal of Oakland to discuss the matter before it made the change. *Am. Rena*, 534 F. App'x at 636; *see also Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 867 (9th Cir. 2017) (affirming the "long-settled principle that harm caused by illegal conduct does not merit significant equitable protection"). An injunction will not harm Oakland for the additional reason that it has only just begun using the Infringing Mark and, in most instances, is still using the OAKLAND INTERNATIONAL AIRPORT mark that it has been known by for over sixty years. Oakland can and should simply revert to that name. Meanwhile, the City has demonstrated actual and likely confusion, with Oakland's further rollout of the Infringing Mark certain to exponentially increase confusion. The equities favor the City.

1

**V.     IF ANY BOND IS REQUIRED, IT SHOULD BE MINIMAL**

2

"The court may issue a preliminary injunction . . . only if the movant gives security in an

3

amount that the court considers proper to pay the costs and damages sustained by any party found

4

to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Generally, the purpose of a

5

bond is to provide an amount sufficient to cover the defendant's costs arising from an injunction

6

that is improvidently granted. *Faizi v. Temori*, 2022 WL 7094259, at *8 (N.D. Cal. Oct. 12, 2022).

7

However, the court "may dispense with the filing of a bond when it concludes there is no realistic

8

likelihood of harm to the defendant from enjoining his or her conduct." *Johnson v. Couturier*, 572

9

F.3d 1067, 1086 (9th Cir. 2009) (citation omitted). Here, Oakland will not be harmed by a

10

preliminary injunction because the name change has been only partially implemented, and because

11

it will not be restrained from using its existing registered mark (OAKLAND INTERNATIONAL

12

AIRPORT) or other non-infringing marks to promote their airport. Moreover, the City has

13

demonstrated that it is highly likely to succeed on the merits at trial, rendering any risk of a

14

"wrongful" injunction remote. No bond is necessary here. *See also Valenzuela v. City of Anaheim*,

15

2020 WL 10731248, at *2 (C.D. Cal. Apr. 20, 2020) ("The City's ability to pay the judgment on its

16

own behalf and on behalf of the officers is so plain that the cost of a bond would be a waste of

17

taxpayer money. . . . This would be a completely unnecessary cost to taxpayers in an extraordinarily

18

difficult economic time.").

19

**VI.     CONCLUSION**

20

For the foregoing reasons, the City respectfully requests that the Court enjoin Defendants

21

and those acting in concert with them from using the Infringing Mark.

22

23

24

25

26

27

28

Dated: September 17, 2024

COOLEY LLP

By: _____

Bobby A. Ghajar
John Hemann
Judd D. Lauter

Attorneys for Plaintiff
CITY AND COUNTY OF
SAN FRANCISCO