Mary C. Richardson (Bar No. 208586)
Port Attorney
mrichrdson@portoakland.com
Kimberly I. McIntyre (Bar No. 184648)
Deputy Port Attorney
kmcintyre@portoakland.com
**PORT OF OAKLAND**
530 Water Street
Oakland, California 94607
Tel: (510) 627-1572 / (510) 627-1205

Eugene M. Pak (Bar No. 168699)
epak@fennemorelaw.com
**FENNEMORE WENDEL**
1111 Broadway, 24th Floor
Oakland, California 94607
Tel: (510) 834-6600 / Fax: (510) 834-1928

Stephen C. Willey (Bar No. 209164)
swilley@fennemorelaw.com
Brandi B. Balanda (*Pro Hac Vice*)
bbalanda@fennemorelaw.com
Christopher J. Lindemeier (*Pro Hac Vice*)
clindemeier@fennemorelaw.com
**FENNEMORE CRAIG, P.C.**
1425 Fourth Avenue, Suite 800
Seattle, Washington 98101
Tel: (206) 749-0500 / Fax: (206) 749-0500

Attorneys for Defendant and Counterclaimant City of
Oakland, a municipal corporation, acting by and
through its Board of Port Commissioners (Port of
Oakland)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY AND COUNTY OF SAN FRANCISCO,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF OAKLAND AND PORT OF OAKLAND,<br><br>Defendants. | Case No. 3:24-cv-02311-TSH<br><br>**DEFENDANT PORT OF OAKLAND'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date: November 7, 2024<br>Time: 10:00 AM<br>Courtroom: E – 15th Floor<br>Trial Date: (None Set) |

FENNEMORE WENDEL.
FENNEMORE CRAIG, P.C.
OAKLAND/SEATTLE

DEFENDANT PORT OF OAKLAND'S OPPOSITION
TO MOTION FOR PRELIMINARY INJUNCTION - 1

CASE NO. 3:24-CV-02311-TSH

1

2   CITY OF OAKLAND, A MUNICIPAL
    CORPORATION, ACTING BY AND
3   THROUGH ITS BOARD OF PORT
    COMMISSIONERS (PORT OF OAKLAND),
4
                    Counterclaimant,
5
    v.
6
    CITY AND COUNTY OF SAN
7   FRANCISCO,
8                   Counterclaim Defendant.
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................ 1

II.     STATEMENT OF RELEVANT FACTS ............................................................ 2

        A.      The Port of Oakland's Airport on San Francisco Bay ............................ 2

        B.      OAK's Distinct Branding and Messaging Regarding its Place on the Bay ....... 3

        C.      Challenges Getting OAK Flights to Appear for Travel Into the Bay Area ........ 4

        D.      The Recommendation to Incorporate OAK's Geographic Location into its
                Name ...................................................................................................... 4

        E.      The City's Opposition Campaign ............................................................ 5

III.    LEGAL STANDARD ........................................................................................ 5

IV.     THE COURT SHOULD DENY THE CITY'S MOTION ................................... 6

        A.      The City Is Not Likely to Prevail on its Trademark Infringement Claims ......... 6

                1.      The *Sleekcraft* Factors Are Flexible Non-Exhaustive Guideposts to
                        Be Considered With and In the Applicable Context .............................. 6

                2.      The Most Informative Factors Strongly Show No Likelihood of
                        Confusion ................................................................................... 6

                3.      The Relevant Factors Also Show No Likelihood of Confusion ........... 15

                4.      The Remaining Factors Are Neutral and Not Illuminating ................. 20

                5.      Classic Fair Use Bars the City's Claims ........................................... 21

        B.      The City Will Not Suffer Irreparable Harm Absent an Injunction .................. 22

        C.      The Balance of Hardships Favors the Status Quo – Not a Preliminary
                Injunction ............................................................................................ 23

        D.      The Public Interest Favors Denying the City's Premature Injunction
                Request ............................................................................................... 25

V.      CONCLUSION ............................................................................................. 25

1

## **TABLE OF AUTHORITIES**

2

### **Cases**

3

*Active Network, Inc. v. Elec. Arts Inc.*
4
   2010 WL 3463378 (S.D. Cal. Aug. 31, 2010) ........................................ 25

5
*AMF Inc. v. Sleekcraft Boats*,
   599 F.2d 341(9th Cir. 1979) .......................................................... 6, 10
6

7
*BGC Inc. v. Robinson*
   2022 WL 2915703 (N.D.Cal. July 25, 2022) ........................................ 17

8
*BNSF Ry. Co. v. Float Alaska IP, LLC*,
   2023 WL 6783506 (C.D. Cal. Aug. 28, 2023) ........................................ 9
9

10
*Boldface Licensing + Branding v. by Lee Tillett, Inc.*
   940 F.Supp.2d 1178 (C.D.Cal. 2013) ................................................ 17

11
*C21FC LLC v. NYC Vision Cap. Inc.*
12
   2022 WL 2191934 (D. Ariz. June 17, 2022) ........................................ 24

13
*Champion-Cain v. Macdonald*
   2016 WL 7188242 (S.D. Cal. Dec. 12, 2016) ........................................ 24
14

15
*City of Leavenworth v. Projekt Bayern Ass'n*
   2022 WL 4546550 (E.D. Wash. Sept. 28, 2022) .................................... 23
16

17
*Coachella Music Festival, LLC v. Simms*
   2018 WL 6074556 (C.D. Cal. Sept. 10, 2018) ...................................... 18

18
*Ctr. for Auto Safety v. Chrysler Grp., LLC*
   809 F.3d 1092 (9th Cir. 2016) ...................................................... 24
19

20
*Dahon N. Am. Inc. v. Hon*
   2012 WL 13012476 (C.D. Cal. Mar. 19, 2012) ...................................... 25

21
*Entrepreneur Media*
22
   279 F.3d at 1141 (9th Cir. 2002) .................................................... 18

23
*Excelligence Learning Corp. v. Oriental Trading Co., Inc.*
   2004 WL 2944048 (N.D. Cal. Dec. 20, 2004) ...................................... 13
24

25
*Florida International University Board of Trustees v. Florida National University, Inc.*
   830 F.3d 1242 (11th Cir. 2016) ...................................................... 16

26
*Freelancer Int'l Pty Ltd. v. Upwork Global, Inc.*
27
   851 Fed. Appx. 40 (9th Cir. 2021) ................................................ 22, 23

*Future Fields, LLC v. Future Scouts*
  2021 WL 6104311 (C.D. Cal. Nov. 24, 2021) ...................................................... 25

*Golden Eye Media USA, Inc. v. Trolley Bags UK Ltd.*
  525 F.Supp.3d 1145 (S.D.Cal. 2021) .................................................................. 20

*Good Meat Project v. GOOD Meat, Inc.*,
  ---F.3d---, 2024 (N.D. Cal. Feb. 12, 2024) ........................................... 5, 22, 25

*Great Western Air, LLC v. Cirrus Design Corp.*,
  649 F. Supp. 3d 965  (D. Nev. 2023) ................................................................. 11

*Helix Env't Plan., Inc. v. Helix Env't & Strategic Sols.*
  2020 WL 2556341 (S.D. Cal. May 20, 2020) ..................................................... 18

*Idaho Golf Partners, Inc. v. Timberstone Mgmt., LLC*,
  2016 WL 4974944 (D. Idaho Sept. 16, 2016) .................................................... 12

*In re Hawaiian Airlines, Inc.*
  2006 WL 2864921 (Bankr. D. Haw. Oct. 5, 2006) ............................................. 24

*Instant Media, Inc. v. Microsoft Corp.*
  2007 WL 2318948 (N.D. Cal. Aug. 13, 2007) .................................................... 23

*Kahala Franchising, LLC v. Real Faith, LLC*
  2022 WL 1605377 (C.D. Cal. May 20, 2022) ..................................................... 22

*Kiva Health Brands LLC v. Kiva Brands Inc.*,
  402 F. Supp. 3d 877 (N.D. Cal. 2019) ......................................................... 12, 24

*La Quinta Worldwide LLC v. Q.R.T.M., S.A. de C.V.*,
  762 F.3d 867 (9th Cir. 2014) .............................................................................. 10

*Lerner & Rowe PC v. Brown Engstrand & Shely LLC*,
  673 F.Supp.3d 1017 (D. Ariz. 2023) .................................................................. 13

*Mazurek v. Armstrong*,
  520 U.S. 968 (1997) ............................................................................................ 5

*Metro Pub. Co. v. San Jose Mercury News*
  1993 WL 266786 (N.D. Cal. July 12, 1993) ...................................................... 25

*Mountain Mike's Pizza, LLC v. SV Adventures, Inc.*
  2021 WL 6136178 (E.D. Cal. Dec. 29, 2021) .................................................... 23

*Multi Time Mach., Inc.*,
  804 F.3d at 935 (9th Cir. 2015) .................................................................. 6, 7, 10

*Network Automation, Inc. v. Advanced Sys., Concepts, Inc.*,
  638 F.3d 1137 (9th Cir. 2011) ................................................... 6, 9, 15, 17, 18, 20

*New Flyer Indus. Can. ULC v. Rugby Aviation, LLC*,
  405 F. Supp. 3d 886 (W.D. Wash. 2019) ................................................ 9

*Nordstrom, Inc. v. NoMoreRack Retail Group, Inc.*,
  2013 WL 1196948 (W.D. Wash. Mar. 25, 2013) ...................................... 11

*North American Aircoach v. North American Aviation*
  231 F.2d 205 (9th Cir. 1955) ............................................................ 18

*Nutri/System, Inc. v. Con-Stan Indus., Inc.*,
  809 F.2d 601 (9th Cir. 1987) ............................................................ 13

*Nutritionals LLC v. Nutraceutical Corp.*
  2013 WL 4480674 (C.D.Cal. 2013) .................................................... 17

