Mary C. Richardson (Bar No. 208586)
Port Attorney
mrichrdson@portoakland.com
Kimberly I. McIntyre (Bar No. 184648)
Deputy Port Attorney
kmcintyre@portoakland.com
**PORT OF OAKLAND**
530 Water Street
Oakland, California  94607
Tel: (510) 627-1572 / (510) 627-1205

Eugene M. Pak (Bar No. 168699)
epak@fennemorelaw.com
**FENNEMORE WENDEL**
1111 Broadway, 24th Floor
Oakland, California  94607
Tel: (510) 834-6600 / Fax: (510) 834-1928

Stephen C. Willey (Bar No. 209164)
swilley@fennemorelaw.com
Brandi B. Balanda (*Pro Hac Vice*)
bbalanda@fennemorelaw.com
Christopher J. Lindemeier (*Pro Hac Vice*)
clindemeier@fennemorelaw.com
**FENNEMORE CRAIG, P.C.**
1425 Fourth Avenue, Suite 800
Seattle, Washington  98101
Tel: (206) 749-0500 / Fax: (206) 749-0500

Attorneys for Defendant and Counterclaimant City of
Oakland, a municipal corporation, acting by and
through its Board of Port Commissioners (Port of
Oakland)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY AND COUNTY OF SAN FRANCISCO,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF OAKLAND AND PORT OF OAKLAND,<br><br>Defendants. | Case No. 3:24-cv-02311-TSH<br><br>**DECLARATION OF DR. CAROL A. SCOTT**<br><br>Date: November 7, 2024<br>Time: 10:00 AM<br>Courtroom: E – 15th Floor<br>Trial Date: (None Set) |

CITY OF OAKLAND, A MUNICIPAL
CORPORATION, ACTING BY AND
THROUGH ITS BOARD OF PORT
COMMISSIONERS (PORT OF OAKLAND),

                Counterclaimant,

v.

CITY AND COUNTY OF SAN
FRANCISCO,

                Counterclaim Defendant.

I, Carol A. Scott, declare as follows:

## I.      BACKGROUND AND QUALIFICATIONS

1.     I am a Professor of Marketing Emeritus at the Anderson Graduate School of Management ("Anderson School") at UCLA and an expert in marketing strategy and consumer and market research. I hold a Ph.D. in Marketing from Northwestern University, where my minor field of study was Social Psychology. I also received a Master of Science in Management degree from Northwestern University and a Bachelor of Science in Business and History Education degree from the University of Texas at Austin. From 1986 through 1994, I held several administrative positions with the Anderson School, including Chairman of the Faculty and Associate Dean for Academic Affairs. I served as the faculty director of the Anderson School's Executive Program, a non-degree, certificate program for mid-level and senior managers, from 2009 through 2019, and I continue to teach in various executive education short courses for the Anderson School.

2.     Over the past 40 years, I have taught courses on Marketing Strategy and Management, Consumer Behavior, Advertising, Distribution Strategy, and International Marketing to students in undergraduate and graduate education programs at UCLA, Stanford

Business School, Harvard Business School, and Ohio State University. I also have published numerous journal articles, research reports, and book chapters on Consumer Behavior, Marketing Research, and other marketing topics, a complete list of which is included in my Curriculum Vitae, attached as Exhibit 1. I have served on the editorial boards of the *Journal of Marketing*, *Journal of Marketing Research*, and *Journal of Consumer Research*. I have been a member of the board of directors for Sizzler International, A-Fem Medical Corporation, Inc., and United Online, Inc.

3.      I am also a founding partner at Crossfield Associates, a litigation analysis and support firm. I have more than 30 years of experience in providing expert marketing analysis and testimony in cases involving class certification, trademarks, copyrights, damages related to infringement of intellectual property, and other questions of marketing strategy, such as advertising, distribution, purchasing processes, and aspects of consumer behavior. My expertise includes the development of surveys to determine consumer perceptions and beliefs, the assessment of drivers of purchase, consumer perceptions of product features and advertising claims, factors that influence pricing products in the marketplace, and consumers' understanding of various marketing materials. A list of my recent testimony is attached as Exhibit 2.

4.      In these assignments, I have used my doctoral level training, approximately 40 years of conducting and teaching various topics within the field of marketing, and my experience serving as a marketing expert on various boards of directors, to inform my work. Specifically, with respect to my assignment in this matter, I have had extensive doctoral level education in social and consumer psychology, which informs the determination of the methodology appropriate for particular research questions for the construction of surveys

designed to investigate consumer attitudes, beliefs, and perceptions. I have had extensive doctoral level education in the design, analysis, and interpretation of experiments designed to determine causal relations (*i.e.*, those studies that show test and control stimuli and observe reactions); have published research using this methodology in the most prestigious, peer-reviewed social psychological journals (*Journal of Personality and Social Psychology*, *Journal of Experimental Social Psychology*) and consumer behavior and marketing journals (*Journal of Consumer Research*, *Journal of Marketing Research*, *Journal of Behavioral Decision Making*); and have conducted many such studies for litigation in state and federal courts. I also have had extensive doctoral level education in the design, analysis, and interpretation of consumer surveys that are used in experimental as well as non-experimental studies to investigate consumer attitudes, beliefs, and perceptions. I have personally designed and implemented hundreds of consumer attitudinal surveys and experimental studies for litigation in state and federal courts.

