COOLEY LLP
BOBBY GHAJAR (198719)
JOHN HEMANN (165823)
JUDD D. LAUTER (290945)
3 Embarcadero, 20th Floor
San Francisco, CA 94111-4004
Telephone:    (650) 843-5000
Email: bghajar@cooley.com
       jhemann@cooley.com
       jlauter@cooley.com

DAVID CHIU (189542)
City Attorney
JESSE SMITH (122517)
Chief Assistant City Attorney
YVONNE R. MERÉ (173594)
Chief Deputy City Attorney
JULIE VEIT (209207)
CHRISTOPHER STUART (262399)
Deputy City Attorneys
City Hall
1 Dr. Carlton B. Goodlett Place
San Francisco, California 94102-4682
Telephone:    (415) 554-4700
Facsimile:    (415) 554-4757
Email: Cityattorney@sfcityatty.org
      Jesse.Smith@sfcityatty.org
      Yvonne.Mere@sfcityatty.org
      Julie.Veit@sfcityatty.org
      Christopher.Stuart@sfcityatty.org

Attorneys for Plaintiff
CITY AND COUNTY OF SAN FRANCISCO

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY AND COUNTY OF SAN FRANCISCO,<br><br>        Plaintiff,<br><br>     v.<br><br>CITY OF OAKLAND AND PORT OF OAKLAND,<br><br>        Defendants.<br><br>AND RELATED COUNTERCLAIM | Case No. 3:24-cv-02311-TSH<br><br>**REPLY BRIEF IN SUPPORT OF PLAINTIFF CITY AND COUNTY OF SAN FRANCISCO'S MOTION FOR PRELIMINARY INJUNCTION ENJOINING DEFENDANTS**<br><br>Hearing Date: November 7, 2024<br>Time: 10:00 AM<br>Courtroom: E – 15th Floor<br>Trial Date: (None Set) |

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ............................................................................................. 1

II.     THE CITY ESTABLISHED THAT IT IS LIKELY TO SUCCEED ON THE
        MERITS .......................................................................................................... 2

        A.    Oakland Does Not Dispute the Validity and Priority of the SF Mark. .................. 2

        B.    The City Established that all *Sleekcraft* Factors Weigh in Its Favor. ..................... 2

              1.    The Parties' Marks Are Highly Similar. ................................................. 3

              2.    The City's Mark Is Unquestionably Strong ............................................. 6

              3.    Identical Services (Airports) Make Confusion Likely ............................... 8

              4.    Overlapping Marketing Channels Make Confusion Likely ....................... 8

              5.    Oakland's "Purchasing Care" Argument Does Not Change the
                    Analysis ................................................................................................ 8

              6.    The City's Evidence of Actual Confusion Is Probative ............................ 9

              7.    The City's Survey Is Well-Designed and Confirms Confusion Is
                    Likely ................................................................................................... 11

              8.    Oakland Ignored Objections and Infringed the SF Mark ........................ 12

              9.    Oakland's Likelihood of Expansion Makes Confusion Likely ................. 13

        C.    The Fair Use Doctrine is Inapplicable Here ........................................................... 13

        D.    Oakland Fails to Rebut the City's Presumption of Irreparable Harm ................... 14

        E.    The Public Interest Strongly Favors an Injunction ............................................... 14

        F.    The Balance of Hardships Strongly Favors an Injunction .................................... 14

III.    CONCLUSION .............................................................................................. 15

1

## TABLE OF AUTHORITIES

2

**Page**

3

**Cases**

4

*Allstate Ins. Co. v. Kia Motors Am., Inc.,*
5
    2017 U.S. Dist. LEXIS 211399 (C.D. Cal. Dec. 22, 2017) ..................................... 5

*Blue Bottle Coffee, LLC v. Liao,*
6
    2024 WL 2061259 (N.D. Cal. May 7, 2024) ......................................................... 8

7

*BNSF Ry. Co. v. Float Alaska IP, LLC,*
    2023 WL 6783506 (C.D. Cal. Aug. 28, 2023).......................................................... 9
8

*Boldface Licensing+Branding v. By Lee Tillett, Inc.,*
9
    940 F. Supp. 2d 1178 (C.D. Cal. 2013) ......................................................... 5, 9, 12

10

*Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.,*
    174 F.3d 1036 (9th Cir. 1999)................................................................... 2, 9, 13
11

*C21FC LLC v. NYC Vision Cap. Inc.,*
12
    2022 WL 2191934 (D. Ariz. June 17, 2022) ......................................................... 15

13

*Cadence Design Sys. v. Avant! Corp.,*
    125 F.3d 824 (9th Cir.1997)........................................................................... 15
14

*Champion-Cain v. Macdonald,*
15
    2016 WL 7188242 (S.D. Cal. Dec. 12, 2016)......................................................... 15

16

*Charles Schwab & Co. v. Hibernia Bank,*
    665 F. Supp. 800 (N.D. Cal. 1987) ..................................................................... 6
17

*Cisco Sys., Inc. v. Shenzhen Usource Tech. Co.,*
18
    2020 WL 5199434 (N.D. Cal. Aug. 17, 2020)......................................................... 14

19

*Coachella Music Festival, LLC v. Simms,*
    2018 WL 6074556 (C.D. Cal. Sept. 10, 2018)......................................................... 7
20

*In re Detroit Athletic Co.,*
21
    903 F.3d 1297 (Fed. Cir. 2018)......................................................................... 3

22

*Fl. Int'l Univ. Bd. of Trs. v. Fl. Nat'l Univ., Inc.,*
    830 F.3d 1242 (11th Cir. 2016)......................................................................... 4
23

*Fleischmann Distilling Corp. v. Maier Brewing Co.,*
24
    314 F.2d 149 (9th Cir. 1963)........................................................................... 9

25

*Ford Motor Co. v. Summit Motor Prods., Inc.,*
    930 F.2d 277 (3d Cir. 1991)............................................................................ 9
26

*GoTo.com, Inc. v. Walt Disney Co.,*
27
    202 F.3d 1199 (9th Cir. 2000).......................................................................... 4

28

# TABLE OF AUTHORITIES
(continued)

Page

*Great W. Air, LLC v. Cirrus Design Corp.*,
  649 F. Supp. 3d 965 (D. Nev. 2023) .................................................................. 10

*Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*,
  736 F.3d 1239 (9th Cir. 2013) ........................................................................... 11

*Humboldt Wholesale, Inc. v. Humboldt Nation Distrib., LLC*,
  2011 WL 6119149 (N.D. Cal. Dec. 8, 2011) ..................................................... 13

*Idaho Golf Partners, Inc. v. Timberstone Mgmt., LLC*,
  2016 WL 4974944 (D. Idaho Sept. 16, 2016) .................................................... 10

*Int'l Info. Sys. Sec. Certification Consortium, Inc. v. Sec. Univ., LLC*,
  823 F.3d 153 (2d Cir. 2016) .................................................................................. 3

*Ironhawk Techs., Inc. v. Dropbox, Inc.*,
  2 F.4th 1150 (9th Cir. 2021) .............................................................................. 10

*Kiva Health Brands LLC v. Kiva Brands Inc.*,
  402 F. Supp. 3d 877 (N.D. Cal. 2019) .......................................................... 11, 15

*N. Am. Aircoach Sys., Inc. v. N. Am. Aviation, Inc.*,
  231 F.2d 205 (9th Cir. 1955) .............................................................................. 3, 7

*New Flyer Indus. Canada ULC v. Rugby Aviation, LLC*,
  405 F. Supp. 3d 886 (W.D. Wash. 2019) ............................................................ 9

*Nichino Am., Inc. v. Valent U.S.A. LLC*,
  44 F.4th 180 (3d Cir. 2022) ................................................................................ 14

*Nordstrom, Inc. v. NoMoreRack Retail Grp., Inc.*,
  2013 WL 1196948 (W.D. Wash. Mar. 25, 2013) ............................................... 10

*Perfumebay.com Inc. v. eBay Inc.*,
  506 F.3d 1165 (9th Cir. 2007) .............................................................................. 9

*Pres. & Trs. Colby Coll. v. Colby Coll.-N.H.*,
  508 F.2d 804 (1st Cir. 1975) .............................................................................. 11

*Rearden LLC v. Rearden Com., Inc.*,
  683 F.3d 1190 (9th Cir. 2012) ........................................................................ 5, 10

*Reflex Media, Inc. v. Chan*,
  2021 WL 5936912 (C.D. Cal. June 4, 2021) ....................................................... 8

*Schluter Sys., L.P. v. Telos Acquisition Co. 10, LLC*,
  2024 WL 1659898 (N.D. Cal. Apr. 16, 2024) ..................................................... 9

*SunEarth, Inc. v. Sun Earth Solar Power Co.*,
  846 F. Supp. 2d 1063 (N.D. Cal. 2012) ............................................................. 14

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Sutter Home Winery, Inc. v. Madrona Vineyards, L.P.*,
  2005 WL 701599 (N.D. Cal. Mar. 23, 2005) ......................................................... 15

*Triad Sys. Corp. v. Se. Express Co.*,
  64 F.3d 1330 (9th Cir. 1995) .............................................................................. 14

*Trouble v. Wet Seal, Inc.*,
  179 F. Supp. 2d 291 (S.D.N.Y. 2001) .................................................................. 10

*Truescents LLC v. Ride Skin Care Care, L.L.C.*,
  81 U.S.P.Q.2d 1334 (T.T.A.B. 2006) ................................................................... 13

*Vans, Inc. v. Walmart, Inc.*,
  2022 WL 1601530 (C.D. Cal. Mar. 31, 2022) ..................................... 7, 10, 11, 14

*WEX Inc. v. HP Inc.*,
  2024 WL 3358651 (D. Me. July 9, 2024) ........................................................ 7, 11

**Statutes**

15 U.S.C. § 1115(b)(4) ................................................................................................ 13

17 U.S.C. § 1117(c) ..................................................................................................... 15

**Other Authorities**

Fed. R. Evid. 702 ........................................................................................................... 5

1 McCarthy on Trademarks and Unfair Competition § 11:46 (5th ed. 2024) .............. 13

3 McCarthy on Trademarks and Unfair Competition § 23:12 (5th ed. 2024) ................. 9

1  **I.    INTRODUCTION**

2       The Port of Oakland wants to make this case about its supposed "need" to convey to the

3  world that its airport is located on the San Francisco Bay.  Oakland has many ways to inform

4  travelers that its airport is proximate to San Francisco or the Bay.  It didn't *need* to adopt a new

5  brand that mimics the City's incontestable SF Mark.  Nonetheless, over the objections from the

6  City, the public, the airline and travel industry, and others, that is the path it chose.

7       Oakland's response tries to distract from established facts by contorting the law and

8  presenting a narrow, inaccurate, and misleading narrative.  In particular, it improperly collapses the

9  likelihood of confusion analysis into an assessment of how consumers purchase airfare on the

10  websites of its two closest airline partners, Spirit and Southwest – both of which may have played

11  a role in Oakland's adoption of the Infringing Mark *but have not yet used it*.  A fulsome examination

12  of the marketplace and all relevant factors, however, overwhelmingly favors an injunction.

13       Oakland's analysis of **similarity of marks** is not credible—sidestepping black-letter law

14  that similarities must be weighed more heavily than differences while ignoring that the Infringing

15  Mark subsumes and frontloads the City's name, is often unaccompanied by an IATA code or logo,

16  and, when spoken, sounds alike.  Oakland is dismissive of the undisputed fact that the parties offer

17  **identical services** – a pivotal factor in the analysis that lessens the City's burden on the similarity

18  of marks factor – and does the same with the **direct overlap in marketing channels** (OTAs,

19  airlines, travel agencies, social media, travel and navigation apps, radio, national publications).

20       Oakland's response to the City's **evidence of strength** is a made-up legal theory that

21  advertising, accolades, and unsolicited media attention don't count if they *also* display "SFO" or a

22  logo, or merely refer to the City's mark in discussing SFO.  It cites no supporting decision, let alone

23  one finding that a 7-decade old mark with a fraction of SFO's publicity and revenue is not strong.

24       To top it off, Oakland criticizes the City's survey showing over 20% net confusion while

25  neglecting to conduct its own and asks the Court to ignore evidence **of actual confusion**.  Although

26  the City needs none to prevail, this evidence is highly probative and, at this juncture, admissible.