*Official Airline Guides, Inc. v. Goss*,
  6 F.3d 1385 (9th Cir. 1993) ............................................................ 13

*Perfumebay.com, Inc. v. eBay, Inc.*
  506 F.3d 1165 (9th Cir. 2007) .......................................................... 17

*Pinterest, Inc. v. Pintrips, Inc.*
  140 F.Supp.3d 997 (N.D.Cal. 2015) ................................................... 20

*Planet Coffee Roasters, Inc. v. Hung Dam*
  2010 WL 625343 (C.D. Cal. Feb. 18, 2010) ......................................... 23

*Playmakers LLC v. ESPN, Inc.*
  376 F.3d 894 (9th Cir. 2004) ............................................................ 23

*Pom Wonderful LLC v. Hubbard*,
  775 F.3d 1118 (9th Cir. 2014) ........................................................... 9

*Punchbowl, Inc. v. AJ Press LLC*
  2024 No. WL 4005220 (C.D.Cal. Aug, 22, 2024) ................................... 13

*R. J. Reynolds Tobacco Co. v. Loew's Theatres, Inc.*,
  511 F. Supp. 867, 210 U.S.P.Q. 291 (S.D.N.Y. 1980) ............................. 15

*Robinson v. Best Price Distributors, LLC*
  2022 WL 3013131 (C.D. Cal. June 14, 2022) ....................................... 22

*S10 Entm't & Media LLC v. Samsung Elecs. Co., Ltd.*,
  2023 WL 2090703 (C.D. Cal. Feb. 14, 2023) ....................................... 11

*Sand Hill Advisors, LLC v. Sand Hill Advisors, LLC*
   680 F. Supp. 2d 1107 (N.D. Cal. 2010)................................................................ 18

*Schluter Sys., L.P. v. Telos Acquisition Co. 10, LLC*,
   ---F.Supp.---, 2024 (N.D.Cal. April 16, 2024) ...................................................... 9

*Scotts Co. v. United Industries Corp*.
   315 F.3d 264 (4th Cir. 2002)............................................................................... 24

*Stark v. Diageo Chateau & Est. Wines Co.*
   907 F. Supp. 2d 1042 (N.D. Cal. 2012)............................................................... 24

*Stonefire Grill, Inc. v. FGF Brands, Inc.*
   987 F. Supp. 2d 1023 (C.D. Cal. 2013)............................................................... 16

*Sutter Home Winery, Inc. v. Madrona Vineyards, L.P.*
   2005 WL 701599 (N.D. Cal. Mar. 23, 2005). ..................................................... 24

*Trouble v. Wet Seal, Inc.*,
   179 F. Supp. 2d 291 (S.D.N.Y. 2001) ................................................................. 12

*Vidal v. Elster*,
   602 U.S. 286 (2024) ............................................................................................. 6

*Water Pik, Inc. v. Med-Systems, Inc.*
   726 F.3d 1136 (10th Cir. 2013)........................................................................... 14

*Wham-O, Inc. v. Paramount Pictures Corp.*
   286 F. Supp. 2d 1254 (N.D. Cal. 2003)............................................................... 25

*Winter v. Nat'l Resources Defense Council, Inc.*,
   555 U.S. 7, (2008) ................................................................................................ 5

*WonderKiln, Inc. v. Snap, Inc.*,
   2022 WL 18397509 (C.D. Cal. Nov. 15, 2022) .................................................. 22

*Zamfir v. Casperlabs, LLC*
   528 F. Supp. 3d 1136 (S.D. Cal. March 26, 2021).............................................. 22

**Rules**

Fed. R. Evid. 802 ....................................................................................................... 11

**Treatises**

GILSON ON TRADEMARKS § 14.02(3)(a) ..................................................................... 24

J. Thomas McCarthy,
   MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 23:14 (5th ed. 2024) ............... 13

## I.    INTRODUCTION

The Port of Oakland is proud of its Airport – the San Francisco Bay Oakland International Airport (OAK) and the city it calls home, Oakland. Firmly rooted in the East Bay, OAK provides easy access for air travelers into the Bay Area, an efficient travel experience, and features local Oakland and East Bay businesses. The Port has no interest in passing off OAK as SFO.

The Port has spent years developing and using OAK's branding that emphasizes the Airport's IATA code (OAK) to promote its benefits. OAK also is, and always has been, both located on the shores of the **San Francisco Bay** and distinctly **Oakland**. None of this has changed.

 

What has changed is that the Port decided to more broadly communicate that it is part of the San Francisco Bay Area by replacing the first word of OAK's name – "Metropolitan" – with "San Francisco Bay" to reflect its geographic location. The City and County of San Francisco responded as if the City owns the entire Bay and as if the Bay and the City are synonymous. Neither is true. The City now seeks to silence OAK by distorting trademark law. There is no basis to do so.

The City's Motion rises – or falls – on three building blocks: (a) the evidentiary record presented in support of its request for extraordinary relief, (b) the analytic framework for the legal claim at issue, and (c) the burden of proof required for a preliminary injunction. It falls on all three.

*First*, the evidentiary record the City offers the Court is inadequate: spare, contrived, and divorced from the real world of physical geography and the ways in which consumers obtain information about airline tickets and make purchasing decisions. The evidence the City does submit consists of a handful of unauthenticated online opinion posts, a flawed consumer survey with manufactured stimuli and manipulated results, a "log" created for litigation by unidentified SFO volunteers, and a curated selection of communications expressing opinions about the Port's consideration of a new name for its Airport. Yet, the few screenshots of flight search pages the City does present show airports displayed with their respective IATA location codes (e.g., OAK) in a clear and distinguishable manner. In short, the City offers no actual evidence of any consumer purchasing a

FENNEMORE WENDEL
FENNEMORE CRAIG, P.C.
OAKLAND/SEATTLE

DEFENDANT PORT OF OAKLAND'S OPPOSITION          CASE NO. 3:24-CV-02311-TSH
TO PLAINTIFF'S MOTION FOR PRELIMINARY
INJUNCTION - 1

flight to the wrong airport because they believed SFO was OAK or vice versa, or because they thought OAK was affiliated with the City; the City offers no testimony from any airline or other informed third party and fails to provide apposite or reliable survey evidence.

*Second,* the City's formal and mechanistic application of the *Sleekcraft* factors warps the applicable legal analysis and ignores the relevant context and commercial marketplace. But *Sleekcraft* is not a machine made for spitting out abstracted infringement determinations. Rather, as the Ninth Circuit instructs, the factors are helpful guideposts, an adaptable proxy, that must be applied flexibly to the facts and circumstances. Here, the most informative factors – the relevant context, heightened care consumers purchasing airline tickets exercise, and lack of any credible evidence of actual confusion – strongly show no likelihood of confusion.

The remaining relevant factors likewise favor the Port. OAK and SFO's names are not similar. OAK's name is "San Francisco Bay Oakland International Airport"; it contains the geographic term "San Francisco Bay" followed by the city's name, "Oakland." These are distinct terms with a different meaning than SFO's name (San Francisco International Airport). "San Francisco International Airport" is a weak descriptive mark. The last few factors are neutral and not illuminating. The totality of the apposite *Sleekcraft* analysis establishes the City has not shown it is likely to prevail.

*Third*, given the paucity of evidence and applicable law, the City falls far short of its burden to show a likelihood of success on the merits. The absence of irreparable harm, balance of equities, and public interest further undermine the City's motion. The City effectively assumes a finding that it will win on the merits, and its requested relief is not a maintenance of *status quo*, but rather the functional equivalent of a premature judgment. The Court should deny the City's Motion.

## II.    STATEMENT OF RELEVANT FACTS

### A.    The Port of Oakland's Airport on San Francisco Bay

The San Francisco Bay Area is a distinct and dynamic region comprised of nine counties that border the Bay. (Declaration of Tiffany Yamasaki ("Yamasaki"), Exs. 1-5); *e.g.*, Cal. Gov. Code §§ 64502(h), 66701(i).) Two of its major cities, San Francisco and Oakland, sit on the Bay's shores.

FENNEMORE WENDEL
FENNEMORE CRAIG, P.C.
OAKLAND/SEATTLE

DEFENDANT PORT OF OAKLAND'S OPPOSITION
TO PLAINTIFF'S MOTION FOR PRELIMINARY
INJUNCTION - 2

CASE NO. 3:24-CV-02311-TSH

Since 1927, the Port has owned and operated an airport – OAK – which juts out into the waters of the Bay. (Declaration of Craig Simon ("Simon"), ¶7.) Given its geographic location, OAK is a convenient entry point into the Bay Area. It is also the closest airport for a large portion of the Bay Area's population. (*Id.* at ¶10; Declaration of Dr. Sabine Reim ("Reim"), ¶22.) Indeed, OAK's location on San Francisco Bay is one of the Airport's most important features. (Declaration of John Albrecht ("Albrecht"), ¶6.) It offers uniquely convenient access to air travel for Bay Area residents and visitors going into or out of downtown Oakland, downtown San Francisco, wine country, major universities, and beyond. (Declaration of Danny W. Wan ("Wan"), ¶11; Simon, ¶¶8-9, 13; Albrecht, ¶¶6-7.) It also directly connects by rail to the San Francisco Bay Area Rapid Transit District's "BART" system, such that passengers flying into OAK can easily utilize public transit for travel out of the Airport. (Simon, ¶¶11–13.)

In addition to being ideally situated for entry into the San Francisco Bay Area, OAK focuses on (1) providing an easier, more efficient experience for those traveling through an airport to their ultimate destination in the Bay Area and (2) including and promoting local Oakland and East Bay businesses, such as Oaklandish, Farley's and Tay Ho. (Wan, ¶14; Simon, ¶¶13, 15; Albrecht, ¶¶6-7.)