5.      Documents considered in forming my opinions are cited herein and/or are listed in Exhibit 3.

## II.      SCOPE OF ASSIGNMENT

6.      I have been asked by counsel for the Port of Oakland ("Defendant") to evaluate and respond to the Expert Report of Sarah Butler, filed on behalf of Plaintiff City and County of San Francisco ("Plaintiff").[1] In particular, I was asked to determine the degree to which the consumer survey conducted by Ms. Butler ("Butler Survey") provides a valid and reliable assessment of consumer confusion regarding the Port of Oakland's decision to change the name

---

[1] Expert Report of Sarah Butler, June 27, 2024, ("Butler Report").

of its airport ("OAK") from "Metropolitan Oakland International Airport" to the "San Francisco Bay Oakland International Airport" (the "New Name").

## III.     SUMMARY OF OPINIONS

7.     Based on my review of the Butler Report, the Butler Survey, and information available to me at this time, I conclude that Ms. Butler provides no reliable basis to determine the "extent to which Defendant Port of Oakland's use of 'San Francisco Bay Oakland International Airport' rather than 'Oakland International Airport' is likely to cause confusion with Plaintiff's 'San Francisco International Airport'… ."[2]  To the extent that the Butler Survey itself can provide any useful data to answer this question, its results instead show that consumers are *unlikely* to be confused by the use of the New Name.[3]

8.     Specifically:

   i.   <u>Skewed Survey Population</u>: Ms. Butler's survey cannot reliably predict consumer confusion in the real world because its sample was drawn from an under-inclusive population that excludes markets that currently account for the largest number of Oakland passengers.

   ii.  <u>Lack of External Validity—The Butler Survey Does Not Replicate the "Real World"</u>: Because Ms. Butler's survey procedures do not correspond to key features of the real-world context in which consumers would make judgments and choices, the survey has no external validity.  The survey results thus cannot be generalized to the real-world environment where, specifically, consumers

---

[2] *Id.* at ¶16.

[3] I reserve the right to amend and/or change my opinions if additional information becomes available that would warrant such amendments and/or changes.

would have more information relevant to their judgments and choices. The lack of external validity renders the results of her confusion Question 2 in the survey irrelevant.

iii. <u>Lack of Internal Validity—A Causal Link between the New Name for OAK and Any Confusion Observed Cannot Be Established</u>: Data for those viewing modified depictions of Southwest Airlines' webpages must be disregarded because the control group used for this setting cannot isolate the effects of OAK's name change from other plausible factors. In addition, one of the three measures of "confusion," i.e., "Which of the following airports, if any, is the primary airport serving the San Francisco Bay Area?", is not tied to a relevant definition of confusion, i.e., this question in  the survey does not necessarily measure confusion between the San Francisco International Airport and the San Francisco Bay Oakland International Airport.

iv. <u>Inadequate Level of Alleged (Net) Confusion for the Only Valid and Reliable Measure of Consumer Confusion Relevant to Selecting and Purchasing a Flight to "San Fran"</u>: No significant net confusion was found for those viewing modified depictions of Google Flights webpages with respect to the only potentially relevant and reliable confusion question in the survey, i.e., where do

consumers think the [San Francisco Bay] Oakland International Airport is located.[4]

## IV.     BASIS FOR OPINIONS

### A.     Background

9.     Ms. Butler stated that her assignment was "to design and conduct a survey to evaluate whether the Metropolitan Oakland International Airport's … decision to change its name to the 'San Francisco Bay Oakland International Airport' is likely to cause confusion amongst relevant consumers."[5]  To answer this question, Ms. Butler designed and fielded a consumer experimental survey that showed respondents one of two mock-ups of internet website pages.  Half of the respondents in the Butler Survey were asked to view mock-up depictions of webpages from one airline (Southwest Airlines), with the other half viewing mock-up depictions of a third-party flight search site (Google Flights). Each of these webpages ostensibly showed the initial process and some of the steps that consumers might take if they were searching for flights to Northern California with the search term "San Fran" while using the Southwest Airlines or the Google Flights website, as applicable.[6]  In each of these two groups, respondents were shown one of two mock-up depictions of the webpages, either a

---

[4] The text in brackets ("San Francisco Bay") herein denotes the text that was added to the beginning of the "Oakland International Airport" text for those respondents in the Butler Survey's test group; in other words, the test group respondents saw the new name "San Francisco Bay Oakland International Airport."  In contrast, respondents in the control group were exposed to text representing the "old" name, namely, "Oakland International Airport" (without "San Francisco Bay" or the word "Metropolitan").

[5] Butler Report, ¶8, pp. 4-5.

[6] The Butler Report does not define what type of real-world consumer confusion is of interest, i.e., confusion amongst consumers with respect to what?

"test" version which used the New Name for OAK or a "control" version which in some cases used the "Oakland International Airport" name.[7]

10.     The Respondents were then asked three questions that purport to measure confusion: (Question 1) "Where do you think the [San Francisco Bay] Oakland International Airport is located?" (an open-ended question); (Question 2) "Do you think the [San Francisco Bay] Oakland International Airport is … The same airport as San Francisco International Airport" or "A different airport from the San Francisco International Airport?"; and (Question 3) "Which of the following, if any, is the primary airport serving the San Francisco Bay Area?"

**B.     Discussion**

> **a.     Opinion 1: Skewed Survey Population: Ms. Butler's survey cannot reliably predict consumer confusion in the real world because its sample was drawn from an under-inclusive population that excludes markets that currently account for the largest number of Oakland passengers.**

11.     While Ms. Butler drew her survey's sample from a pool of consumers who indicated that they are likely to book their own travel by air to Northern California in the next year, Ms. Butler limited this pool to only those persons residing in one of ten (10) U.S. states and the District of Columbia[8] that are reportedly "unserved" for OAK.[9] The Butler Report cites a PowerPoint presentation as the source of this list of markets and airports but does not provide any explanation or definition as to why these 11 locations were used. I have since been

---

[7] *Id.*, pp. 17-22 and at Exhibit F.