27  Predictably, travelers have purchased tickets for flights to and arrived at the wrong airport and

28  continue to do so.  Second Declaration of Chris Birch ("Birch II") ¶ 3.  Oakland doesn't care about

1    international travelers, non-native English speakers, and those from parts of the country who are

2    unaware that the Infringing Mark does not identify *the City's* airport.  The City does.[1]

3         The City has more than a "fair chance of success" on the merits.  Moreover, Oakland faces

4    no "**hardship**" to revert to the registered trademark it has used for decades, especially as its

5    Opposition confirms that the mark's rollout is far from complete.   And the City will suffer

6    **irreparable injury** if a rival airport is using a copycat name – the only other airport in the country

7    doing so – and threatening its goodwill and reputation, and control over its incontestable trademark.

8         The Court is urged to stop Oakland from using the Infringing Mark.

9    **II.    THE CITY ESTABLISHED THAT IT IS LIKELY TO SUCCEED ON THE MERITS**

10        **A.    Oakland Does Not Dispute the Validity and Priority of the SF Mark.**

11        The City established (Mot. 11–12), and Oakland effectively concedes, the validity of the SF

12   Mark.  The City's incontestable registration is conclusive proof that the mark is valid ***and*** has

13   secondary meaning (an admission that is also relevant to the strength of mark factor).  *Id.*

14        **B.    The City Established that all *Sleekcraft* Factors Weigh in Its Favor.**

15        The City properly applied all of the Ninth Circuit's *Sleekcraft* factors – consistent with how

16   courts have done in the myriad cases cited in its motion (Mot. 13–14, 22–23) and not in a "rigid"

17   and mechanistic manner.  Opp. 6.  Oakland's response compresses the likelihood of confusion

18   analysis into an evaluation of "context" (circularly defined as "what a reasonable consumer would

19   believe based upon what they see on the screen") and its narrow view of "consumer sophistication."

20   By focusing on this *subset* of two factors, Oakland glaringly ignores or downplays many

21   unfavorable facts and factors.  Oakland also construes "confusion" too narrowly to mean only

22   confusion about whether the Oakland airport *is* the San Francisco airport.  But cognizable confusion

23   includes both **initial interest confusion** (where a defendant's mark creates initial customer interest

24   even if no actual sale occurs as a result (*see Brookfield Communications, Inc. v. West Coast

25   Entertainment Corp.*, 174 F.3d 1036, 1063–64 (9th Cir. 1999)), and **confusion as to affiliation or**

26

---

27   [1] The City has amassed this preliminary record without Oakland's candor about confusion at
     Oakland's airport: Oakland *refuses* to meaningfully oblige the City's public records requests. Yakel
28   Decl. ¶ 21. The record demonstrates that Oakland knew of the City's trademark, mimicked it, and
     ignored warning signs occurring at a frequency uncommon in a typical trademark case.  Mot. 6.

1   **sponsorship**. *See Int'l Info. Sys. Sec. Certification Consortium, Inc. v. Sec. Univ., LLC*, 823 F.3d

2   153, 161–62 (2d Cir. 2016) (error to consider only confusion as to source, and not confusion as to

3   sponsorship, affiliation or connection).  All such confusion is relevant here but ignored by Oakland.

4   **1.     The Parties' Marks Are Highly Similar.**

5           Under the applicable legal test, Oakland cannot credibly dispute that the parties' marks are

6   similar. Mot. 15-17. Both begin with "SAN FRANCISCO" and end with "INTERNATIONAL

7   AIRPORT".  Indeed, the Infringing Mark incorporates ***every word*** of the City's mark:

8           **SAN FRANCISCO INTERNATIONAL AIRPORT**

9           **SAN FRANCISCO** BAY OAKLAND **INTERNATIONAL AIRPORT**

10  The result is that the marks look alike, are pronounced alike, and share similar meanings; all the

11  more so when they are truncated.  Mot. 8.  SAN FRANCISCO is both the first element of the marks

12  read by consumers and the dominant one.[2]  *See In re Detroit Athletic Co.*, 903 F.3d 1297, 1303

13  (Fed. Cir. 2018).  The Infringing Mark's prominent use of SAN FRANCISCO is "particularly

14  significant because consumers typically notice [the initial two words of a mark] first," (*id*.) and also

15  because of the role that city names traditionally play within airport names as indicators of both the

16  airport's operator along with the location of the airport.  Second Decl. of Charles Schuler ("Schuler

17  II") ¶ 12; Andretta Decl. ¶ 24.  The City has enjoyed exclusive use of "SAN FRANCISCO" for

18  airport services for over 70 years.[3] *See N. Am. Aircoach Sys., Inc. v. N. Am. Aviation, Inc.*, 231 F.2d

19  205, 210 (9th Cir. 1955).  This makes Oakland's replication of the SF Mark even more confusing.

20          Oakland responds by overemphasizing the significance of the word "Bay" in its Infringing

21  Mark.  This is just another way of saying that the parties' marks are not *identical*, but that is not the

22  test.  The descriptive word "Bay" does not diminish irrefutable similarities.  *E.g.*, Williams II ¶ 8.

23          Oakland fares no better distinguishing the City's authorities.  It suggests that *Greater*

24  *Orlando Aviation Auth. v. Sanford Airport Auth.* is unpersuasive because it concerned two airports

25  _____

26  [2] Further reinforcing this point, the parties were both required by the USPTO to disclaim rights in
    "INTERNATIONAL AIRPORT" due to its descriptiveness and common use by others, but not
    "OAKLAND" or "SAN FRANCISCO."  Second Declaration of Jessica Williams ("Williams II")

27  ¶¶ 2-3.  This indicates the USPTO regards city names as the dominant component of these marks.
    [3] Oakland suggests that there are "thousands" of federally registered trademarks that "start with

28  'San Francisco'" (Opp. 15) but cites no evidence.  In any case, the relevant services are airports
    and, prior to Oakland's infringement, only the City had used its name for airport services.

using the same city name, whereas Oakland is using "San Francisco Bay," not "San Francisco." Opp. 17.  This is a distinction without a difference.  *Both marks lead with SAN FRANCISCO*.  It similarly argues that *Perfumebay.com Inc. v. eBay Inc.* is distinguishable because "PERFUMEBAY" incorporated "EBAY," whereas Oakland merely "replaced… 'Metropolitan'" with "San Francisco Bay."  Opp. 17.  This too is semantics.  However Oakland spins its mark, it is no less true that the *entire* SF Mark is subsumed within it – just like in *Perfumebay*. Mot. 17.