**B.    OAK's Distinct Branding and Messaging Regarding its Place on the Bay**

The Port is proud of OAK's unique qualities and community focus, and strives to set OAK apart as a different and recognizable option for air travel into and out of the San Francisco Bay Area. (Wan, ¶¶13-14; Simon, ¶¶14-23; Albrecht ¶¶6-17.) It has maintained OAK's identity and developed distinct branding while seeking to communicate the benefits of OAK's location on San Francisco Bay. (Wan, ¶¶13-14; Simon, ¶¶13-16, 19-23; Albrecht, ¶¶6-21.) For over 80 years, the Airport's IATA code – OAK – has been used to identify the Airport for the purpose of airline ticket sales, baggage routing, and other logistics. (Simon, ¶¶17-18.) That remains true today. (*Id.*) The Port has also always included "Oakland" in the Airport's full name. (Wan, ¶26.) In the 2000s, the Port introduced a brand campaign using the Airport's IATA code and an "I Fly OAK" logo. (Albrecht, ¶8.) This branding has

DEFENDANT PORT OF OAKLAND'S OPPOSITION                    CASE NO. 3:24-CV-02311-TSH
TO PLAINTIFF'S MOTION FOR PRELIMINARY
INJUNCTION - 3

been used ever since and is prominently featured throughout the Airport and on OAK's marketing materials. (Simon, ¶¶19-20, 48; Albrecht, ¶¶8-14, 18-21.)

Over the years, the Port has complemented OAK's identity and brand with messaging that highlights the Airport as part of and serving the San Francisco Bay Area. (Simon, ¶¶21-23; Albrecht, ¶¶17-21.) In a continuation of this messaging, in 2020, the Port federally registered its trademark THE BEST WAY TO SAN FRANCISCO BAY, which is used with the Airport's I Fly OAK logo. (Albrecht, ¶19; Yamasaki, Ex. 7.)

**C.  Challenges Getting OAK Flights to Appear for Travel Into the Bay Area**

Despite OAK's long history, prime location, and marketing messages, the Airport has faced difficulties attracting and maintaining nonstop routes due to insufficient in-bound demand, which is a necessary predicate for routes. (Wan, ¶15; Simon, ¶24; Albrecht, ¶22; Reim, ¶¶22-23.) The Port's Aviation Division spent several years researching, assessing, and working on this issue, including with the input of industry consultants. (Wan, ¶16; Simon, ¶25; Albrecht, ¶23; Reim, ¶¶20-24.) That work highlighted two main challenges. First, many travelers outside of the region are not familiar with OAK's geographic location on the San Francisco Bay nor do they understand that OAK is part of the Bay Area. (Simon, ¶26; Albrecht, ¶24; Reim, ¶25(a).) Without this awareness, most would not search for flights to "OAK" or "Oakland" as an option for Bay Area travel. (*Id.*)

Second, although OAK sits on the San Francisco Bay, OAK flights are not routinely displayed when people search for flights using "San Francisco Bay" or "San Francisco" as a keyword because of various back-end codes and sorting rules used by online travel agencies ("OTAs") and flight aggregator websites. (Simon, ¶26; Albrecht, ¶25; Reim, ¶25(b).) As a result, when consumers search for flights, they may be shown only route options to SFO – not alternatives to OAK. (*Id.*) These two issues combine to depress in-bound passenger demand that market data suggests should otherwise support nonstop routes to OAK. (Simon, ¶27; Albrecht, ¶24–26; Reim, ¶26.)

**D.  The Recommendation to Incorporate OAK's Geographic Location into its Name**

The Port sought to address this issue while maintaining OAK's distinct identity. (Simon, ¶¶30,

FENNEMORE WENDEL
FENNEMORE CRAIG, P.C.
OAKLAND/SEATTLE

DEFENDANT PORT OF OAKLAND'S OPPOSITION          CASE NO. 3:24-CV-02311-TSH
TO PLAINTIFF'S MOTION FOR PRELIMINARY
INJUNCTION - 4

37; Albrecht, ¶¶30-31; Wan, ¶¶16-17.) Ultimately, in March 2024, the Port's Aviation Division and its Executive Director together recommended that the Board of Port Commissioners approve incorporating the Airport's geographic location into the beginning of its full name by replacing the generic word METROPOLITAN with SAN FRANCISCO BAY. (Simon, ¶ 30; Albrecht, ¶ 30; Wan, ¶16; Reim, ¶29.) The remainder of the Airport's name (OAKLAND INTERNATIONAL AIRPORT) and the Airport's IATA code (OAK) would remain the same, as would the Airport's branding and I Fly OAK logo. (Simon, ¶¶30, 37; Albrecht, ¶¶ 31-33; Wan, ¶¶16-17.)

## E.    The City's Opposition Campaign

In response to the Port's planned public discussion of this potential name change, the City launched a marketing campaign to spur opposition opinion and create a narrative of purported "confusion." (Yamasaki, Exs. 9-13.) To this end, the City's Aviation Director instructed staff to "get more aggressive on [social media] with the OAK confusion messaging[.]" (*Id.*, Exh. 9.)

The Port believes in fair competition and that its full name can include its geographic location on SAN FRANCISCO BAY. So the Port moved forward, heard additional public comment, analysis and input from its Aviation Division, and then voted to approve the new name on May 9, 2024. (Wan, ¶¶24-34; Simon, ¶¶30-44, Albrecht, ¶¶28-33.) OAK's new full name has been official and in use for almost five months. (Simon, ¶¶45-52; Albrecht, ¶34.)

## III.    LEGAL STANDARD

A preliminary injunction is "extraordinary relief." *Winter v. Nat'l Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008). It is a "drastic remedy" "which should not be granted unless the movant shows 'substantial proof' and 'by a clear showing, carries the burden of persuasion.'" *Good Meat Project v. GOOD Meat, Inc.*, ---F.3d---, 2024 WL 1083462, at *2 (N.D. Cal. Feb. 12, 2024) (*quoting Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)); *Winter*, 555 U.S. at 24. To obtain a preliminary injunction, the City has the burden to make a clear showing that it is likely to succeed on the merits, likely to suffer irreparable harm absent preliminary relief, that the balance of equities tips in its favor, and that an injunction is in the public interest. *Id.* It has failed to do so.

FENNEMORE WENDEL
FENNEMORE CRAIG, P.C.
OAKLAND/SEATTLE

DEFENDANT PORT OF OAKLAND'S OPPOSITION    CASE NO. 3:24-CV-02311-TSH
TO PLAINTIFF'S MOTION FOR PRELIMINARY
INJUNCTION - 5

## IV.    THE COURT SHOULD DENY THE CITY'S MOTION

### A.    The City Is Not Likely to Prevail on its Trademark Infringement Claims

#### 1.    The *Sleekcraft* Factors Are Flexible Non-Exhaustive Guideposts to Be Considered With and In the Applicable Context

The foundation of trademark protection is to ensure that consumers have accurate information to make informed choices in a trustworthy marketplace. Thus, the "principle underlying trademark protection is that distinctive marks – words, names, symbols, and the like – can help distinguish a particular artisan's goods from those of others." *Vidal v. Elster*, 602 U.S. 286, 290-91 (2024). The "linchpin of trademark infringement is consumer confusion[.]" *Network Automation, Inc. v. Advanced Sys., Concepts, Inc.*, 638 F.3d 1137, 1154 (9th Cir. 2011). Confusion must be "probable, not simply a possibility" from the viewpoint of a "reasonably prudent consumer." *Multi Time Mach., Inc. v. Amazon, Inc.*, 804 F.3d 930, 935 (9th Cir. 2015).

To  analyze whether there is the requisite likelihood of confusion, the Ninth Circuit has developed the "*Sleekcraft* factors." *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979). These eight factors are "non-exhaustive," an "adaptable proxy" to be used as "helpful guideposts." *Multi Time Mach., Inc.*, 804 F.3d at 933; *Network Automation, Inc.*, 638 F.3d at 1149. They are not, as the City suggests by its formalistic presentation, a rote checklist or rigid template. *Id.* Instead, the *Sleekcraft* factors "should be applied flexibly, particularly in the context of Internet commerce." *Network Automation, Inc.*, 638 F.3d at 1149.

The failure to consider context and to weigh the factors flexibly with emphasis on the most illuminating ones to match the specific facts of the case is reversible error. *Network Automation, Inc.*, 638 F.3d at 1153-54 (reversing grant of preliminary injunction because the "district court did not consider the surrounding context" and "did not weigh the *Sleekcraft* factors flexibly to match the specific facts of th[e] case").

#### 2.    The Most Informative Factors Strongly Show No Likelihood of Confusion

This case concerns how consumers select an airport destination – *i.e.*, the information presented and considered in their search for and purchase of commercial airline flights. To decide

FENNEMORE WENDEL
FENNEMORE CRAIG, P.C.
OAKLAND/SEATTLE

DEFENDANT PORT OF OAKLAND'S OPPOSITION        CASE NO. 3:24-CV-02311-TSH
TO PLAINTIFF'S MOTION FOR PRELIMINARY
INJUNCTION - 6

which flights to book, the "vast majority" of consumers engage online. (ECF 37, 3:4-5; ECF 48, 11:21-23; Reim, ¶¶9-14.) In the Internet context, "the labeling and appearance of the advertisements and the surrounding context on the screen displaying the results page" is a "particularly important" "additional factor" in evaluating whether there is a likelihood of confusion. *Multi Time Mach., Inc.*, 804 F.3d at 936 (internal quotation omitted).

Given what is at issue here, the factors to be weighed most heavily in the likelihood of confusion analysis are: (1) context – what a reasonable consumer would believe based upon what they see on the screen; (2) the degree of care a consumer exercises when buying a flight; and (3) whether there is evidence of actual confusion. Each factor strongly favors the Port.