[8] These states were Arizona, Florida, Illinois, Louisiana, Michigan, New York, North Carolina, Ohio, Pennsylvania, and Texas, as well as the District of Columbia.

[9] "Ex 6 Met OAK Presentation," Port of Oakland PowerPoint file "41124 Presentation.pptx", as cited in the Butler Report at footnote 19.

informed that "unserved markets," as used in the presentation, refers to certain airports with no non-stop flights to Oakland, [10] which Ms. Butler either did not know and/or failed to mention. This set of markets excludes entirely 57% of the U.S. population from her sample, and, in particular, excludes four of the five markets that provide the most passengers for OAK, i.e., Los Angeles (California), Las Vegas (Nevada), San Diego (California), and Phoenix (Arizona).[11],[12] The resulting sample was therefore even more geographically constrained; 53% of respondents who took the Butler survey resided in one of only *three* states (New York, Texas, and Florida).[13]

12.    The Butler Report fails to provide any rationale for the decision to sample only from this small number of "unserved" states.[14]  Standard practice for likelihood of confusion research is to select the market of the defendant that overlaps with that of the plaintiff, which in this case is potentially nationwide.[15]  By limiting the sample population to only these ten states and the District of Columbia, and excluding important markets like California, the Butler

---

[10] Conversation with counsel for Port of Oakland, October 5, 2024.

[11] "Estimates of the Total Resident Population and Resident Population Age 18 Years and Older for the United States, Regions, States, District of Columbia, and Puerto Rico: July 1, 2023 (SCPRC-EST2023-18+POP)," United States Census Bureau.

[12] Conversation with counsel for Port of Oakland, October 5, 2024.

[13] *See* Butler Report, Table 2, p. 23.

[14] A review of the PowerPoint presentation from which Ms. Butler obtained the list of "unserved" markets shows a total of 21 such markets in 12 U.S. states and the District of Columbia.  The pool of consumers from which the sample was drawn, however, did not include the states of two of these markets, i.e., Indiana and Massachusetts. The Butler Report provides no rationale for their exclusion.

[15] *See generally*  Barber, W G. & G. E. Yaquinto, "The Universe," in Shari S. Diamond and Jere B. Swann (eds.), *Trademark and Deceptive Advertising Surveys: Law, Science, and Design, Second Edition* (Diamond and Swann 2022), Chapter 3.

Survey samples only a small portion of relevant consumers searching for flights to Northern California who potentially would be exposed to the new name during a search for flights.[16] Thus, Ms. Butler's sample is severely under-inclusive of OAK's target market, one that can be better described as all consumers in the United States that are planning to travel to Northern California (or the San Francisco Bay Area), including those residing in California or other nearby locations that provide a large number of passengers for OAK and presumably have a greater familiarity with the Northern California/San Francisco Bay geographic area.[17] The findings of the Butler Survey thus cannot be used to provide a reliable estimate of the likelihood of confusion in the overall target market.

> **b.     Opinion 2:  Lack of External Validity—The Butler Survey Does Not Replicate the "Real World": Because Ms. Butler's survey procedures do not correspond to key features of the real-world context in which consumers would make judgements and choices, the survey has no external validity.  The survey results thus cannot be generalized to the real-world environment where, specifically, consumers would have more information relevant to their judgments and choices. The lack of external validity renders the results of her confusion Question 2 in the survey irrelevant.**

13.     One of the most important factors in establishing the external validity[18] of a survey is the degree to which information that is present in the real world and relevant to the

---

[16] Survey respondents are told to "imagine [they] were shopping for a flight to Northern California." Butler Report, ¶29, p. 15,

[17] Ms. Butler's sampling procedures required that half of her sample had "ever" flown to Northern California, but the recency of such travel is unknown. She also did not ask whether or not the respondent purchased that prior ticket for him/herself, or if it was purchased online.

[18] External validity is indicated by the degree to which the experimental setting replicates that of the real-world setting of interest.

judgment or decision being measured in the survey is also present in the survey environment.[19] An examination of Ms. Butler's survey procedures clearly demonstrate that her survey does not meet this requirement.  Her study has no external validity, and thus the survey results cannot serve as a reliable predictor of consumer decisions that would occur in the real world.[20]

**2.    The Butler Study Does Not Use Stimuli That Represent the Current Real World.**

14.    As a practical matter, the Butler survey does not replicate the real world because neither Southwest Airlines nor the other six major domestic airlines that fly into and out of OAK's use airport names on their webpages to identify the airport options.[21]

---

[19] *See* Simonson, Itamar and Ran Kivetz, "Demand Effects in Likelihood of Confusion Surveys: the Importance of Marketplace Conditions," in Shari S. Diamond and Jere B. Swann (eds.), *Trademark and Deceptive Advertising Surveys: Law, Science, and Design, First Edition,* Chapter 11, pp. 243-259. *See also* Shadish, William R., Thomas D. Cook, and Donald T. Campbell, Experimental an44d Quasi-Experimental Designs for Generalized Causal Inference, Houghton Mifflin Col, 2002 ("Cook and Campbell 2002").