Meanwhile, the only new case cited by Oakland is factually distinguishable.  In *Florida Int'l University v. Florida Nat'l University*, the Eleventh Circuit affirmed that "Florida National University" and "Florida International University" were dissimilar largely because the parties were "in a field where so many competitors have names that appear and sound similar." 830 F.3d 1242, 1261 (11th Cir. 2016).  Against a backdrop of many similar university names across the U.S., minor differences between the parties' marks took on greater importance. Also, the marks were being marketed to students and parents whom "generally spend a substantial amount of time and energy learning about their options" before committing their educational future *and tens of thousands of dollars* to a school.  *Id*.  Here, there was only *one* airport in the United States with "SAN FRANCISCO" in its name prior to Oakland's infringement, and the degree of care exercised in purchasing airfare is incomparable to a decision to attend a four-year college.

Oakland's brief suggests that examining the parties' marks in "context" is a separate factor (Opp. 7-8), but it is part of the "similarity of marks" factor, which instructs that "marks must be considered in their entirety and as they appear in the marketplace." *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1205–06 (9th Cir. 2000).  Under the pretense of setting the record straight regarding "the commercial context in which consumers actually search for and purchase flights," Oakland and its declarants conjecture that a combination of "IATA codes, city references or other pertinent information" displayed on airline and OTA websites clearly "distinguish[] airport choices." Opp. 8. This conclusion is based on an incomplete and misleading picture of the market.

To begin, Oakland's emphasis on the websites for Southwest and Spirit Airlines to the exclusion of other market contexts is backwards.  Neither website currently displays the Infringing Mark – demonstrating that Oakland's top airline partners are smart enough not to use the mark, or

1     simply don't "need" it. Moreover, most travelers today rely on OTAs as a resource when

2     purchasing airfare; and many of the most popular OTAs display the Infringing Mark in full. Schuler

3     II ¶¶ 8. This means that by the time these consumers arrive at an airline website, they will have

4     already encountered the Infringing Mark, to say nothing of other contexts in which the Infringing

5     Mark would have been displayed to them.

6        Travelers also become familiar with airport names prior to making purchases by

7     encountering them in advertising and other media such as news articles, and this background can

8     inform later purchasing decisions. *Id.* ¶ 9. In these contexts or aurally, logos or IATA codes often

9     are ***not*** conveyed at all. *See id.* ¶ 9-10; Williams Decl. ¶¶ 14–15; Second Decl. of Melissa Andretta

10    ("Andretta II") ¶¶ 7–10. *See Allstate Ins. Co. v. Kia Motors Am., Inc.*, 2017 U.S. Dist. LEXIS

11    211399, at *31–32 (C.D. Cal. 2017) (marks similar despite distinguishing logo because, among

12    other reasons, defendant has no "control over the way in which its dealers describe" its product);

13    *Boldface Licensing+Branding v. By Lee Tillett, Inc.*, 940 F. Supp. 2d 1178, 1187 (C.D. Cal. 2013)

14    (KROMA and KHROMA BEAUTY BY KOURTNEY, KIM AND KHLOE similar because

15    KHROMA was often displayed, by itself, by third parties). Of note, these conclusions are not

16    inconsistent with Oakland's Bridie, Rolek, and Reim declarations.[4]

17        Likewise, Oakland's reliance on its IATA code as distinguishing the parties' marks is

18    misplaced. Opp. 17. It presumes – without any evidence – that consumers (including out-of-state

19    or international travelers) recognize the "OAK" IATA code and know that the corresponding

20    airport (i) is not the San Francisco International Airport, and (ii) is not otherwise associated with

21    the City or its airport. Also, as the City explained, in many contexts the IATA code is displayed

22    only after an airport's name, where it is less likely to be seen or make a commercial impression.

23    Mot. 17. More generally, even where IATA codes have visible placement, the parties' word marks

24    remain overwhelmingly dominant. *See, e.g.*, *Rearden LLC v. Rearden Com., Inc.*, 683 F.3d 1190,

25

26    [4] Oakland proffers these declarations as dispassionate, objective opinions about the parties' market.
But each of the declarants is a self-interested player, Andretta II ¶ 4, and may have been involved
27    in Oakland's decision to adopt the Infringing Mark. Moreover, although Dr. Reim is implicitly
positioned as an aviation marketing "expert," she is not so qualified. Fed. R. Evid. 702. She
28    describes her focus as "service network strategies and route development," not consumer marketing
or behavior, which is what is at issue here. Schuler II ¶ 6. Her opinions are not probative at all.

1212 (9th Cir. 2012) (surname "Rearden" was prominent in both marks despite distinct logos); *Charles Schwab & Co. v. Hibernia Bank*, 665 F. Supp. 800, 808–09 (N.D. Cal. 1987) (house mark insufficient to distinguish infringing sub-brand because it was downplayed in ads while the infringing mark was in bold).  Oakland offers no evidence or argument to the contrary.

Oakland also suggests that city and region references on some airfare booking websites mitigate confusion risk.  Opp. 7–8.  In the present context, however, they exacerbate it.  Mot. 21. A search for either party's airport on Southwest's website returns them both under the heading "San Francisco Area Airports," while Spirit's returns "Oakland, CA / San Francisco, CA AREA."  Bridie ¶ 11; Rolek ¶ 17. For a consumer visiting these sites already having formed an impression of the Infringing Mark, these results (both which prominently feature references to "San Francisco") may reinforce that the Oakland airport is SFO or affiliated with SFO.  Schuler  II ¶ 12.

**Finally**, Oakland relegates to its declarations an argument that it is "common" for more than one airport within a region to share a city name, and thus, travelers might distinguish between them.  Reim ¶¶ 17, 19; Bridie ¶ 6; Rolek ¶ 6.  None of its evidence reflects actual consumer perception.  Regardless, this argument is undermined by the facts. For example, O'Hare and Midway are both operated by the City of Chicago; Fort Worth and Love Field are both operated, in whole or in part, by the City of Dallas; and Dulles Airport and Ronald Reagan National are both operated by the federal government. Andretta ¶ 24.  That is, the **source of these airports is the same**.  Thus, confusion is heightened when two regional airports operated by different cities share the same city name because that is ***not*** the norm.  Mot. 15–16 (discussing Orlando airports).