### a.    The Surrounding Context Clearly Distinguishes Airport Choices

The displays and information that consumers see when they search for and book flights demonstrates that OAK's full name (San Francisco Bay Oakland International Airport) is not likely to cause consumer confusion. This context – and industry standards in this regard – is depicted in accurate screenshots and discussed in detail in testimony from Southwest Airlines, which is the second largest domestic carrier in the United States. (Declaration of Jennifer Bridie ("Bridie"); ECF 36-24.) It is also reflected in screenshots and discussed in detail in testimony from Spirit Airlines (Declaration of Piotr Rolek ("Rolek")), discussed in testimony by an aviation industry expert (Reim, ¶¶9-19) and shown in the screenshots of dozens of other airline, OTA, and flight aggregator websites. (Yamasaki, Exs. 14-17.)

All of this evidence demonstrates three key points regarding the relevant context.

First, airports are identified by and displayed with their three-letter IATA codes. (Bridie, ¶¶26, 28; Rolek, ¶¶9-10, 14-15, 22, 24-25; Reim, ¶12; Yamasaki, Exs. 14-17.) This is standard industry practice. (Bridie, ¶28; Rolek, ¶24; Reim, ¶12). When consumers search for and book flights online, arrival and destination airport options are not shown to consumers without those codes. (Bridie, ¶¶ 9-29; Rolek, ¶¶ 9-10, ¶¶13-19, ¶¶21-25; Reim, ¶ 13; Yamasaki, Exs. 14-17.)

Second, the displays always show other pertinent information, usually a city and/or region reference. (Bridie, ¶¶10-26; Rolek, ¶¶9-26; Reim, ¶¶12-16; Yamasaki Exs. 14-17.) This makes sense,

DEFENDANT PORT OF OAKLAND'S OPPOSITION          CASE NO. 3:24-CV-02311-TSH
TO PLAINTIFF'S MOTION FOR PRELIMINARY
INJUNCTION - 7

FENNEMORE WENDEL
FENNEMORE CRAIG, P.C.
OAKLAND/SEATTLE

as people buy flights for travel to and from other places. The reasonable consumer seeks access to a destination location; they do not search for and buy tickets for a given flight in order to visit an airport independent of their ultimate destination.

Third, the manner in which airport arrival and destination options are shown, including in a drop-down menu format, indicates that each airport is a different departure or arrival choice. (Bridie, ¶¶11-12, 17-18, 20-21, 24; Rolek, ¶¶10, 12, 17, 20-21, 23; Yamasaki Exs. 14-17.)

The City ignores the commercial context in which consumers actually search for and purchase flights except to summarily conclude, without evidentiary support, that "it is all too easy for consumers to mistakenly purchase tickets to one party's airport intending to select the other (*e.g.*, with some travelers seeing "San Francisco…" and reading no further) (*e.g., supra* Fig. 2)."[1] A review of the actual information displayed during flight searches and the purchasing process demonstrates the implausibility of the City's argument that consumers will see "San Francisco" somewhere on the initial screen, read nothing else, and then proceed to buy a flight to the wrong airport when they meant to book one to SFO. (Bridie, ¶¶11-13, 17-24; Rolek, ¶¶8-26; Yamasaki Exs. 14-17.)

Rather than focusing on the relevant context, the City points to press articles, and general references to airport names as the backdrop for its confusion analysis. (ECF 36, ¶¶19-28, Exs. F-W.) This evidence shows that airport names bring general awareness of an airport's geographic location and identity. (*Id.*; Reim, ¶16.) This evidence does not, however, show that consumers interact with these names in a vacuum and blindly move through flight search and purchase decisions so as to be confused because of airport names. The handful of actually relevant airline ticket search screenshots buried in the City's submission contain the same context discussed above – IATA codes, city references or other pertinent information, and a format that clearly distinguishes airport choices, further demonstrating that confusion is not likely. (ECF 37-5, 37-9, 37-10, 39-7, 39-8.) This factor weighs heavily in favor of the Port.

---

[1] The Figure 2 cited purports to display partial social media account pages that do not show a consumer "mistakenly purchase[d] tickets to one party's airport intending to select the other."

FENNEMORE WENDEL
FENNEMORE CRAIG, P.C.
OAKLAND/SEATTLE

### b.    Purchasers of Airline Tickets Exercise Heightened Care

Another important factor concerns the type of services and consumers at issue to evaluate the degree of care they will exercise. *Network Automation, Inc.*, 638 F.3d at 1152-53. A higher degree of consumer care reduces the likelihood of confusion. *Id.* That is the case here. As discussed below, buying an airline ticket involves the purchase of an expensive, specialized service (airline travel) that necessarily includes considerations beyond price.

As a starting point, reasonably prudent online consumers are considered "relatively sophisticated." *Schluter Sys., L.P. v. Telos Acquisition Co. 10, LLC*, ---F.Supp.---, 2024 WL 1659898, at *10-11 (N.D.Cal. April 16, 2024). "The Ninth Circuit has evaluated several cases in which the marketplace was the Internet and has reasoned that 'the default degree of consumer care is becoming more heightened as the novelty of the Internet evaporates and online commerce becomes commonplace.'" *Id.* at *11-12 (quoting *Network Automation, Inc.*, 638 F.3d at 1152). This online-facilitated consumer care has only increased in recent years.

Second, an airline ticket is not a fungible consumer product marketed to buyers who are governed by "appearance and general impressions" as the City contends. (ECF 35, 20:10-11.) Instead, purchasing an airline ticket involves a "high price point" for "specialized services" and "[c]ommercial airline travelers are likely to be especially discerning of quality of service and safety [ ] among other factors like timing and convenience." *BNSF Ry. Co. v. Float Alaska IP, LLC*, 2023 WL 6783506, at *7 (C.D. Cal. Aug. 28, 2023) (citing *New Flyer Indus. Can. ULC v. Rugby Aviation, LLC*, 405 F. Supp. 3d 886, 903 (W.D. Wash. 2019)).

While there are many passengers who fly, purchasing a plane ticket is not as quotidian as buying a drink at the supermarket. Unlike "consumers [who] exercise a low degree of care and sophistication when selecting inexpensive, single-serve beverages[,]" purchasing a flight must often be coordinated with other trip details, such as accommodations, ground transportation, and nearby activities. *See Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1127 (9th Cir. 2014). The purchasing decision is not simply which commodified product to buy.

FENNEMORE WENDEL
FENNEMORE CRAIG, P.C.
OAKLAND/SEATTLE

DEFENDANT PORT OF OAKLAND'S OPPOSITION          CASE NO. 3:24-CV-02311-TSH
TO PLAINTIFF'S MOTION FOR PRELIMINARY
INJUNCTION - 9

1    Finally, airline tickets are expensive. The average airfare for a domestic flight to SFO is

2    $444.09 (it is $303.55 to OAK) and some domestic tickets to SFO can cost several thousands of

3    dollars. (Yamasaki, Exhs. 19-21.) Where, as here, the goods or services at issue "are expensive, the

4    buyer can be expected to exercise greater care in his purchases." *Sleekcraft*, 599 F.2d at 353; *see also*

5    *Multi Time Machine, Inc.*, 804 F.3d at 937 (finding watches that "sell for several hundred dollars"

6    were "expensive").

7    The City's arguments to the contrary are unavailing. The City tries to characterize purchasers

8    of airline tickets as unsophisticated and "neither careful nor discerning" because "travelers" are a mix

9    of people that fly for different reasons, and there are occasional fare deals. (ECF 20:13-27.) The gaps

10   in this logic are several. Whether someone is booking from another country or tends to book flights

11   farther in advance or closer to their travel date has nothing to do with their sophistication as a

12   reasonably prudent consumer or whether they exercise care in purchasing an airline ticket. In fact, in

13   making its argument, the City implicitly recognizes that buying airfare involves a host of other

14   considerations and planning. (*Id.*, 20:20, 21:10-17.)

15   The City's attempt to portray airline tickets as a cheap commodity that consumers buy without

16   care likewise fails. An advertisement for a one-way ticket deal does not establish that airline tickets

17   are "cheap" and thus that consumers do not exercise heighted care. (ECF 37-5, p.3.) To the contrary, a

18   ticket with no return and with fare deal restrictions invites more, rather than less, consumer scrutiny in

19   understanding its details before buying. (*See id.*) Again, the average cost of domestic coach airfare to

20   SFO is over $400 a ticket, and some tickets cost thousands. (Yamasaki, Exhs. 19-21.)

21   The single case the City cites to support its argument is *La Quinta Worldwide LLC v.*

22   *Q.R.T.M., S.A. de C.V.*, 762 F.3d 867, 877 (9th Cir. 2014). But *La Quinta* does not stand for the

23   proposition that airfare is a low-cost commodity or that consumers purchasing airline tickets online

24   "are neither careful nor discerning" when they do so. (ECF 20:26.) Rather, the Ninth Circuit simply

25   held that the district court did not err by applying the ordinary caution standard when it combined

26   consideration of this factor with others. *La Quinta Worldwide LLC*, 762 F.3d at 877. In the context of

27

purchasing airline tickets online, however, reasonably prudent consumers exercise a heightened degree of care. This factor weighs strongly in the Port's favor.

### c.    There is No Competent Evidence of Actual Confusion

While the City contends it has many examples of consumer confusion caused by OAK's name, an examination of the City's submission reveals no such thing. The totality of this purported evidence consists of: (1) a handful of social media posts and online comments on a newspaper article (ECF 36, ¶¶19-28, Exhibits O-W); and (2) a "log" that purports to show just 15 passengers allegedly reported confusion during a period in which 14,479,155 million passengers flew into or out of SFO (ECF 38, Ex. A; Yamasaki, Exs. 24-26.) Far from showing actual confusion, these documents are unreliable, not probative, and should be afforded no weight.