[20] *Id.*

[21] See Exhibit 5.  Alaska Airlines does not use the full airport name but instead lists *abbreviated* airport names but does so along with city and state locations as well as airport codes such as: "Oakland, CA (OAK – Oakland Intl.)" and "San Jose, CA (SJC – San Jose Intl.)."

15.     For the Southwest Airlines webpages, Ms. Butler created a test stimulus based on a hypothetical world in which Southwest uses an airport name for OAK in the pop-up menu of airport choices.[22]

Figure 1



The Southwest Airlines control webpages, however, do not reflect this hypothetical world of a changed Southwest Airlines policy, but instead remain in the current real world with no

_____

[22] Strangely, in this hypothetical world created by Ms. Butler's Southwest Airlines test webpages, Southwest Airlines not only decides to change its long-standing policy of not using airport names (*see* Declaration of Jennifer Bridie, October 4, 2024), but it inexplicably does so only for OAK on the first pop-up menu that lists alternative airports for the San Francisco Bay Area (i.e., in contrast, SFO and SJC are still listed only by city and airport code).  The control webpage, however, does not enter the hypothetical world of a changed Southwest Airlines policy, but instead remains in the real world with no apparent changes from what Southwest Airlines actually shows on its website.

apparent changes from what Southwest Airlines actually shows on its website, i.e., all airports indicated only by city names and airport codes.

16.    For the Google Flights platform, the Butler Survey does not use the actual Google Flights webpages as they currently appear when one enters "San Fran" as the search term. At the present time, a search for flights to "San Fran" brings up a pop-up menu that includes the heading of "San Francisco, California/City in California," with only the "San Francisco International Airport SFO" and "11 mi to destination" indented under the heading. This is followed by a second heading of "San Francisco Bay Area, Region in California." No listing for OAK is shown in the pop-up menu. The only airport shown, other than SFO, is that of "San Francesco d'Assisi Airport PEG, International Airport in Italy."[23] Ms. Butler does not explain what she based the survey's Google Flights' webpages on. Webpages for both platforms thus do not replicate the webpages in the real world, but instead "replicate" webpages, at best, in a hypothetical world that does not exist, and may never exist.

### 3.    The Butler Survey Does Not Show Respondents All Relevant Webpages

17.    The Butler Survey procedures also fail to show respondents all of the pages (and thus all of the information) that consumers would have to view in order to actually select and book a flight, the required precursor to going to or arriving at an unintended airport. Each additional page that consumers must view in order to actually purchase or book a flight contains additional cues that could alert a consumer as to the true identity and location of the airports. Had the respondents who were shown the mock-up depiction of a Southwest Airlines website, for example, been allowed to click on the downward arrow next to each airport listed

---

[23] Google Flights webpage accessed October 7, 2024. *See* Exhibit 4.

FENNEMORE WENDEL
FENNEMORE CRAIG, P.C.
OAKLAND/SEATTLE

on one of the webpages they saw – which they would have had to do in order to see the available flights, select one, and then follow through to purchase a ticket – they would be exposed to further cues as to the locations of and the differences between the airports that would clearly indicate that each one is a different airport with a different airport code and with different flights available.  An example of what a consumer would see on this further page is shown in Figure 2 (accessed October 7, 2024).  The same is true for Google Flights stimuli, which shows only a single page that contains the menu of airport options that pops up when one types "San Fran" into the search bar.  If a consumer were to click  to view "All San Francisco Airports" a map of the area and airports would appear (Figure 3) (accessed October 7, 2024).

Figure 2



Figure 3



**4.      Respondents Are Not Allowed to View the Webpages and the Information in Them as They Would in the Real World.**

18.      In the real world, consumers would be looking at the relevant webpages when searching for an airport and/or flights and would be able to go back and review all of the information on the webpage when making judgments or purchasing decisions.

19.      In the Butler Survey, however, those webpages were removed and the multiple, relevant cues on them were not available to respondents when they were asked about their judgments and beliefs.  The lack of correspondence between the information available in the real world and the information available in the survey when forming judgments and beliefs makes the level of confusion observed in the Butler Survey an unreliable predictor of the

likelihood of confusion in the real world, i.e., we cannot say what level of confusion, if any, would occur in the real world.[24]  Further, respondents taking a survey rarely are as motivated and as focused as consumers who are actually trying to search for flights with the intention of making a purchase, making it even more important that cues that could easily be used in the real world be equally easy to use in the survey.[25]

20.    The effect of not replicating the information accessible in the real world when asking for judgments or opinions in the survey is seen in particular when considering responses to the second confusion question (Q2:  "Do you think the [San Francisco Bay] Oakland International Airport is the same airport as the San Francisco International Airport, a different airport from the San Francisco International Airport, or you don't know or are unsure?").  If one were looking at the webpages as one would in the real world when searching for and selecting an airport and a flight, it would be obvious that the airports are different—why would an airline or a search platform list two names or entries, two different airport codes (which was not included in the survey question) and different flights if the airports are really one and the

---

[24] For example, to the extent that respondents were not allowed to view the webpages as they were asked about their judgments and beliefs as they would be in the real world, any estimate of net confusion would be biased in a positive direction.

[25] *See* Allenby, Greg, Geraldine Fennell, Joel Huber, Thomas Eagle, Tim Gilbride, Dan Horsky, Jaehwan Kim, Peter Lenk, Rich Johnson, Eli Ofek, Bryan Orme, Thomas Otter, and Joan Walker, "Adjusting Choice Models to Better Predict Market Behavior," *Marketing Letters*, vol. 16, no. 3-4, Sixth Invitational Choice Symposium, December 2005 ("Allenby et al. 2005"), pp. 197-208.  *See also* Simonson, Itamar and Ran Kivetz, "Demand Effects in Likelihood of Confusion Surveys: the Importance of Marketplace Conditions," in Shari S. Diamond and Jere B. Swann (eds.), *Trademark and Deceptive Advertising Surveys: Law, Science, and Design, First Edition,* Chapter 11, pp. 145-154.