### 2.    The City's Mark Is Unquestionably Strong

Oakland fails to cite any case approximating a decades-old incontestable mark, supported by tens of millions in advertising, billions in revenue, and hundreds of millions of commercial impressions, in which a court did not conclude that a brand owner's mark was strong.  Instead, Oakland introduces a strawman, misconstruing the Motion as arguing that the SF Mark is inherently distinctive.  The City made no such argument.  Instead, the City established that the SF Mark is strong by virtue of its significant *commercial* strength, secondary meaning (undisputed, *see* § II.A), and longstanding use. Mot. 12–14.  Oakland also badly misconstrues the authorities cited in the

Motion. It argues that both *Coachella Music* and *North American Aircoach* concerned inherently distinctive trademarks that the courts found strong due to their conceptual strength. Opp. 18–19. This is the **opposite** of what those cases say. *See N. Am. Aircoach*, 231 F.2d at 209–10 (explaining that geographic names may "acquire a secondary or fanciful meaning" and become "strong," and affirming that "'North American' in connection with aviation means the plaintiff solely and exclusively" due to commercial success and exclusive use); *Coachella Music Festival, LLC v. Simms*, 2018 WL 6074556, at *4 (C.D. Cal. Sept. 10, 2018) (explaining that a "geographic location" like Coachella "is generally a descriptive mark" but acquired secondary meaning and strength due to substantial success, including $84M in sales).

The record concerning the strength of the SF Mark is even stronger than in those cases. SFO is an award-winning and highly acclaimed airport that receives tens of millions of passengers each year, all of whom encounter the SF Mark in some fashion. Mot. 2-4; Schuler ¶¶ 8–9, 11–16. The SF Mark is also the subject of millions of dollars in advertising (*id*. ¶ 12), is displayed in a variety of commercial contexts (*id*. ¶¶ 14–16), and extensive unsolicited media attention (Williams ¶¶ 3–5). The SF Mark is undoubtedly widely recognized and, by one independent measure, regularly ranks among the top 25 strongest airport brands. Schuler ¶ 17.

Oakland responds to this evidence by arguing that the City's advertising shouldn't factor into the SF Mark's strength because the City cannot isolate its spend on advertising that *only* displays the SF Mark. This nonsensical argument is unsupported by any legal authority. Marketing spend and accolades are proxies for consumer awareness of a mark. So long as a mark is displayed in advertising materials (*e.g*., Schuler ¶¶ 14–16), it contributes to that awareness, regardless of whether other branding indicia (e.g., logos, taglines, etc.) are present. *See Vans, Inc. v. Walmart, Inc.*, 2022 WL 1601530, at *9 (C.D. Cal. Mar. 31, 2022) (granting injunction and finding strength of trade dress weighed strongly in plaintiff's favor, noting its "tens of millions of dollars" on advertising, notwithstanding defendant's criticism that ads were not specific to the trade dress); *WEX Inc. v. HP Inc*., 2024 WL 3358651, at *29-30 (D. Me. July 9, 2024) (trademark strong due to 35 years of exclusive use and significant advertising spend).

Oakland also argues that references to the SF Mark in media publications are "rarely" in

isolation and generally refer to the airport as a location.  Opp. 19.  Because media attention is a proxy for consumer awareness, courts routinely recognize that significant unsolicited media attention is strong evidence of commercial strength; there is no separate requirement for a mark to be displayed in a particular way so long as it appears.  *See, e.g.*, *Blue Bottle Coffee, LLC v. Liao*, 2024 WL 2061259, at *11-12 (N.D. Cal. May 7, 2024) (mark was strong because of, among other things, it "received news and social media coverage"); *Reflex Media, Inc. v. Chan*, 2021 WL 5936912, at *6 (C.D. Cal. June 4, 2021) (brand with "millions of customers" and significant media recognition regarded as strong) (collecting cases).  The SF Mark is ***strong***. *See* Mot. 12–14.

### 3.    Identical Services (Airports) Make Confusion Likely

Oakland does not dispute that the parties are competitors and offer the same service.  Mot. 14-15.  Nor does it challenge caselaw directing that where services are identical, lesser showings of similarity are required.  *Id.*  Instead, it seeks to minimize this by asking the Court to consider the parties' competitive posture only in combination with other factors. Opp. 20.  Consistent with the law, the City welcomes the Court to do so.  Oakland cannot wave away that the parties sell the same services to the same customers, via the same marketing and sales channels.  The parties' overlapping services weigh heavily in the City's favor.

### 4.    Overlapping Marketing Channels Make Confusion Likely

Oakland also does not dispute that the parties share the same marketing channels.  Instead, misapplying two decisions, Oakland argues that shared use of the internet for marketing is not probative of confusion.  Opp. 20.  Here, however, the parties' airports are profiled in the *same* publications, third-party websites, and apps, and on the same local radio station.  *See* Schuler II ¶ 10.  This isn't a case in which the parties both merely "have websites."  This convergence of marketing channels further heightens the risk of confusion and weighs heavily in the City's favor.

### 5.    Oakland's "Purchasing Care" Argument Does Not Change the Analysis

Oakland attributes a heightened standard of care to air travelers, but this is unsupported by the record and law.  The sophistication and depth of experience of air travelers varies widely and includes both inexperienced and knowledgeable consumers. Mot. 20–21; Andretta ¶ 19. And while travel is often planned carefully in advance, it is also often the result of spur of the moment decision

1    making.  *Id*.  The law is clear that considerations of consumer care must account for the experiences

2    of *all* travelers.  *Fleischmann Distilling Corp. v. Maier Brewing Co*., 314 F.2d 149, 156 (9th Cir.

3    1963); *Brookfield*, 174 F.3d at 1060.  *See also Ford Motor Co. v. Summit Motor Prods., Inc.*, 930

4    F.2d 277, 293 (3d Cir. 1991) ("when a buyer class is mixed, the standard of care … will be equal

5    to that of the least sophisticated consumer in the class").   Here, the victims of Oakland's

6    infringement could just as easily include foreign travelers or those who buy a $49 one-way ticket;

7    book a $30 Uber ride; arrange for a car rental or car share; get a ride from a friend; or hastily book

8    a flight on an app.  The record demonstrates the ease with which the consuming public has been

9    confused at this early stage (Mot. 17–18) and does not support any inference that victims' "degree

10   of care" would prevent confusion. Mot. 20-21. That is likely why many airlines and agencies voiced

11   concerns over the name change.  *Id*. 6.  "[G]iven the similarity of the parties' marks and relatedness

12   of the goods on which those marks appear, even purchasers exercising a high degree of care would

13   likely be confused, and some, in fact, have been confused."  *Boldface*, 940 F. Supp. 2d at 1194.