### 1)    The Online Posts Are Unreliable Hearsay Not Probative of Actual Confusion

The City offers just **two** social media/online posts purporting to show actual confusion caused by OAK's name change. (ECF 26, Exs. S-W; Declaration of Chris Lindemeier ("Lindemeier"), ¶¶4-13.) For example, a user posts in the comments section of an SF Gate article that "[s]omeone I know is flying into town tomorrow for the first time and accidentally went to sfo instead of Oakland." (ECF 36, Ex. V.) But if this unnamed passenger is not flying until "tomorrow" then how could the user even know that the passenger already "went" to SFO instead of OAK?

Regardless, the two posts are unauthenticated inadmissible hearsay of the type that Ninth Circuit courts routinely afford no weight. *See* Fed. R. Evid. 802; *see, e.g., S10 Entm't & Media LLC v. Samsung Elecs. Co., Ltd*., 2023 WL 2090703, at *6 (C.D. Cal. Feb. 14, 2023) (excluding social media posts purportedly showing actual confusion; plaintiff did not prove that the posts were created by "real people" and thus was unable to authenticate them); *Great Western Air, LLC v. Cirrus Design Corp*., 649 F. Supp. 3d 965, 983 (D. Nev. 2023) (social media posts were "weak evidence" of confusion because "the Court lack[ed] information about the people making the social media posts"); *Nordstrom, Inc. v. NoMoreRack Retail Group, Inc*., 2013 WL 1196948, at *6 (W.D. Wash. Mar. 25, 2013) ("isolated instances of confusion, particularly those cloaked by anonymity on the Internet, do

FENNEMORE WENDEL
FENNEMORE CRAIG, P.C.
OAKLAND/SEATTLE

not rise to the level of actual confusion on a purchasing decision").

### 2)    SFO's Litigation Log is Uninformative

The rest of the City's record consists of a one-page "Daily Operation Log" made by unidentified SFO "volunteers" which purportedly documents instances of actual confusion. (ECF 38, ¶ 5 and Ex. A). Courts routinely find such party-created logs to be inadmissible hearsay or of weak evidentiary value. *Kiva Health Brands LLC v. Kiva Brands Inc.*, 402 F. Supp. 3d 877, 894-95 (N.D. Cal. 2019) (expressing skepticism of reliability of confusion log); *Idaho Golf Partners, Inc. v. Timberstone Mgmt., LLC*, 2016 WL 4974944, at *3 (D. Idaho Sept. 16, 2016) (confusion log was inadmissible hearsay and did not fall under business records exception); *Trouble v. Wet Seal, Inc.*, 179 F. Supp. 2d 291, 300 (S.D.N.Y. 2001) ("confusion logs [did] not fall within the business records or the residual exceptions to the hearsay rule and [were] inadmissible."). That the City created the log for litigation indicates a "lack of trustworthiness" further undermining its reliability. *Kiva Health Brands*, 402 F. Supp. 3d at 895.

Regardless, the log itself is unhelpful. It contains only dates and incomplete information regarding the alleged passengers and flights. (ECF 38-1.) (five people are not identified at all). The City also does not identify let alone offer any testimony from any of the volunteers who purportedly entered any of the log entries. The "log" should be afforded no weight.

### 3)    Even if the Court Considers the City's Posts and Log, They Are *De Minimis* and Do Not Establish Actual Confusion

Even if the City could establish that its handful of online posts and one-page log constituted authentic, reliable, non-hearsay evidence of instances of actual confusion, they are *de minimis* and do not establish actual confusion.

> Evidence of only a small number of instances of actual confusion can be dismissed as inconsequential or *de minimis*. … the number of instances of actual confusion must be placed against the background of the number of opportunities for confusion before one can make an informed decision as to the weight to be given the evidence. If there is a very large volume of contacts or transactions which could give rise to confusion and there is only a handful of instances of actual confusion, the evidence of actual confusion may receive relatively little weight.

FENNEMORE WENDEL
FENNEMORE CRAIG, P.C.
OAKLAND/SEATTLE

J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 23:14 (5th ed. 2024); *Nutri/System, Inc. v. Con-Stan Indus., Inc.*, 809 F.2d 601, 606-07 (9th Cir. 1987) (affirming district court's finding that "any actual confusion was de minimis" because "in light of both parties' high volume of business, the misdirection of several letters and checks proved insignificant").

Thus, assuming *arguendo* that the two social media posts alleging instances of confusion proffered by SFO and its incomplete one-page litigation log are reliable and relevant (they are not), they still "must be placed against the background of the number of opportunities for confusion." *See id.* Considering that approximately 21,045,655 passengers have flown into or our of SFO since May 2024, SFO's alleged instances of confusion comprise just 0.0000808% and is *de minimis*. (Yamasaki, Exs. 22-26; Lindemeier, ¶¶15-20.); *See Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1393 (9th Cir. 1993) (just seven instances of actual confusion out of 80,000 opportunities, *i.e.*, 0.00875%); *Punchbowl, Inc. v. AJ Press LLC*, 2024 WL 4005220, at *11 (C.D.Cal. Aug, 22, 2024) ("Out of thousands of communications, only approximately 100 were misdirected; that amount is insignificant."); *Lerner & Rowe PC v. Brown Engstrand & Shely LLC*, 673 F.Supp.3d 1017, 1033 (D. Ariz. 2023) (finding *de minimis* 236 instances of potential confusion which was just 0.215% of total); *Excelligence Learning Corp. v. Oriental Trading Co., Inc.*, 2004 WL 2944048, at *11 n.9 (N.D. Cal. Dec. 20, 2004) ("[T]wenty instances of customer confusion out of 480,000 is so statistically insignificant (approximately .00417%) as to support a finding of no actual customer confusion").

#### 4) The City's Flawed Survey Should Be Afforded No Weight

The City otherwise relies upon a consumer survey by Sarah Butler (ECF 42-1) ("Survey"). Courts may consider consumer confusion surveys as circumstantial evidence but "only to the extent that the survey replicates the real world setting which can create an instance of actual confusion." MCCARTHY, *supra* at § 23:17. As explained in more detail in the Declaration of Professor Carol A. Scott, Ph.D. ("Scott"), the Survey wholly fails to replicate the real world and is deeply flawed in its stimuli, questions used, and sample size, among other deficiencies. Briefly summarized:

➢ The stimuli is bad. The Survey uses fake webpages and a partial process that do not accurately replicate the real world and therefore lack external validity and reliability. (Scott, ¶¶13-22.)

FENNEMORE WENDEL
FENNEMORE CRAIG, P.C.
OAKLAND/SEATTLE

DEFENDANT PORT OF OAKLAND'S OPPOSITION    CASE NO. 3:24-CV-02311-TSH
TO PLAINTIFF'S MOTION FOR PRELIMINARY
INJUNCTION - 13

Butler created a mock website for Southwest Airlines that shows three Bay Area airports, two of which are identified by city, state, and IATA code ("San Francisco, CA – SFO" and "San Jose, CA – SJC"). (ECF 42-1 at 20.) The third airport option is inexplicably the only one identified by using its full name ("San Francisco Bay Oakland International Airport – OAK). (*Id.*) This does not replicate reality. The actual Southwest Airlines website and mobile app do not do this, and – **as Southwest Airlines itself states** – it has no plans to do this. (Bridie, ¶¶ 15-16 and 23-27); *see also Water Pik, Inc. v. Med-Systems, Inc.*, 726 F.3d 1136, 1146 (10th Cir. 2013) (survey improperly showed the marks not as they actually appeared in the marketplace).[2] Butler also used a manipulated Google Flights webpage that likewise does not replicate how Google Flights displays flights. (Scott, ¶¶30-34.)

> ➤ The Survey also includes an irrelevant and ambiguous question to artificially inflate a purported confusion total. More specifically, the Survey asks respondents to identify "[w]hich of the following, if any, is the primary airport serving the San Francisco Bay Area." (ECF 42-1, p. 16.) Yet the Survey does not define what is meant by "primary," nor did Butler pre-test consumers' understanding of this word, instead leaving it up to each respondent's idiosyncratic interpretation. (Scott, ¶¶35-38.) A respondent could have interpreted it as meaning the most centrally located airport for the nine-county Bay Area and then selected "San Francisco Bay Oakland International Airport" (notably, this was the only answer choice that had the phrase "San Francisco Bay"). Butler then makes an unexplained unfounded assumption to conclude that respondents who picked the airport name with "San Francisco Bay" in it somehow shows consumers are confusing OAK with SFO or believe that OAK is owned by or affiliated with the City. It does not.

---

[2] Furthermore, in the real world, ticket buyers would be exposed to additional stimuli and cues showing what airport they are going to, including repeated showings of the three-digit IATA code OAK, which would dispel any possible confusion created from looking only at the initial drop-down menu. The Survey, however, does not account for this reality at all. *See* (Scott, ¶¶18-20; Bridie, ¶11-14.) In addition the Survey's use of the Southwest Airlines <u>Control</u> Stimuli also renders the Survey invalid because the Control Stimuli does not contain the former mark at all. Consequently, the Survey does not measure how the <u>change</u> in the mark – from former mark to the current mark – causes any alleged confusion. (Scott, ¶¶23-29.)

➤    Further compounding the Survey's infirmities, the sample size used is selective and underinclusive (Scott, ¶11-12.) Even though travelers fly to and from the Bay Area from all over the country, the Survey's sample population consisted of respondents from only ten (10) states and the District of Columbia. The Survey cannot be used to provide a reliable estimate of the likelihood of confusion in the overall market. (*Id.*; *see R. J. Reynolds Tobacco Co. v. Loew's Theatres, Inc*., 511 F. Supp. 867, 877 (S.D.N.Y. 1980) (confusion survey limited to cities in just 15 states, failed to produce nationally projectable percentage).