DECLARATION OF DR. CAROL A. SCOTT - 16                    CASE NO. 3:24-CV-02311-TSH

same airport?[26]  Not only were the respondents in the Butler Survey unable to view the actual webpages when answering this question (which they may never have even considered without being asked in the survey), the question itself did not include the airport codes (e.g., OAK) for the airports which were shown on all of the survey webpages.  Seeing a different airport code for the two airports in the questions, as was done on the webpages, would have been a clear cue that the airports are not one and the same.

21.    Finally, the Butler Survey was conducted at only one point in time which is likely to inflate the level of "net" confusion observed, i.e., during the 30 days in which the new name was being rolled out to potential consumers.  At this point in time, consumers undoubtedly already had knowledge and prior experience with the prior airport name because it has been used and promoted in marketing materials for many years, thus lowering the level of any confusion observed in response to the control webpages not because of the name, per se, but because of a long history of use and promotional materials.  In the real world, the multiple cues typically provided in the context of a search for and selection of an airport and flight may preclude confusion even for a new, unfamiliar name.

22.    In summary, the results of the Butler Survey, and particularly the results of Question 2 in the survey, cannot be generalized to the real world in which consumers would

---

[26] For the Southwest Airlines test web pages, two cities and only one airport name (for OAK) are listed on the first page, and three airport names are listed on the second page.  For the Southwest Airlines control web pages, three cities, but no airport names are listed on either the first or second page.  For the Google Flights test and control pages, two airport names (for SFO and OAK) are listed.

have additional diagnostic information about each airport.[27,28] As a practical matter, it may be difficult to obtain a reliable estimate of the likelihood that consumers in the real world who would be confused by a change in the name of OAK because they are likely to be exposed to many types and sources of information. A study conducted by Ipsos in March 2023 found that three out of four air trips taken by Americans in 2022 were taken for personal reasons.[29] Of those flying for personal reasons, 70% of consumers in the Ipsos study said that they visit one or more airline mobile apps or websites to research options before making a purchase and 80% report consulting more than one "site/agencies/companies" before making a final purchase.

    a.    **Opinion 3: Lack of Internal Validity—A Causal Link between the New Name for OAK and Any Confusion Observed Cannot Be Established: Data for those viewing modified depictions of Southwest Airlines webpages must be disregarded because the control group used for this setting cannot isolate the effects of Oakland's name change from other plausible factors. A second**

---

[27] Notably, at present, the Southwest Airlines website, like other airline sites, generally does not include airport names, but instead uses city names and airport codes (e.g., SFO, OAK, SJC), which is what Ms. Butler used for the Southwest <u>control</u> webpages in her survey. (*See* the declaration of Jennifer Bridie, October 4, 2024). In order to create stimuli for the test webpages for Southwest Airlines, however, Ms. Butler modified the actual first Southwest Airlines webpage by replacing the city name "Oakland, CA" with the airport name "San Francisco Bay Oakland International, CA" yet leaving the other alternative airports, i.e., SFO and SJC, identified by only their city names and airport codes.

[28] Using Google Flights, a consumer is also likely to be exposed to further cues about each airport they see if they use the site to find available flight options and purchase a ticket. Notably, however, at the present time, Google Flights does not even list OAK when a consumer types "San Fran" into the search bar, unlike the mock-up depiction of Google Flights used in the Butler Survey. On October 7, 2024, however, I observed that the Google Flights website showed only San Francisco International Airport when using the search term "San Fran." The site does not show "San Francisco Bay Oakland International Airport" or "Oakland International Airport" as an option even if the website may have done so in the past. Further, only the Sacramento Airport is shown if the consumer enters "Northern California" as the search term. See Exhibit 4.

[29] "Air Travelers in America: Key Findings of a Survey Conducted by Ipsos" pp. 9, 13-14.

**aspect of internal validity is also violated because one of the measures, "What of the following [among a list of airport names including San Francisco Bay Oakland International Airport, San Francisco International Airport, San Jose Mineta International Airport and Something Else and Don't Know /unsure] is the primary airport serving the San Francisco Bay Area does not necessarily measure relevant confusion or imply that a 'confused' consumer would necessarily select and purchase a ticket to the wrong airport.**

23.    While external validity ensures that the results of the survey can be generalized to the real world context of interest, internal validity ensures that a causal nexus can be made between the feature of interest, here the airport name, and the construct of interest, here confusion as to which airport should be selected and purchased in order to go a preferred destination or location.  Without internal validity, the study construction cannot be used to draw a valid conclusion with respect to the effects of the variable of interest.

24.    Standard procedure to measure any increase in consumer confusion due to a new name for OAK would be to compare the level of confusion that occurs when respondents are shown a relevant real-world stimulus that uses the "old" name (i.e., a control stimulus) with the level of confusion that occurs when a separate group of respondents are shown a stimulus that is exactly the same except for the use of the "new" name (i.e., a test stimulus).[30]  If respondents are randomly assigned to see either the control or the test stimulus, and if there is no difference between the two stimuli shown except the difference in the name of the airport, then scientific principles allow one to attribute the difference in the levels of confusion to the change in the

---

[30] Standard and proper research practice would be to choose a control stimulus that is as close to the test stimulus as possible but alters or removes the allegedly infringing mark (*see* Diamond and Swann 2022, Chapter 9).  In the present case, the proper control to test any confusion by the change from the old name to the new name would have been to at least use the prior name used, "Oakland International Airport." [See Butler Expert Report, ¶40, p. 20.]