14        Oakland's various authorities do not alter this conclusion.  Opp. 9.  It relies on one case,

15   which stands for the unremarkable observation that "there are many contexts in which it no longer

16   holds true" that internet shoppers are presumed to be unsophisticated. *Id.*  All of its cited cases are

17   inapt or distinguishable.[5]  Mot. 20–21.  This factor weighs in favor of confusion – not against it.

18                    **6.    The City's Evidence of Actual Confusion Is Probative**

19        Actual confusion is difficult to adduce.  "Persons who are truly confused will often never

20   be aware of the deception. Others who were confused and later learned of their deception will often

21   not bother to report the fact."  3 McCarthy on Trademarks and Unfair Competition § 23:12 (5th ed.

22   2024).  The law requires a ***likelihood*** of confusion, *Perfumebay.com Inc. v. eBay Inc.*, 506 F.3d

23   1165, 1176 (9th Cir. 2007).  The City doesn't need any actual confusion evidence. Mot. 17–18.

24

---

25   [5] *Schluter Systems, L.P. v. Telos Acquisition Co. 10, LLC*, concerned online shoppers "who
     specialize in tile construction," *i.e.*, expert consumers.  2024 WL 1659898, at *11 (N.D. Cal. 2024).
26   *BNSF Ry. Co. v. Float Alaska IP, LLC*, indicated that, in selecting services from a freight railway
     and start-up airline, consumers are discerning of "quality of service and safety," but nevertheless
27   granted a preliminary injunction. 2023 WL 6783506, at *7, *11 (C.D. Cal. 2023).  And *New Flyer
     Industries Canada ULC v. Rugby Aviation, LLC*, concerned a small airline that primarily served a
28   30-mile radius, and which required tickets to be purchased by phone.  405 F. Supp. 3d 886, 894
     (W.D. Wash. 2019).  None of these decisions address the variable pricing and levels of care here.

REPLY BRIEF ISO PRELIMINARY INJUNCTION
Case No. 3:24-cv-02311-TSH                           9

1    Here, confused travelers, recognizing that they've purchased tickets to the wrong airport are

2    likely to be in transit (and rushed to get to the right airport).  They are unlikely to have a desire or

3    time to report their confusion as they adjust their plans, and unlikely to communicate their

4    confusion to airport personnel (as opposed to airlines) because the airport has little ability to help

5    them.  Other travelers who instead incorrectly assume that Oakland's airport is the same as or

6    affiliated with SFO or the City are unlikely to register their mistaken view at all.

7        Thus, it is significant that the City already has meaningful evidence of ongoing confusion.

8    **Oakland's response is to belittle it**.  Multiple individuals have booked flights to one party's airport

9    intending to travel to the other (Williams Exs. T-V; Williams II ¶¶ 4-15; Birch ¶¶ 6–7, Ex. A),

10   including several known instances since the Motion was filed (Birch II ¶ 3).  Evidence also includes

11   travelers tagging the wrong airport on social media, and those directed to the wrong airport by

12   digital assistants, navigation apps, and rideshare services, (Williams Exs. O, V–W; Williams II ¶¶

13   4-15), and even airline professionals taking a meeting with the Oakland airport thinking it was SFO.

14   Andretta II ¶ 11.  These examples of confusion are entitled to weight, and even "non-consumer

15   confusion can properly factor into the 'likelihood of confusion' inquiry," both as a proxy for

16   consumer confusion and a contributor to it.  *Rearden*, 683 F.3d at 1214–15; *see also Ironhawk*

17   *Techs., Inc. v. Dropbox, Inc.*, 2 F.4th 1150, 1165–66 (9th Cir. 2021) (error to disregard declaration

18   of plaintiff's CEO that he was asked about the affiliation between the parties).  This is especially

19   true at the preliminary injunction stage.  *See* Mot. 18 (collecting cases); *Vans*, 2022 WL 1601530,

20   at *11-12 (crediting, in part, three instances of online confusion).

21       Part of Oakland's attack is to argue that the evidence is inadmissible hearsay.  Opp. 11.[6]

22   But "the rules of evidence do not apply strictly to preliminary injunction proceedings" and

---

[6] Oakland's decisions on this issue are inapposite, including because they resulted from motions *in limine* following discovery or after a bench trial. *See, e.g.*, *Great W. Air, LLC v. Cirrus Design Corp.*, 649 F. Supp. 3d 965, 982 (D. Nev. 2023) (affirming finding at trial that evidence was limited relative to parties' 13 years of coexistence); *Idaho Golf Partners, Inc. v. Timberstone Mgmt., LLC*, 2016 WL 4974944, at *3 (D. Idaho Sept. 16, 2016) (motion *in limine*); *Trouble v. Wet Seal, Inc.*, 179 F. Supp. 2d 291, 300 (S.D.N.Y. 2001) (similar).  Only *Nordstrom, Inc. v. NoMoreRack Retail Group, Inc.* was decided on a motion for preliminary injunction, and it is distinguishable: over two years, there were a handful of examples of confusion comprised mostly of misdirected communications.  2013 WL 1196948, at *6-7 (W.D. Wash. Mar. 25, 2013).  Here, Oakland has been using the Infringing Mark for a few months and traveler confusion is not a few errant emails.

prohibitions on hearsay are relaxed.  *Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250 n.5 (9th Cir. 2013).  Courts regularly credit actual confusion evidence like the City's at this stage.  *Vans*, 2022 WL 1601530, at *11.  Notably, in *Kiva Health Brands LLC v. Kiva Brands Inc.* (cited by Oakland), this Court held that a confusion log like the City's "is not hearsay" because it falls within the state of mind exception.  402 F. Supp. 3d 877, 895 (N.D. Cal. 2019) (collecting cases).  The log was even given weight notwithstanding that the plaintiff had conspicuously failed to "record any of the phone calls reflected in the log, it deleted all of the voicemails, and it did not retain any of the underlying emails."  *Id.*  No such indicia of unreliability are present here.  To the contrary, when the City became aware of confusion, it began recording information from willing travelers.  Birch ¶ 5.  The City's evidence of ongoing confusion—in different forms and forums— is "strong" evidence of a likelihood of confusion.  Mot. 10.