These are a few of the Survey's most salient deficiencies; more are discussed in Scott's Declaration. In short, Survey does not provide relevant, reliable, or probative evidence of a likelihood of confusion and the Court should disregard it.

**3.    The Relevant Factors Also Show No Likelihood of Confusion**

        **a.    OAK and SFO's Names Are Not Similar**

"Similarity of the marks is tested on three levels: sight, sound, and meaning." *Network Automation*, 638 F.3d at 1150. All three of these show that OAK's name is not similar to SFO's.

First, OAK's and SFO's names do not look similar. The City recognizes that "marks must be considered in their entirety." (ECF 15:7-22.) Yet the City argues that OAK's name is similar to SFO's name because they both begin "with the City's name." (ECF 15:7-22.) This is incorrect. OAK's name starts with the name of a body of water – the "**<u>San Francisco Bay</u>**" – not the City's name. The City cannot simply stop reading OAK's name when convenient, and truncate it to help the City's position. The Ninth Circuit has rejected this exact approach. *See Alpha Industries, Inc. v. Alpha Steel Tube & Shapes, Inc.*, 616 F.2d 440, 444 (9th Cir. 1980) (rejecting the argument that courts should look "principally" to the lead word and not compare the marks and names "taken as a whole"). OAK's name is the "San Francisco Bay Oakland International Airport." SFO's name is the "San Francisco International Airport." They do not look similar.

Indeed, using the City's logic, every one of the thousands of federally registered marks that start with "San Francisco" would be deemed similar to SFO's name – regardless of what words came

FENNEMORE WENDEL
FENNEMORE CRAIG, P.C.
OAKLAND/SEATTLE

DEFENDANT PORT OF OAKLAND'S OPPOSITION          CASE NO. 3:24-CV-02311-TSH
TO PLAINTIFF'S MOTION FOR PRELIMINARY
INJUNCTION - 15

after San Francisco. This is an absurd result and illustrates why the City's approach is unsupported by the law. Where, as here, "additional words make the marks distinctive[,]" "the presence of a common word does not render two marks similar." *Stonefire Grill, Inc. v. FGF Brands, Inc.*, 987 F. Supp. 2d 1023, 1052 (C.D. Cal. 2013).

Second, when said aloud, the differences can be plainly heard.

Finally, the different words in OAK's name have distinct and important meanings that render the name even more dissimilar to SFO's name than a visual reading and hearing of the name present. OAK's name begins with "San Francisco Bay," which is a distinct geographic feature – a body of water, not the City. It is then followed by the name of a city – Oakland – before ending with a description of what it is, an "International Airport." Thus, even if the Court found that OAK and SFO's names appeared to be similar, there is no similarity because OAK's name includes additional terms that impart different meaning.

*Florida Int'l Univ. Bd. of Trustees v. Florida Nat'l Univ., Inc*., 830 F.3d 1242, 1260 (11th Cir. 2016) is instructive. In that case, the Eleventh Circuit considered whether the "Florida National University" and "FNU" marks infringed on the "Florida International University" and "FIU" marks. There, unlike here, the marks were almost identical, and both contained the same geographic reference (Florida). But that did not end the similarity inquiry. The court affirmed the district court's finding that the marks ***were not*** similar because the word that was different – national versus international – had a different and distinct meaning.

> The district court acknowledged that "Florida International University" and "Florida National University" (and the acronyms FIU and FNU) are similar in sound and appearance, but determined that the difference in the meaning of the words 'national' and 'international' outweighed any similarity. It explained that, in common usage, the two terms are used as antonyms to describe the domestic or overseas character of something and, therefore, they are not "so closely aligned as to create a likelihood of confusion among consumers." *Id.*

Here, there is more difference. OAK's name uses "San Francisco Bay" instead of "San Francisco" – a bay rather than a city – and includes Oakland (a different city), thereafter. These are not just "tag on" words as the City contends. They impart different and important meaning.

FENNEMORE WENDEL
FENNEMORE CRAIG, P.C.
OAKLAND/SEATTLE

DEFENDANT PORT OF OAKLAND'S OPPOSITION
TO PLAINTIFF'S MOTION FOR PRELIMINARY
INJUNCTION - 16

CASE NO. 3:24-CV-02311-TSH

Further, in the commercial context, the City rarely uses SAN FRANCISCO INTERNATIONAL AIRPORT in isolation. Instead, the City frequently uses only SFO or the full name as part of its SFO branding with its IATA code. (ECF 39, Exs. A-C, E-F.). The Port, likewise, commonly uses the Airport's name with its IATA code and I Fly OAK logo. (Simon, ¶¶37, 45-48; Albrecht, ¶¶31-33.) These additional differences further undercut the City's argument that OAK and SFO's names are "nearly identical."

The City relies heavily on the Trademark Trial & Appeal Board Decision, *Greater Orlando Aviation Auth.*, which is currently under de novo review by a U.S. District Court in Florida. That case, which involved a challenge to the registration of the ORLANDO SANFORD INTERNATIONAL AIRPORT mark is inapposite. There, unlike here, both airports used the same city name, Orlando. In contrast, the Port is using not using the city name, "San Francisco," but rather the term "San Francisco Bay" – a distinct geographic feature, the actual Bay upon which the Airport sits.

The three other cases the City cites do not otherwise support a finding of similarity. In *Perfumebay.com, Inc. v. eBay, Inc.*, 506 F.3d 1165, 1174 (9th Cir. 2007), Perfumebay incorporated "ebay" into its mark to sell perfume online and utilized a spelling that mirrored eBay – "PerfumeBay." Here, the Port <u>did not</u> "incorporate" the City's mark into its name. It replaced the generic word "Metropolitan" with "San Francisco Bay" – the name of the Bay – and kept the rest of its name the same, "Oakland International Airport." In the other two cases the City cites, *BGC Inc. v. Robinson*, 2022 WL 2915703, *4 (N.D.Cal. July 25, 2022) and *Boldface Licensing + Branding v. by Lee Tillett, Inc.*, 940 F.Supp.2d 1178, 1187 (C.D.Cal. 2013), the courts found similarity where the marks were "identical" or "nearly identical" and "sound identical." That is far from the situation here.

### b.    The City's Mark is Weak

Evaluating a mark's strength involves examining (1) its conceptual strength and (2) its commercial strength. *Network Automation, Inc.*, 638 F.3d at 1149-50.[3] At best, the name SAN

---

[3] The fact that the City has an incontestable federal registration for it is irrelevant. *Hero Nutritionals LLC v. Nutraceutical Corp.*, 2013 WL 4480674 (C.D.Cal. 2013) ("Incontestable status does not make a weak mark strong.") (citation omitted).

FENNEMORE WENDEL
FENNEMORE CRAIG, P.C.
OAKLAND/SEATTLE

DEFENDANT PORT OF OAKLAND'S OPPOSITION                    CASE NO. 3:24-CV-02311-TSH
TO PLAINTIFF'S MOTION FOR PRELIMINARY
INJUNCTION - 17

1  FRANCISCO INTERNATIONAL AIRPORT is a weak descriptive mark and the City has not shown

2  commercial strength sufficient to overcome this.

3      The conceptual strength of a mark is determined by its inherent distinctiveness. Stronger

4  marks are fanciful or arbitrary, whereas weak marks are descriptive or generic. *Network Automation,*

5  *Inc.*, 638 F.3d at 1149. "Descriptive marks define qualities or characteristics of a product [or services]

6  in a straightforward way that requires no exercise of the imagination to be understood." *Entrepreneur*

7  *Media,* 279 F.3d at 1141-42 (9th Cir. 2002).

8      The City's Mark at issue (SAN FRANCISCO INTERNATIONAL AIRPORT) is entirely

9  descriptive. It is used for one international airport that is owned and operated by the City. As such, it

10  is conceptually weak. *See*, *e.g.*, *Sand Hill Advisors, LLC v. Sand Hill Advisors, LLC*, 680 F. Supp. 2d

11  1107, 1115 (N.D. Cal. 2010) (Sand Hill Advisors was weak descriptive mark where "Sand Hill" refers

12  to a geographical locale where Plaintiff operates its business."); *Helix Env't Plan., Inc. v. Helix Env't*

13  *& Strategic Sols.*, 2020 WL 2556341, at *6 (S.D. Cal. May 20, 2020) (Helix Environmental Planning

14  was weak, where "'Helix' appears to describe, or at least relate to, the Mount Helix area in San Diego,

15  California where Plaintiff is located. And, the rest of the trademark, 'Environmental Planning'

16  describes the services Plaintiff provides.").

17      The City relies on two cases to argue that its Mark is conceptually strong even though it is

18  descriptive. (ECF 35, 13:19-14:13.) Neither support the City's position. In each of those cases, the

19  marks containing geographic terms had acquired strength precisely because those terms <u>were not</u>

20  <u>geographically descriptive</u> and instead had acquired "fanciful meaning." In *North American Aircoach*

21  *v. North American Aviation*, 231 F.2d 205, 210-11 (9th Cir. 1955), the plaintiff had adopted the name

22  "North American" "to identify it with all phases of the aviation industry, specifically including air

23  transportation" that it used <u>worldwide</u>. The name did not describe the geographic location of products

24  or services but rather had "acquired fanciful meaning connected with plaintiff" associated with its

25  global products, services, and operations. *Id.*

26      Likewise, in *Coachella Music Festival, LLC v. Simms*, 2018 WL 6074556, at *4 (C.D. Cal.

27  Sept. 10, 2018), the court found that the Coachella Marks were strong because Coachella was a highly

successful commercial music festival such that consumers associated the word "Coachella" with that festival rather than as describing a geographic location.[4] That is not the case here, where the City owns and operates one international airport. The name SAN FRANCISCO INTERNATIONAL AIRPORT remains a geographic description of a single airport proximate to San Francisco and has not become a recognized term for airport services generally.[5]

In an attempt to overcome the conceptual weakness of its Mark, the City argues that the name SAN FRANCISCO INTERNATIONAL AIRPORT has gained commercial strength such that it is nonetheless a strong mark. In this regard, the City points to press and industry references, its investment of "millions of dollars annually to market and promote SFO" and third parties (like airlines and OTAs) that display SFO's name. (ECF 35 at 12:27-13:18.) But the City conflates its use of "SFO," the City's logo for SFO, and its overall branding for SFO, with the actual Mark at issue here, which is just the word mark: the SAN FRANCISCO INTERNATIONAL AIRPORT. The City provides no information regarding how much of its marketing dollars were spent to promote only its word mark. The City routinely features "SFO" and the SFO logo, not the airport's full name on its own. (Yamasaki, Ex. 32; ECF 39, Exs. A-C, E-F; Lindemeier, Exs. 4-6.)