FENNEMORE WENDEL
FENNEMORE CRAIG, P.C.
OAKLAND/SEATTLE

name. Although Ms. Butler cites this scientific rule for the creation of an appropriate control group, she did not abide by it in creating the Southwest Airlines test and control groups.[31] This can be seen by examining the different aspects of the test and control stimuli used in the Butler Survey.

**5.    Test and Control Stimuli Differed in Ways Other Than the Airport Name.**

25.    The Southwest Airlines test and control stimuli preclude the establishment of a causal relationship between the change in the airport name and any consumer confusion because they differ with respect to a feature, in addition to the different airport name, which may have affected the responses to the survey's confusion questions. Thus, the effect of the different airport name cannot be isolated from the effect of this other feature.

26.    Specifically, the first Southwest Airlines webpage shown to all respondents showed a pop-up menu indicating that a respondent should choose between three San Francisco Bay Area airports after doing a search for flights to "San Fran."[32] In the test condition, only OAK is identified by its full airport name as if it were a California city: "San Francisco Bay Oakland International Airport, CA – OAK."[33] The other two airports are listed using only the

---

[31] *See* Butler Expert Report, ¶40, p. 20: [To establish causality, the control stimulus must be] "as close to the test stimulus as possible but alters or removes the allegedly infringing material."

[32] Prior to seeing any webpages, all respondents were told to "Please imagine you were shopping for a flight to Northern California. On the next [few pages/page] you will be shown some information you might see if you were looking to purchase a flight." After this, respondents were shown the first Southwest Airlines webpage as if the person searching has entered "San Fran" as the intended destination. I can find nothing in the survey that would explain to the respondent why "San Fran" was the selected search term for Northern California flights, nor a reason why this change in terms was not made clear to the respondents.

[33] See Butler Expert Report, Exhibit F.

relevant cities' names, "San Francisco, CA – SFO" and "San Jose, CA – SJC" as is the current Southwest Airlines practice. The letters "San Fran" were bolded for both the San Francisco airport and OAK entries. The same webpage for the control group respondents did not include any airport names. In addition, "San Fran" was highlighted only for the San Francisco, CA – SFO entry.

27.     Thus, the test webpage differs from the control webpage in that OAK is singled out for special emphasis, as well as for being designated by its airport name rather than by the name of the city only. Any differences in responses to the test versus the control group, then, could be due to extra attention being drawn to OAK in the test stimuli. In particular, the highlighting of "San Fran" in OAK listing along with suggesting that this is a city like the other airport listings (i.e., the use of a comma after the airport name followed by "CA") may have led respondents to indicate in the second survey confusion question that there is another airport located in San Francisco, CA. The survey question itself also did not include the airport code for the San Francisco Bay Oakland International Airport, and thus did not include this important cue that was present in the test page. In addition, singling out OAK for special attention – the only airport named – in particular could have caused respondents in the Southwest Airlines test condition to assume that it must be the main or "primary" airport for the San Francisco Bay Area (Question 3 of the survey).

**6.    The Control Does Not Measure Confusion Due to a Change in the Airport Name.**

28.     A second fatal problem with the Southwest Airlines control stimuli arises because the control is not consistent with Ms. Butler's hypothetical test condition. Specifically, the control stimuli for the Southwest webpages did not adhere to Ms. Butler's "new" protocol

of showing the airport name for OAK (whereby OAK would have been listed in the control as "Oakland International Airport – OAK"), but instead followed the current real-world protocol of using city name and code, and no airport names at all. To measure the difference in confusion specifically due to a change in the airport name, the control condition should have listed OAK with its prior name and airport code, just like Ms. Butler listed OAK with its New Name and airport code in the test webpages, to account for or control for any confusion the use of this "old" name might cause.[34]

29.    Thus, the findings for the Southwest Airlines website must be discarded as scientifically unsound because the test and control conditions differ in ways other than different airport names.

**7.    Google Flights Stimuli Are Also Problematic.**

30.    The control group for the Google Flights webpages may be similarly flawed but it is unclear what modifications Ms. Butler made to the actual Google Flights webpages.[35] Unlike the Southwest control stimuli, the Google Flights control stimulus does allow for a comparison of the use of the "new" name in the test condition versus the use of the "old" name in the control condition. However, it is unclear how Ms. Butler may have altered the actual Google Flights webpages. In particular, the way in which OAK is presented on the page as

_____

[34] By using this control, Ms. Butler apparently assumes that no consumers are confused by the "old" OAK name, which is very unlikely. For example, some consumers might misread or be confused by the word "International" and the inclusion of "Oakland International" under the heading of "San Francisco Area Airports." Thus, the amount of confusion shown in Ms. Butler's control condition is likely to be too low.

[35] See Butler Expert Report, Exhibit F.

well as the name itself may have been changed, and the rationale for any change other than the

airport name would need to be justified.

Figure 4[36]



31.      As shown in Figure 4, the webpages used in Ms. Butler's experiment shows

OAK (i.e., either "San Francisco Bay Oakland International Airport" or "Oakland International

Airport") as well as the "San Francisco International Airport" indented under the heading "San

Francisco, California, USA" with a second line in smaller type of "U.S. County in California."