### 7.    The City's Survey Is Well-Designed and Confirms Confusion Is Likely

Courts routinely recognize, and Oakland does not dispute, that surveys showing net confusion rates above 15% are strong evidence of confusion.  Mot. 19 (collecting cases crediting surveys with 12.5+% confusion rates).  Accordingly, the Butler survey, which returned a net confusion rate above 20%, is highly probative.  *Vans*, 2022 WL 1601530, at *11 (granting injunction in part on survey showing 23.2% net confusion); *WEX*, 2024 WL 3358651, at *26-27 (granting preliminary injunction in part on survey by Sarah Butler showing 20.8% confusion).

Without doing its own survey – despite having the time and financial ability to do so (*id.* (noting lack of rebuttal survey)) – Oakland hired Dr. Scott to critique Butler's survey.  Her criticisms fall short and "do not remedy the lack of affirmative evidence to the contrary." *Pres. & Trs. Colby Coll. v. Colby Coll.-N.H.*, 508 F.2d 804, 809–10 (1st Cir. 1975) (reversing denial of injunction where defendant criticized survey without offering its own).

*First*, Dr. Scott claims that Butler's survey universe was selective and underinclusive, because it purportedly "excludes markets that currently account for the largest number of Oakland passengers."  Scott ¶ 8(i).  But this criticism implies that the only relevant consumers are in the Oakland airport's current market.  Butler II ¶¶ 4, 9-20.  Given that the stated purpose of the name change is to help grow the airport and expand its footprint, it was also important for the survey to

account for "areas where Oakland International Airport itself has suggested its name change may have an impact." *Id*. ¶ 10 and fn30. Moreover, it was appropriate for the survey not to target local geographic regions in which respondents were more likely to be familiar with the parties' dispute to avoid biasing results. *Id*. ¶ 15 and §IV.A. As Ms. Butler explains, "Dr. Scott presents no data to demonstrate that some other set of states would have yielded different results and ignores [] data demonstrating that even consumers who have previously traveled to Northern California were confused." *Id*. ¶¶ 4, 15-21. Dr. Scott's other criticisms of the Butler survey's universe are equally baseless. *See generally § IV.A* (¶¶ 17-21).

*Second*, Dr. Scott contends that the Butler survey failed to replicate real-world marketplace, and objects that Ms. Butler tested confusion at only one point in time. Scott ¶¶ 13–33. These criticisms have no merit: proper methodology required testing whether the name "San Francisco Bay Oakland International Airport when appearing in a realistic manner causes confusion." Butler II ¶¶ 5, 22-34. The Butler survey did so by showing uses consistent with how the marks have been and could be displayed. *Id*. And any survey is necessarily a snapshot of perceptions at a particular point in time. *Id*. ¶ 24.

*Third*, Dr. Scott takes issue with the format of one of Butler's questions ("which is the primary airport"), but Butler's results demonstrate a net confusion rate of over 18% *even without* it. *Id*. ¶ 43. Dr. Scott takes other swipes at the Butler survey, which are not called out in the Opposition, but these too are baseless. *Id*. ¶¶ 46-48. Overall, the Butler survey is a powerful indicator of likelihood of confusion, unrebutted by a contrary survey or Dr. Scott's flimsy and superficial criticisms. *Id*. ¶¶49-50 (explaining conclusions and Dr. Scott's failure to consider data).

### 8.    Oakland Ignored Objections and Infringed the SF Mark

Oakland says that it adopted the Infringing Mark with no intent to copy or deceive, but this is belied by the record. Oakland does not dispute that it had actual knowledge of the SF Mark, and that it pressed ahead with the Infringing Mark over objections from the City, multiple airlines, travel agencies, and others. Mot. 7–8, 21–22 (citing evidence). *See Boldface*, 940 F. Supp. 2d at 1195. Moreover, Oakland has been less than forthcoming with records requests inquiring about the name change, the City's trademark rights, and confusion occurring at Oakland. Yakel ¶ 21.

1    The Court may also infer bad faith from Oakland's decision to rebrand yet forego a trademark

2    application. The logical inference from this is that Oakland knew it may be sued and did not want

3    the USPTO to assess the SF Mark as confusingly similar.  On balance, this factor weighs in the

4    City's favor. Regardless, lack of intent cannot weigh against a likelihood of confusion.

### 9.    Oakland's Likelihood of Expansion Makes Confusion Likely

6        As explained (Mot. 22), this factor is "relatively unimportant where two companies already

7    compete to a significant extent."  *Brookfield*, 174 F.3d at 1060.  It should nevertheless carry some

8    weight here. Oakland's stated impetus for adopting the Infringing Mark is to attract more business

9    to its airport.  Opp. 4–5.  If Oakland succeeds in adding new routes or attracting new airlines, in

10   particular airlines with routes to SFO, this will only increase opportunities for confusion.

### C.    The Fair Use Doctrine is Inapplicable Here

12       Oakland disingenuously argues that the doctrine of fair use insulates it from liability for

13   adopting the Infringing Mark.  Opp. 21.  Fair use is inapplicable here as a matter of law.  "The only

14   type of use which can qualify as a 'classic fair use' is use [] in a ***non-trademark*** sense. This is the

15   rule both at common law and under the Lanham Act." 1 McCarthy on Trademarks and Unfair

16   Competition § 11:46 (5th ed. 2024).[7]  *See* 15 U.S.C. § 1115(b)(4) (recognizing descriptive fair use

17   as a defense to infringement of an incontestable trademark only where the use is "*otherwise than*

18   *as a mark*" (emphasis added)).  This is illustrated in *Humboldt Wholesale, Inc. v. Humboldt Nation*

19   *Distribution, LLC*, where this Court considered on a motion to dismiss whether fair use could apply

20   to the defendants' use of the geographic descriptor "Humboldt" within a family of marks (e.g.,

21   "Humboldt Nation Distribution," "Humboldt Nutrients," etc.).  2011 WL 6119149, at *5 (N.D. Cal.