Indeed, SFO's full name is rarely used in isolation – let alone promoted as its brand. The only examples showing SAN FRANCISCO INTERNATIONAL AIRPORT the City provides are news articles solely referencing the airport's physical location, the vast majority of which state the name to refer to the location of a crime or other happenings (ECF 36-2), and a picture of the physical sign on an SFO building. (ECF 39, Ex. D.) Everything else includes SFO and the logo. (*Id.*, Exs. A-F.)

The City's remaining argument is that certain airlines and other airports have descriptive trademarks. (ECF 14:14-19.) The fact that others may use descriptive terms in their names or have descriptive trademarks is irrelevant to evaluating the strength of the City's Mark here.

---

[4] *N.b.*, the Coachella court denied plaintiff's summary judgment, holding that the strength of a mark was an issue for the jury, with all evidence before them.

[5] The other three cases the City cites support the proposition that a once descriptive name can acquire secondary meaning or strength when it has "fanciful" meaning. They do not support that San Francisco International Airport is a conceptually strong mark. (ECF 35:13, 20-27.)

FENNEMORE WENDEL
FENNEMORE CRAIG, P.C.
OAKLAND/SEATTLE

DEFENDANT PORT OF OAKLAND'S OPPOSITION    CASE NO. 3:24-CV-02311-TSH
TO PLAINTIFF'S MOTION FOR PRELIMINARY
INJUNCTION - 19

### 4.    The Remaining Factors Are Neutral and Not Illuminating

#### a.    Marketing Channels Favor Neither Party

The City argues that SFO and OAK's marketing and trade channels "overlap completely" and then concludes this factor therefore weighs in its favor. It does not. Airline tickets are marketed and sold online which is general "shared use" of "a ubiquitous marketing channel [that] does not shed much light on the likelihood of consumer confusion." *Network Automation*, 638 F.3d at 1151 ("district court's determination that because both parties advertise on the Internet this factor weighed in favor of Systems was incorrect."). This factor is neutral. *Id.*; *see also Pinterest, Inc. v. Pintrips, Inc.*, 140 F.Supp.3d 997, 1018-19 (N.D.Cal. 2015) (complete overlap of marketing channels by general internet advertising and word of mouth did not weigh in favor of either party).

#### b.    Potential Expansion Favors Neither Party

This factor considers whether either party may expand its business to compete with the other. *Network Automation, Inc.*, 638 F.3d at 1153. But where, as here, "two companies are direct competitors, this factor is unimportant." *Id.*

#### c.    There Was No Intent to Deceive

As discussed in detail in the Wan, Simon, and Albrecht declarations, the Port changed OAK's name from the "Metropolitan Oakland International Airport" to the "San Francisco Bay Oakland International Airport" in good faith, with no intent to "copycat" SFO or "deceive" consumers. Regardless, this factor is of "minimal importance" and does not favor the City. *Golden Eye Media USA, Inc. v. Trolley Bags UK Ltd.*, 525 F.Supp.3d 1145, 1230 (S.D.Cal. 2021).

#### d.    The Remaining Factor – that Both the City and the Port Own and Operate an Airport – Cannot Be Considered in Isolation

The final *Sleekcraft* factor concerns the similarity of the goods or services at issue. It is true that the City and the Port each own and operate one commercial airport. But this factor "must be considered in conjunction with the labeling and appearance of the advertisements and the degree of care exercised by the consumers" – not as a standalone checkmark in the City's favor. *Network Automation*, 638 F.3d at 1150. When weighed accordingly, it does not support a finding of confusion.

FENNEMORE WENDEL
FENNEMORE CRAIG, P.C.
OAKLAND/SEATTLE

1    *Id.* (holding "district court allowed this factor to weigh too heavily in the analysis).

2         The City falls far short of showing it is likely to prevail on the merits.

3         **5.    Classic Fair Use Bars the City's Claims**

4         Finally, even if the City could overcome all of the above, the Port's use of the geographic term

5    "San Francisco Bay" constitutes "classic (descriptive) fair use" which is a complete defense to the

6    City's claims. 15 U.S.C. § 1115(b)(4); *USPTO v. Booking.com B.V.*, 591 U.S. 549, 562 (2020) ("even

7    where some consumer confusion exists, the doctrine known as classic fair use . . . protects from

8    liability anyone who uses a descriptive term . . . to describe her own goods"); *Fortune Dynamic, Inc.

9    v. Victoria's Secret Stores Brand Mgmt., Inc*., 618 F.3d 1025, 1031 (9th Cir. 2010) (classic fair use

10   "involves a defendant's use of a descriptive term in its primary, descriptive sense"). To establish a

11   classic fair use defense, "the defendant must show that it used the term 'fairly and in good faith only

12   to describe its goods or services'" or in this case, their geographic origin. *Id*.[6]

13        The City asserts that "SAN FRANCISCO BAY OAKLAND INTERNATIONAL AIRPORT"

14   is being used "as a trademark" (ECF, p. 17:13) and the defense does not apply. But the Motion's focus

15   is on use of the first two words of San Francisco Bay: "San Francisco." The issue then is whether the

16   Port is using "San Francisco Bay" as a geographically descriptive term within its name or as a source

17   identifier. *Bell v. Harley Davidson Motor Co*., 539 F.Supp.2d 1249, 1258 (S.D. Cal. 2008) (use "as a

18   trademark" means "to identify the source of its products"). The evidence shows that the term was

19   adopted and is being used by the Port to identify OAK's geographic location. (Wan Decl. ¶¶ 15-17,

20   28; Simon, Decl. ¶¶ 8, 30.) And the Port has done this in good faith as evidenced by its continuing use

21   of its existing logo and large "OAK" lettering. (Albrecht, ¶31; *see Skydiving School, Inc. v. GoJump

22   Americ*a, LLC, 703 F.Supp.3d 1215,1125 (D. Hawaii 2023) (use of images and other terms by

23   defendant with the disputed term indicated good faith); *American Olean Tile Company, Inc. v.*

24   _____

25   [6] Subsection (b)(4) states that the rights accorded a federally registered mark are "subject to the
     following defenses," namely, "[t]hat the use of the name, term, or device charged to be an
26   infringement is a use, otherwise than as a mark, . . . of a **term** or device which is descriptive of and
     used fairly and in good faith only to describe the goods or services of such party, or their **geographic**
27   **origin**." 15 U.S.C. § 1115(b)(4) (emphasis added).

FENNEMORE WENDEL
FENNEMORE CRAIG, P.C.
OAKLAND/SEATTLE

DEFENDANT PORT OF OAKLAND'S OPPOSITION          CASE NO. 3:24-CV-02311-TSH
TO PLAINTIFF'S MOTION FOR PRELIMINARY
INJUNCTION - 21

1   *American Marazzi Tile, Inc*., 1988 WL 29056 at *8 (E.D. Pa. October 5, 1988) ("[t]he word

2   'American' in 'American Marazzi' is not used as a separate trademark [but] is used to describe

3   defendant as a non-foreign corporation"; finding of "American" in "American Marazzi" was fair

4   use).

5   **B.    The City Will Not Suffer Irreparable Harm Absent an Injunction**

6          To satisfy the "irreparable injury" prong of the *Winter* test, a plaintiff must "demonstrate that

7   irreparable injury is *likely* and not merely a possibility." *Freelancer Int'l Pty Ltd. v. Upwork Global,*

8   *Inc.*, 851 Fed. Appx. 40, 41 (9th Cir. 2021), *cert. denied*, 142 S. Ct. 766, 211 L. Ed. 2d 480 (2022)

9   (citation and internal quotation marks omitted). In trying to establish likelihood of irreparable injury,

10  the City relies on the rebuttable presumption under 15 U.S.C. § 1116(a). But that presumption only

11  applies if the City establishes that it is likely to prevail on the merits or shows serious questions,

12  which it has not done here. *Good Meat Project v. GOOD Meat, Inc.*, 2024 WL 1083462, at *9 (N.D.

13  Cal. Feb. 12, 2024); *WonderKiln, Inc. v. Snap, Inc.*, 2022 WL 18397509, at *3 (C.D. Cal. Nov. 15,

14  2022); *Zamfir v. Casperlabs, LLC*, 528 F. Supp. 3d 1136, 1150 (S.D. Cal. March 26, 2021).

15         Even if the City had shown it is likely to prevail on the merits, the presumption that it will

16  suffer irreparable harm absent an injunction is rebuttable. *Kahala Franchising, LLC v. Real Faith,*

17  *LLC*, 2022 WL 1605377, at *4 (C.D. Cal. May 20, 2022). Since the Port implemented OAK's new

18  name five months ago, SFO's reputation has not been impacted. The number of passengers who have

19  flown into or out of SFO has **_increased_**, SFO has secured new airline routes, and the press continues

20  to positively characterize the airport. (Yamasaki, Exs. 24-26; Lindemeier, Exs. 4-6; ECF 39-2, Ex. B.)