Next, a non-indented heading, "San Francisco Bay Area, California" with a second line reading

"Region in California" is listed.  This arrangement may have suggested to the respondent that

OAK is located in San Francisco County (which it is not) rather than in the greater San

---

[36] The Butler Survey control condition for Google Flights was exactly the same, except that
OAK was instead listed as "Oakland International Airport."

Francisco Bay Area. Respondents who saw the control stimuli with the name "Oakland International" may have already known where and what this airport is, but test respondents are seeing something new and previously unheard of, and thus the heading under which the airport is listed could be a more important cue to them.

32. It is notable that this is not the way in which OAK was presented on the Google Flights webpage when I conducted the same search as the Butler survey in May 2024. The results of that search are shown in Exhibit 4. Specifically, when I searched Google Flights using the search term "San Fran", the new name ("San Francisco Bay Oakland International Airport") was shown, but it was not nested under "San Francisco, California" (the actual Google Flights webpage also included a second line in smaller type of "City in California" rather than "US County in California"). Instead, only "San Francisco International Airport" (with a second line of "11 miles to destination") was shown under that city heading. As seen in Exhibit 4, "San Francisco Bay Oakland International Airport" was listed, but not indented under any heading. It also was followed by a second line in smaller type reading, "International Airport located in Alameda County." It was listed immediately above an item which read "San Francisco Bay Area, California," with a second line in smaller type reading "Region in California."[37] The webpage that resulted from my search is important because it shows how Google Flights actually did display OAK at one point after its change of name.

33. Because Ms. Butler did not provide a screenshot of the actual Google Flights webpage that she used to create those stimuli (before she altered it, presumably with image

---

[37] The Google Flights webpage apparently has changed again and as of October 7, 2024 does not show a listing for OAK at all when the search term "San Fran" is typed in. This is presumably due to Google Flights also reverting to the old Oakland Airport name, rather than the New Name it previously used. *See* Exhibit 4.

editing software), I cannot determine whether she modified the formatting and placement of OAK, whether she was modeling her stimuli on an actual Google Flights webpage, or whether she created the Google Flights webpage in some other way. If Ms. Butler modified the placement of OAK from what Google actually used, then her stimuli would not represent what consumers actually saw in the real world and a rationale would need to be provided for this deviation.

34.    While it could be argued that the placement of OAK in the Butler Survey was the same for both test and control conditions and thus any differences in responses cannot be due to a difference in placement between the two conditions, it is possible that responses to "San Francisco Bay Oakland International" would be differentially affected by its placement under the heading "San Francisco, California, USA/US County in California" as well as the removal of the second line, "International Airport in Alameda County." The actual placement and content of OAK entry may have provided such clear information about the location of OAK that little confusion would be seen in either the test or the control conditions.

**Confusion Question 3 (regarding the "primary" airport serving the San Francisco Bay Area) is Ambiguous, Has Methodological Problems, and Is Not Clearly Related to Confusion About OAK.**

35.    I have previously explained why the second confusion question (regarding whether the San Francisco Bay Oakland International Airport is the same airport as the San Francisco International Airport) is flawed and cannot provide a reliable prediction of the level of confusion in the real world. Question 3 ("Which of the following, if any, is the primary airport serving the San Francisco Bay Area?") is also flawed from an internal validity standpoint for two reasons: (1) it is not clear how respondents might have interpreted the term

"primary"[38] and (2) because it is not clear that the "wrong answer" with respect to which airport is the primary one for the San Francisco Bay Area indicates confusion as to where one would depart from and arrive at if consumers select the San Francisco Bay Oakland International Airport.

36.    First, Question 3 is not directly related to the question of whether consumers would believe that they would be flying into the City of San Francisco or into SFO when they would actually be flying into Oakland if they chose the San Francisco Bay Oakland International Airport.  Ms. Butler assumes that indicating the San Francisco Bay Oakland International Airport is the "wrong" or a "confused" answer because she assumes that all respondents define "primary" the same way that she intended, i.e., that "primary" means the airport that serves the largest number of passengers.  But the Butler Survey did not provide respondents with a definition of "primary," nor did Ms. Butler report any pre-test of Question 3 to ascertain respondents interpretation of the word "primary," i.e., one could think that the San Francisco Bay Oakland International Airport is the primary airport, but still understand clearly that it is not located in San Francisco and that it is not the San Francisco International Airport. If respondents interpret "primary," for example, as being the most centrally located airport in the San Francisco Bay Area or the airport serving the largest portion of the entire San Francisco

---

[38] Ms. Butler claims that the "right" answer is the San Francisco International Airport, because it is the "largest or primary airport serving the Bay Area" with "primary apparently meaning it offers the largest number of flights and seats scheduled for service" (Butler Report at ¶34). Since we do not know if Ms. Butler pre-tested this question, we do not know if this is how respondents understood the term "primary."  It is possible that respondents thought of the primary airport as the one most convenient to them, or the one that serves the largest geographical portion of the Bay Area. In this case, it is debatable as to which airport would be the correct answer.

Bay Area, then they may have believed that OAK, the "San Francisco Bay Oakland International Airport," is the appropriate choice and therefore selected it.