22   Dec. 8, 2011).  The Court concluded that it could **not**, explaining that "[f]air use only allows use of

23   another's mark where the use is otherwise than as a trade or service mark." *Id*. (quotations omitted).

24   This was so, even though the defendants were using the term "Humboldt" only "as part of" their

25   own trademarks, *i.e.*, in combination with other words.  *Id*.

26       Here, Oakland is using the terms "San Francisco" and "International Airport" as

---

[7] For this reason, the Trademark Trial and Appeal Board, which has a purview limited to issues of trademark registrability, will not entertain fair use claims even for components of marks. *See Truescents LLC v. Ride Skin Care, L.L.C.*, 81 U.S.P.Q.2d 1334, at *4 (T.T.A.B. 2006).

components of a trademark; indeed, they are using the Infringing Mark as a ***replacement*** for their registered OAKLAND INTERNATIONAL AIRPORT mark.  Mot. 5. And that use is causing confusion.  The defense of fair use is therefore unavailable to Oakland, and does not help it here.

### D.   Oakland Fails to Rebut the City's Presumption of Irreparable Harm

Oakland agrees that the City is entitled to a presumption of irreparable harm upon a showing of likelihood of success on the merits.  Opp. 22.  The City has done so.  To rebut the presumption, Oakland was required to "introduce evidence sufficient for a reasonable factfinder to conclude that the consumer confusion is unlikely to cause irreparable harm." *Nichino Am., Inc. v. Valent U.S.A. LLC*, 44 F.4th 180, 186 (3d Cir. 2022).  It has not.  At most, Oakland argues that SFO has continued to thrive and receive positive press despite the ongoing harm caused by the Infringing Mark and risk of future reputational damage.  Opp. 22.  This argument does not meet its burden.

Still, the City detailed the immediate and irreparable harm to its reputation and goodwill. Andretta ¶¶ 8, 27.  *See SunEarth, Inc. v. Sun Earth Solar Power Co.*, 846 F. Supp. 2d 1063, 1083 (N.D. Cal. 2012).  Every disgruntled, confused passenger that ends up at the wrong airport or otherwise has an unsatisfactory experience at the Oakland airport jeopardizes the City's decades-long effort to cultivate an award winning, world-class reputation around the globe. Schuler ¶¶ 8–9, 17; Andretta ¶¶ 8, 27.  The City's harm is not speculative or unfounded, as Oakland argues.  *See, e.g., Cisco Sys., Inc. v. Shenzhen Usource Tech. Co*., 2020 WL 5199434, at *8 (N.D. Cal. Aug. 17, 2020)*; Vans,* 2022 WL 1601530, at *13 ("evidence of loss of market control, consumer confusion [and survey evidence], and the poor quality of [defendant's] shoes is sufficient to establish" in light of the presumption).

### E.   The Public Interest Strongly Favors an Injunction

Oakland acknowledges that protecting the public from trademark infringement is in the public interest.  Opp. 25. Its only response is that the City has failed to demonstrate a likelihood of success on the merits or irreparable harm.  As discussed above, that argument fails.

### F.   The Balance of Hardships Strongly Favors an Injunction

Oakland cannot complain of alleged harms "when properly forced to desist from its infringing activities."  *Triad Sys. Corp. v. Se. Express Co.*, 64 F.3d 1330, 1338 (9th Cir. 1995),

superseded on other grounds by 17 U.S.C. § 1117(c). Oakland's only purported hardship is that it will need to revert to its old name, and may, as a practical matter, be forced to scrap its plans for the Infringing Mark altogether. Opp. 24. **It should**. Oakland was well aware of the City's concerns before it forged ahead with rebranding, and has no legitimate interest in infringing the SF Mark. *Cf. Cadence Design Sys. v. Avant! Corp.*, 125 F.3d 824, 829 (9th Cir. 1997) (a knowing infringer "cannot complain of the harm" from being forced to stop infringement). While Oakland argues that courts have "routinely" rejected this argument, its authorities are distinguishable.[8]

Critically, Oakland provides scant ***evidence*** of hardship. It argues it will suffer "immediate and direct harm" because it "has invested considerable resources" in the Infringing Mark. Opp. 24. It provides no evidence quantifying its alleged investment or the cost of complying with an injunction and, once more, Oakland's cited cases (*id*. 24-25) provide no support for its position. It also speculates that, as a practical matter, an injunction might cause it to permanently scrap plans for the Infringing Mark. But the balance of hardships doesn't favor a defendant merely because it might capitulate if it loses the motion. If that were so, this factor would favor every defendant.

Oakland needs to go back to its registered trademark. It offers no argument that doing so would cause it to lose customers. Nor would it impact its main airline partners (Southwest and Spirit), who say they are ***not*** using the Infringing Mark. Balanced against the actual confusion and the City's interest in protecting its reputation and goodwill, the equities favor requiring Oakland to revert back to the name that, up until five months ago, it had used for decades.

## III.    CONCLUSION

For the foregoing reasons, the City respectfully requests that the Court enjoin Defendants and those acting in concert with them from using the Infringing Mark.

---

[8] In both *C21FC LLC v. NYC Vision Capital Inc.*, 2022 WL 2191934, at *9 (D. Ariz. June 17, 2022), and *Sutter Home Winery, Inc. v. Madrona Vineyards, L.P.*, 2005 WL 701599, at *13 (N.D. Cal. Mar. 23, 2005), the plaintiffs had failed to demonstrate a likelihood of success on the merits and there were facts indicating lack of harm. In the other cited cases, the courts credited the defendants' lack of intent to infringe. *Kiva*, 402 F. Supp. 3d at 899 (junior trademark user had used mark in good faith for 8 years); *Champion-Cain v. Macdonald*, 2016 WL 7188242, at *9 (S.D. Cal. Dec. 12, 2016) (less than three months before trial and no evidence of intent).

1    Dated: October 22, 2024                    COOLEY LLP

2

3                                              By:_____
                                               Bobby A. Ghajar
4                                              John Hemann
                                               Judd D. Lauter
5
                                               Attorneys for Plaintiff
6                                              CITY AND COUNTY OF
                                               SAN FRANCISCO
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

REPLY BRIEF ISO PRELIMINARY INJUNCTION
Case No. 3:24-cv-02311-TSH                          16