21  This evidence rebuts any presumption that the City will suffer irreparable harm absent an injunction.

22         Once rebutted, the presumption "bursts like a bubble," and the City has the burden to show

23  irreparable harm. *Robinson v. Best Price Distributors, LLC*, 2022 WL 3013131, at *3 (C.D. Cal. June

24  14, 2022). The City, for its part, relies upon conclusory and speculative assertions of reputational

25  harm and a handful of purported angry online opinion comments (which are directed at the Port or

26  OAK, not SFO). This is insufficient. "A finding of likely irreparable harm cannot be based on

27  'unsupported and conclusory statements regarding harm'—it must be based on 'factual findings.'"

FENNEMORE WENDEL
FENNEMORE CRAIG, P.C.
OAKLAND/SEATTLE

DEFENDANT PORT OF OAKLAND'S OPPOSITION          CASE NO. 3:24-CV-02311-TSH
TO PLAINTIFF'S MOTION FOR PRELIMINARY
INJUNCTION - 22

*Freelancer*, 851 Fed. Appx. at 42; *see also Mountain Mike's Pizza, LLC v. SV Adventures, Inc.*, 2021 WL 6136178, at *4 (E.D. Cal. Dec. 29, 2021) (plaintiff failed to show external data of loss of goodwill); *City of Leavenworth v. Projekt Bayern Ass'n*, 2022 WL 4546550, at *5 (E.D. Wash. Sept. 28, 2022) (rejecting argument that the angry reaction of some consumers indicated reputational harm; finding no irreparable harm where plaintiff failed to submit "evidence from local businesses demonstrating actual canceled reservations or reduced booking numbers, or any other evidence from which the Court could infer a likelihood of irreparable harm.").

## C.   The Balance of Hardships Favors the Status Quo – Not a Preliminary Injunction

The City has not shown it is likely to suffer hardship without an injunction. Indeed, the evidence shows SFO's reputation and economic performance have ***improved*** since the Port changed OAK's name. (Yamasaki, Exs. 24-26; Lindemeier, Exs. 4-6; ECF 39-2, Ex. B.) The City therefore failed to meet its burden of proof such that the equities favor OAK. *Playmakers LLC v. ESPN, Inc.*, 376 F.3d 894, 898 (9th Cir. 2004) (balance of equities favored defendant where there was a "lack of proof quantifying the harm that [plaintiff] would suffer absent preliminary relief."); *Instant Media, Inc. v. Microsoft Corp.*, 2007 WL 2318948, at *17 (N.D. Cal. Aug. 13, 2007) (burden not met where "no evidence of any *actual* harm" presented).

Even if the City could overcome this, its two arguments about why the Port will not suffer any harm if enjoined fail. First, the City asserts that "[t]he balance of equities favors the City because its requested relief seeks 'no more than requir[ing] Defendant[s] to comply with … laws'" (ECF 35, 24:13-14.) But this argument requires a predicate infringement finding, which the City has not shown.

Second, the City argues that "[a]ny hardship that Oakland may claim is entirely self-inflicted[.]" (ECF 35, 24:17-18.) This assertion again presumes the City has established it is likely to prevail on the merits, which it has not done. It is also at odds with the analysis required by *Winters*. "[T]he real issue in this regard is the degree of harm that will be suffered by the plaintiff or the defendant if the injunction is *improperly* granted or denied.'" *Planet Coffee Roasters, Inc. v. Hung Dam*, 2010 WL 625343, at *6 (C.D. Cal. Feb. 18, 2010) (internal citations and quotation marks omitted) (emphasis in original). Following the City's logic, if so-called "self-made harm" is given

FENNEMORE WENDEL
FENNEMORE CRAIG, P.C.
OAKLAND/SEATTLE

DEFENDANT PORT OF OAKLAND'S OPPOSITION          CASE NO. 3:24-CV-02311-TSH
TO PLAINTIFF'S MOTION FOR PRELIMINARY
INJUNCTION - 23

substantially less weight under the analysis, "then the balance of the harms will almost always favor the plaintiff, thus transforming a preliminary injunction from an extraordinary remedy into a routine occurrence." *Scotts Co. v. United Industries Corp.*, 315 F.3d 264, 284 (4th Cir. 2002). That is not the law. *Id.* Thus, courts have routinely rejected the "self-inflicted harm" argument. *Kiva Health Brands*, 402 F. Supp. 3d at 899-900 (denying motion for preliminary injunction); *see also C21FC LLC v. NYC Vision Cap. Inc.*, 2022 WL 2191934, at *9 (D. Ariz. June 17, 2022); *Champion-Cain v. Macdonald*, 2016 WL 7188242, at *9 (S.D. Cal. Dec. 12, 2016); *see also Sutter Home Winery, Inc. v. Madrona Vineyards, L.P.*, 2005 WL 701599, at *14 (N.D. Cal. Mar. 23, 2005).

While the City will not suffer any harm by the issuance of an injunction, the Port will. As a practical matter, a preliminary injunction will essentially force the Port to abandon OAK's new name completely, since even if the Port were to prevail at trial, the repeated discontinuing and re-adoption of names would harm consumers and convey an impression of business instability. *See* GILSON ON TRADEMARKS § 14.02(3)(a); *see also*, *e.g.*, *Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1099 (9th Cir. 2016) ("A motion for preliminary injunction may even, as a practical matter, determine the outcome of a case"); *In re Hawaiian Airlines, Inc.*, 2006 WL 2864921, at *6 (Bankr. D. Haw. Oct. 5, 2006) ("As a practical matter, the preliminary injunction which HA requests would give it all, or nearly all, of the injunctive relief which HA might get in a final judgment."). In other words, a preliminary injunction will effectively grant the City the final relief it ultimately seeks.

OAK will also suffer immediate and direct harm, as it has invested considerable resources in its new name, including the approval process with the FAA, and working with third party providers to ensure a smooth process for the traveling public. (Simon, ¶¶45-52, 55.)

When these significant hardships are compared to the City's conclusory, speculative, and generalized assertion of possible harm, the balance of equities tips sharply in OAK's favor, and against issuance of an injunction at this stage of the proceedings on a very limited record. *See*, *e.g.*, *Stark v. Diageo Chateau & Est. Wines Co.*, 907 F. Supp. 2d 1042, 1067 (N.D. Cal. 2012) ("The harm from an erroneously issued, widespread injunction far outweighs any harm should such relief be erroneously denied."); *Metro Pub. Co. v. San Jose Mercury News*, 1993 WL 266786, at *5 (N.D. Cal.

FENNEMORE WENDEL
FENNEMORE CRAIG, P.C.
OAKLAND/SEATTLE

DEFENDANT PORT OF OAKLAND'S OPPOSITION          CASE NO. 3:24-CV-02311-TSH
TO PLAINTIFF'S MOTION FOR PRELIMINARY
INJUNCTION - 24

July 12, 1993) ("Where "the harm that Plaintiff points to is one of gradual erosion rather than some discrete cataclysmic even from which it would suffer irrevocable harm," an injunction should be denied."); *Wham-O, Inc. v. Paramount Pictures Corp.*, 286 F. Supp. 2d 1254, 1264 (N.D. Cal. 2003).[7]

**D.    The Public Interest Favors Denying the City's Premature Injunction Request**

The City argues that an injunction is in the public interest because OAK's name "has misled and will continue to mislead the public." (ECF 35:27-28.) Where a plaintiff's "public interest argument rests on the likelihood of consumer confusion" and plaintiff "has not clearly shown a likelihood of confusion or irreparable harm" the public interest is not served by an injunction. *Good Meat Project v. GOOD Meat, Inc.*, 2024 WL 1083462, at *11 (N.D. Cal. Feb. 12, 2024); *see also Future Fields, LLC v. Future Scouts*, 2021 WL 6104311, at *6 (C.D. Cal. Nov. 24, 2021) ("As Plaintiff has not established that it is likely to succeed on its claim of common law trademark infringement, the public interest is not served by an injunction."); *Active Network, Inc. v. Elec. Arts Inc.*, 2010 WL 3463378, at *6 (S.D. Cal. Aug. 31, 2010) ("Plaintiff has not sufficiently shown the possibility of confusion. If anything, an injunction would violate the public's interest in fair and healthy competition.")

In fact, the opposite is true. "Although avoiding consumer confusion would serve the public interest, enjoining the wrong party would harm the public interest." *Dahon N. Am. Inc. v. Hon*, 2012 WL 13012476, at *6 (C.D. Cal. Mar. 19, 2012). This is especially so here, where the City seeks an injunction to prohibit the Port from using a name that accurately describes its geographic location on San Francisco Bay.

## V.    CONCLUSION

The City's word mark and OAK's full name must be considered in "the full commercial context in which consumers encounter them." (ECF 48:21-23.) Yet the City's Motion actively avoids that context. The reason why is clear: reviewing it with the apposite legal analysis shows the City cannot prevail. For the reasons discussed above, the Court should deny the Motion.

---

[7] Any grant of the City's Motion would require a substantial bond and briefing on this issue.

1

2    Dated: <u>October 8, 2024</u>                    FENNEMORE WENDEL & FENNEMORE
                                                CRAIG, P.C.

3

4                                               By:    *s/ Brandi B. Balanda*
                                                      _____
5                                                     Eugene M. Pak
                                                      Stephen C. Willey
                                                      Brandi B. Balanda
6                                                     Christopher J. Lindemeier

7                                                     Attorneys for Defendant and
                                                      Counterclaimant City of Oakland, a
8                                                     municipal corporation, acting by and
                                                      through its Board of Port Commissioners
9                                                     (Port of Oakland)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

DEFENDANT PORT OF OAKLAND'S OPPOSITION          CASE NO. 3:24-CV-02311-TSH
TO PLAINTIFF'S MOTION FOR PRELIMINARY
INJUNCTION - 26