37.     Secondly this third question was only asked of those respondents who previously indicated that the [San Francisco Bay] Oakland International Airport is <u>not</u> the same airport as the San Francisco International Airport or were unsure, because Ms. Butler speculates that they may have really believed that the San Francisco Bay Oakland International Airport is SFO but they were unsure of the name "San Francisco International Airport."[39] This is only speculation, however, and in addition is inconsistent with the view expressed in Plaintiff's Motion for Preliminary Injunction that the name "San Francisco International Airport" has been in use and widely publicized in marketing materials for many years and is quite well known among consumers. [40]

38.     For all these reasons, the responses to the flawed Question 3 regarding the "primary" airport of the San Francisco Bay Area cannot be relied upon to ascertain or predict consumer confusion caused by the name change.  It does not necessary measure what the Report says it does, and thus it cannot establish any causal connection between the use of the New Name and consumer confusion.

39.     Thus, the findings for the Southwest Airlines website must be discarded as scientifically unsound because the test and control conditions differ in ways other than different airport names.  Further, the findings for Question 3 must also be discarded due to its methodological flaws.

---

[39]  Butler Report, ¶34.
[40]  Plaintiff City and County of San Francisco's Notice of Motion and Motion For Preliminary Injunction Enjoining Defendants; Memorandum of Points and Authorities In Support Thereof ("Motion for Preliminary Injunction"), September 17, 2024, pp. 12-24.

a.      **Opinion 4:  Inadequate Level of Alleged (Net) Confusion for the Only Valid and Reliable Measure of Consumer Confusion Relevant to Selecting and Purchasing a Flight to "San Fran": No significant net confusion was found for those viewing modified depictions of Google Flights webpages with respect to the only potentially relevant and reliable confusion question in the survey, i.e., where do consumers think the [San Francisco Bay] Oakland International Airport is located.**

40.      I have demonstrated previously that the responses to the Southwest Airlines pages must be disregarded not only because the pages failed to replicate the real-world consumer decision-making environment, but also because the lack of a scientifically valid control group for the Southwest Airlines portion of the survey prevents any possibility of a causal connection between any confusion observed in response to the New Name attributable to the change in the name of OAK.

41.      The portion of the survey involving Google Flights webpages also suffers from serious methodological flaws—most importantly the failure to replicate key features of the actual information environment in which consumers would search for and select airports and flights, and a failure to disclose what the actual Google Flights webpage used to create the control stimuli was.

42.      Regardless of these flaws, an analysis of the responses to the first open ended confusion question ("Where do you think the [TEST ONLY: San Francisco Bay] Oakland International Airport is located?") for those respondents viewing the Google Flights webpages may be instructive.[41]  If this analysis is performed, the resultant "net" percentage of confusion –

---

[41] As noted above, the resulting "net" confusion with respect to this question could also be a conservative measure, since to the extent that respondents were not allowed to view the webpages as they were asked about their judgments and beliefs as they would be in the real world, any estimate of net confusion would be biased in a positive direction.

approximately 5% – would instead indicate that an insignificant amount of consumers would be confused as to location of the San Francisco Bay Oakland International Airport.

43.     The geographic location question (Question 1) speaks to the situation of a traveler finding him/herself at OAK when he or she intended to go to the San Francisco International Airport, and it assesses whether the change in the name of the airport itself is likely to generate such confusion.  In addition, both the test and control stimuli contained very little information, other than the name of the airport, about the location of the airport, i.e., both the test and control stimuli included the "distance to the destination" of  San Francisco, CA county in very small type under the name of both the Oakland and the San Francisco airports. The stimuli, however, did show the airport code for each airline, but that code was not given in the question regarding the airport's location which might have decreased any confusion observed.  Finally, the location question was open-ended.  It was not a multiple-choice type of question in which the respondent is shown and asked to select from a list of possible answers. Instead, respondents were asked to write in, in their own words, where they thought OAK was located.

44.     The Butler Report does not provide the results for Question 1 (geographic question) for each website separately, i.e., for the Google Flights website versus the Southwest Airline website, nor did the report include a copy of the coding sheet which would indicate how each verbatim response to the location question was coded or categorized as indicating "San Francisco" or another location.  Nevertheless, I and members of my staff under my direction examined the verbatim responses given in response to Question 1 and categorized the responses in the manner that Ms. Butler indicates that she did, e.g., a response was coded as "San Francisco" only if the respondent specifically indicated San. Francisco.  References to San

Francisco in broader terms were coded as "other." Using the resulting codes, I was able to determine that approximately 23% of respondents who saw the test Google Flights webpages using the New Name for OAK indicated that it is located in San Francisco versus 18% of respondents who saw the control Google Flights webpages using the "old" name. The resultant "net percentage" of confusion **is only 5%**, a level that would not generally be considered significant in legal proceedings.[42]

## V.    SUMMARY

45.    In summary, as shown in my analysis, the Butler survey cannot be used to predict the level of confusion that would result in the real world if OAK's name is changed to San Francisco Bay Oakland International Airport. It does not use a sample representative of OAK's entire target market, the survey stimuli do not represent the real world decision context, and the survey itself cannot establish a causal nexus between the change in OAK's name and any confusion amongst consumers. Only one of the three survey questions can be used as valid and reliable measures of confusion, and analysis of the only reliable data, i.e., that of the Google Flights platform, for the one reliable and valid consumer measure shows that consumers are unlikely to be confused by OAK's new name.

## VI.    COMPENSATION

46.    I am being compensated at my usual rate of $900 per hour for my work in this case. My opinions are based on information available to me at this time, and I reserve the right to amend and/or supplement them.

---

[42] *See* Butler Report at ¶10.

1        I declare under penalty of perjury under the laws of the United States of America that

2    the foregoing is true and correct.

3        Executed on this 8th day of October, 2024 at Calistoga, California.

*Carol A. Scott*

Carol Scott, Ph.D.