BARBARA J. PARKER, City Attorney, SBN 069722
MARIA BEE, Chief Assistant City Attorney, SBN 167716
JOHN A. BURKE, Supervising Deputy City Attorney, SBN 148385
CHRISTINA LUM, Deputy City Attorney, SBN 278324
One Frank H. Ogawa Plaza, 6th Floor
Oakland, California  94612
Telephone:  (510) 238-4483; Fax:  (510) 238-6500
Email: clum@oaklandcityattorney.org
X05557/3375490v1

Attorneys for Defendant,
CITY OF OAKLAND

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| CITY and COUNTY of SAN FRANCISCO,<br><br>Plaintiff,<br><br>v.<br><br>CITY of OAKLAND and PORT OF OAKLAND,<br><br>Defendants. | Case No. 3:24-cv-02311-TSH<br><br>**DECLARATION OF CHRISTINA LUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**<br><br>Date:      December 5, 2024<br>Time:     10 a.m.<br>Courtroom: E – 15th Floor |

I, Christina Lum, declare as follows:

1.      I am an attorney licensed to practice before all courts of the State of California.  I am a Deputy City Attorney with the Office of the City Attorney for the City of Oakland, counsel of record for Respondent City of Oakland.

2.      Exhibit 1 is a true and correct copy of City of Oakland Ordinance No. 3825 N.S., dated February 14, 1927.

3.      Exhibit 2 is a true and correct copy of City of Oakland Ordinance No. 3826 N.S., dated February 14, 1927.

4.      Exhibit 3 is a true and correct copy of the current Article VII of the Charter of the City of Oakland.

5.       Exhibit 4 is a true and correct copy of excerpts from "Property Owned by the Port of Oakland," from Port of Oakland, Land Surveys and Mapping, 530 Water Street, Oakland California, dated September 4, 2012.

6.      Exhibit 5 is a true and correct copy of "Order Granting in Part and Denying in Part Motion to Dismiss," from United States District Court, Northern District of California, case no. 18-CV-03353-KAW, dated October 5, 2018.

I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct.

Executed on this 30th day of October 2024 in Oakland, California.


_____
Christina Lum

DECLARATION OF CHRISTINA LUM IN SUPPORT OF                    3:24-cv-02311-TSH
MOTION FOR SUMMARY JUDGMENT

# EXHIBIT 1

APPROVED AS TO FORM AND LEGALITY.

INTRODUCED BY COMMISSIONER   GOODRICH

_____
CITY ATTORNEY.

## ORDINANCE No. 3825 N. S.

AN ORDINANCE FINDING AND DETERMINING VARIOUS
MATTERS IN RELATION TO THE ESTABLISHMENT OF A PORT
DEPARTMENT UNDER THE CONTROL AND JURISDICTION OF A
BOARD OF PORT COMMISSIONERS, AS PROVIDED BY ARTICLE
XXV OF THE CHARTER, RATIFYING, CONFIRMING AND DELE-
GATING UNTO THE SAID BOARD THOSE POWERS, DUTIES,
PROPERTY RIGHTS AND FUNCTIONS PERTAINING THERETO,
AND PROVIDING FOR VARIOUS ADJUSTMENTS THEREOF IN RE-
LATION TO THE DEPARTMENTS OF THE CITY.

- - - - - - -

WHEREAS, the people of the City of Oakland, on
December 21, 1926, adopted an amendment to the charter of the city by
adding thereto a certain article known as ARTICLE XXV, consisting of
Sections 206 to 231 inclusive, thereby establishing a Port Department
of the city, and assigning and placing said department and all matters,
employments, contracts, and properties of the city relating to the
port and harbor under the control and management of a Board of Port
Commissioners; and

WHEREAS, the Legislature of the State of California on
January 13, 1927, duly and regularly ratified the said amendment; and

WHEREAS, it provided therein that except for the purpose
of appointing the members of and organizing the Board of Port Com-
missioners, the said amendment shall take effect thirty days after said
ratification, to-wit, on February 12, 1927, and said amendment is now
about to become of full force and effect:

NOW, THEREFORE, BE IT ORDAINED by the Council of the City
of Oakland, as follows:

Section 1.  The City Council hereby finds and determines
that on and following the said 12th day of February, 1927, the Board
of Port Commissioners shall be vested with complete and exclusive
jurisdiction and control as to all matters concerning the port and
harbor of the city, and over the "Port Area" described in said

FORM O. 2

-1-

ARTICLE XXV, and shall have and exercise all the powers, duties, and functions as is provided in said article, the City Council hereby ratifying, confirming and delegating unto the said Board all the powers, duties and functions pertaining to or incidental to its purposes as in said article provided.

Section 2. The said City Council further finds and determines that, in accordance with said ARTICLE XXV, the jurisdiction and control of all the waterfront properties, and lands adjacent thereto, or under water, structures thereon, and approaches thereto, storage facilities, and other utilities, and all leases, easements, permits, privileges, rights and interests belonging thereto, but not franchises, which are now owned or possessed or under lease or purchase, by the City of Oakland, including all salt or marsh or tide lands and structures thereon granted to the city in trust by the State of California, and all other properties within the port area, shall on said date be vested exclusively in said Board of Port Commissioners.

Section 3. The Council further finds and determines that the jurisdiction, control and possession of all dredges and other water craft, automobiles, office furniture, equipment, maps, files, documents, and other personal property pertaining to or relating to the said Port Department or its functions, shall on and after said date be vested exclusively in the said Board.

Section 4. In connection with the foregoing section the Commissioner of Public Works and the Port Manager are hereby directed and authorized to prepare an inventory, or inventories, designating properties in said section referred to, and to file a copy of said inventories with the City Clerk and the said Board, as a public record thereof. The filing of such inventory, or inventories, shall be deemed a delivery of the possession of all properties designated therein to the said Board.

Section 5. The Council further finds and determines that on and after said date the said Board of Port Commissioners shall have and exercise full control and jurisdiction over all lawful ordinances, resolutions, regulations, employments, duties, contracts, claims, leases, and obligations pertaining to or related to harbor work or harbor construction, port development, its management and operation, and to any

-2-

and all other matters included in the said ARTICLE XXV, all of which, as in said article provided, shall continue in force until duly amended, repealed or abolished by said Board.

      Section 6. In connection with the matters mentioned in the preceding section, the Council particularly finds and determines that the following positions and places of employment now in the Department of Public Works pertain to and relate to the said Port Department:

      Port Manager & Chief Harbor Engineer; Chief Asst. to Port Manager & Chief Harbor Engineer; Harbor Engineer; Asst. Harbor Engineer; Office Engineer; Chief Structural Designer; Structural Designer Grade "A"; Structural Designer Grade "B"; 2 Structural Designers Grade "C"; 2 Structural Draftsmen; 2 Draftsmen; Harbor Field Engineer; 2 Chainmen; 2 Inspectors of Construction; Harbor Traffic Investigator; Tariff & Traffic Man; Accountant; Sr. Clerk & Stenographer; 2 Jr. Stenographers; City Wharfinger; 3 Asst. Wharfingers; 2 Sr. Bookkeepers; 2 Watchmen; 2 Extra Watchmen; Waterfront Foreman; 5 Waterfront Laborers; 3 Extra Waterfront Laborers; 1 Tractor Operator; 4 Pile Driver and Dredge Tenders; Supt. of Dredgers; Chief Mate; Chief Electrician; 4 Electricians; 3 Levermen; 1 Sub. Leverman; 3 Deckmates; 1 Sub. Deckmate; 1 General Mechanic; 1 Mechanic's Helper; 2 Levee Bosses; 1 Sub. Levee Boss; 25 Deckhands or Levee Laborers; Pile Driver Foreman; Pile Driver Engineer; 1 Sub. Pile Driver Engineer; 2 Pile Driver Foreman or Pile Driver Journeyman; 4 Pile Driver Journeymen;

      Section 7. The Commissioner of Public Works and the Port Manager are hereby authorized and directed to prepare a list of all the said positions and places of employment designated in the preceding section, briefly showing therein the names of the employees occupying the same, in each case, if any, the salaries and duties thereof; and the particular sections or sub-sections of Ordinances Nos. 1856 N.S. and 1857 N.S., pertaining thereto. A copy of such list shall be filed with the City Clerk and the Board of Port Commissioners, as a record of the particular employees who shall, by virtue of said charter amendment, become assigned to and placed under the control and jurisdiction of the said Board. When, and after February 12, 1927, the Board of Port Commissioners shall have adopted an ordinance or ordinances taking over and classifying, abolishing, recreating, or amending such positions and employments, or any of them, or prescribing the duties, authority and compensation thereof, it shall be proper for the City Council to amend

or repeal such sections or subsections of said Ordinances Nos. 1856 N.S. and 1857 N.S. as may be affected thereby. Nothing herein, however, shall be construed to prevent said Board in its pleasure to take further action from time to time as it may desire in reference to any such employments or positions.

Section 8. The Council further particularly finds and determines, without attempting to designate all contracts, claims, obligations and leases which may be affected thereby, that the jurisdiction and control of the following contracts shall, in accordance with said charter amendment, xxx on and after said date be vested in said Board:

A contract with Smith Brothers, Inc., for the construction of the Fourteenth Street Wharf, Outer Harbor.
A contract with Clinton Construction Company of California for the construction of the Grove Street Pier.
A contract with W.H. Hauser for grading and filling certain area at the Fourteenth Street Wharf.
An option agreement and lease with Frank W. Taylor, G.C. Stephens, et al., for the purchase of certain property on Bay Farm Island and within the Port Area.

Section 9. The Council further finds and determines that, as provided in said charter amendment, the jurisdiction and control of the following funds, and all moneys therein contained or belonging thereto, shall, on and after said date, be vested in the said Board:

"1925, Oakland Harbor Improvement Fund".
"Harbor Maintenance and Improvement Fund".
"Harbor Appropriations, General Fund".

That in addition thereto all other revenues and funds in the possession of the city set aside for port purposes, including all revenues, dockages, tolls and other income from the operation of the port and its facilities, and the income from leases of waterfront properties within the Port Area, or other sources relating to the port, now or hereafter to be received, shall on and after said date be apportioned and appropriated exclusively to the control of the said Board until expended by it.

Also, all proceeds from the sale of any Oakland Harbor Improvement Bonds, 1925 issue, heretofore or hereafter to be sold, shall, on and after said date, be vested exclusively in the control and jurisdiction of said Board, and there is hereby conferred upon and delegated to said Board full power and authority to carry out, acquire, construct, complete and maintain that certain municipal improvement provided for in said bond issue.

-4-

The Auditor and Treasurer are hereby authorized and directed to set up the necessary accounts to carry out the foregoing purposes, and to comply with the provisions of the said ARTICLE XXV.

Section 10. The City Attorney be, and he is hereby authorized and directed to transfer and deliver to the said Board all records, reports, documents, papers, files and other property in his possession belonging to his office, which, in his discretion, pertain or relate to the said port department, or to litigation connected therewith. A receipt of such properties so transferred, signed by the Port Attorney, shall be filed as a record with the City Attorney. From and after said February 12, 1927, the said Board, for and on behalf of the City of Oakland, shall have and exercise full control and jurisdiction over all litigation, proceedings or actions, at law or in equity, and special proceedings, for or against the city, pertaining or related to any matters within its jurisdiction.

Section 11. All the necessary power and authority is hereby vested in the officers of the City, and they are hereby directed to do and perform all acts and things proper or convenient to adjust the affairs of the City in relation to the Port Department that the said Board of Port Commissioners may assume and perform its various powers, duties and functions as in said Article XXV provided, with the least confusion or delay.

Section 12. This ordinance shall take effect immediately.

IN COUNCIL. OAKLAND, CAL. *February 14*, 192 7.

PASSED BY THE FOLLOWING VOTE :

AYES—COMMISSIONERS BACCUS. CARTER. COLBOURN, *GOODRICH* MOOREHEAD AND PRESIDENT DAVIE — *5*

NOES— *None*

ABSENT— *None*

ATTEST: _____
MAYOR OF THE CITY OF OAKLAND, CAL.

ATTEST: _____
CITY CLERK AND CLERK OF THE COUNCIL OF THE CITY OF OAKLAND, CAL.

EXHIBIT 2

APPROVED AS TO FORM AND LEGALITY.

INTRODUCED BY COMMISSIONER  GOODRICH

*CITY ATTORNEY.*

# ORDINANCE No. 3826 N. S.

AN ORDINANCE INVESTING THE BOARD OF PORT COMMISSIONERS WITH THE
POWER AND AUTHORITY TO ACQUIRE, ESTABLISH, EQUIP, MAINTAIN AND OPERATE
AN AIRPORT AND FACILITIES INCIDENTAL THERETO WITHIN THE PORT AREA IN
THE CITY OF OAKLAND, AND TO HAVE AND EXERCISE VARIOUS POWERS, DUTIES
AND FUNCTIONS PERTAINING THERETO.

--------

BE IT ORDAINED BY THE COUNCIL OF THE CITY OF OAKLAND AS FOLLOWS:

Section 1.  There is hereby conferred upon, delegated to, and
vested exclusively in the Board of Port Commissioners, subject to its
approval, the power and authority in its discretion to acquire, establish,
equip, maintain and operate an airport within the port area of the City
of Oakland, including air terminals, hangars, fields for landing and
flying aircrafts, mooring masts, lights, repair shops and other facilities,
appliances, and structures incidental thereto, of such number and character
and in such places as the Board may, in its judgment, deem advisable and
proper.  In so doing, the said Board may expend such funds as it may deem
necessary, and may cooperate with other governmental agencies.

The said Board shall further have and exercise, and is hereby vested
with, all the powers, duties and functions in connection therewith as fully
and completely as it would have, had an airport and such facilities been
expressly mentioned and set forth in the provisions of Article XXV of this
charter, and included therein as a part of the facilities of the port and
harbor, the Council hereby finding and determining the same to be among the
facilities and aids incidental to the development, protection and operation
of the harbor, and to the furtherance of commerce, transportation, shipping
and navigation, and that such powers are necessary and convenient to carry
out the general purposes of such Board.

Section 2.  This ordinance shall take effect immediately.

FORM O. 2

IN COUNCIL, OAKLAND, CAL., *February 14* ,192 7.

PASSED BY THE FOLLOWING VOTE :

AYES—COMMISSIONERS BACCUS, ~~CARTER~~, COLBOURN, *GOODRICH* MOOREHEAD AND PRESIDENT DAVIE — 5

NOES— *None*

ABSENT— *None*

ATTEST:_____
MAYOR OF THE CITY OF OAKLAND, CAL.

ATTEST:_____
CITY CLERK AND CLERK OF THE COUNCIL
OF THE CITY OF OAKLAND, CAL.

FORM O. 3

# EXHIBIT 3

ARTICLE VII - PORT OF OAKLAND

**Section 700. Establishment of a Port Department.** To promote and more definitely insure the comprehensive and adequate development of the Port of Oakland through continuity of control, management and operation, there is hereby established a department of the City of Oakland known as the "Port Department."

(Amended by: Stats. November 1988.)

**Section 701. Board of Port Commissioners.** The exclusive control and management of the Port Department is hereby vested in the Board of Port Commissioners, which shall be composed of seven (7) members who shall be appointed by the Council, upon nomination by the Mayor.

No person shall be appointed as, or continue to hold office as, a member of the Board who is not at the time of their appointment, and has not been continuously for thirty (30) days immediately preceding their appointment, and who shall not continue to be during their term, a bona fide resident of the City of Oakland.

The members of the Board shall serve without salary or compensation.

(Amended by: Stats. November 1988 and November 2000.)

(Res. No. 89280, 6-21-2022)

**Section 702. Organization, Terms of Office.** The Board of Port Commissioners shall consist of seven (7) members nominated by the Mayor and appointed by the Council for a term of four (4) years. Members in office at the time this section takes effect shall continue in office until their successors are appointed and qualified. For terms commencing July 10, 1969, two (2) members shall be appointed to fill the positions expiring upon that date, and two (2) additional members shall be appointed to bring the membership of said Board to seven (7); provided, that the terms of such two additional members shall be for such original duration, in no event to exceed four years, as will insofar as practicable permit appointment at the end of subsequent terms of office of members, of either one or two members.

(Amended by: Stats. November 1988.)

**Section 703. Removal.** Any member of the Board may be removed from office by the affirmative vote of six (6) members of the Council in the same manner and subject to the same conditions as the Council may remove the members of any of the Boards provided for in this Charter in Article VI.

(Amended by: Stats. November 1988.)

**Section 704. Ordinances and Resolutions.** All action taken by the Board of Port Commissioners shall be by resolution, except as hereinafter set forth in this Article. Any member of the Board may require a record of the vote on any resolution to be made in its minutes. The Board shall keep a minute book wherein shall

be recorded the proceedings taken at its meetings and it shall keep a record and index of all of its resolutions and ordinances.

No ordinance or resolution shall be passed or become effective without receiving the affirmative- votes of at least four (4) members of the Board. To constitute an ordinance a bill must, before final action thereon, be passed to print and published with the ayes and noes at least once in the official newspaper of the City. Between the first and final readings at least five (5) days shall elapse. The enacting clause of all ordinances passed by the Board shall be substantially in these words:

Be it ordained by the Board of Port Commissioners of the City of Oakland as follows:

All ordinances shall be signed by the President or Vice-President of the Board and attested by the Secretary.

A certified copy of each ordinance adopted by the Board shall be forthwith filed with the City Clerk, and the City Clerk shall keep a record and index thereof which shall at all times be open to public inspection.

(Amended by: Stats. November 1988.)

**Section 705. Ordinances Required in Certain Cases.** All proceedings for the acquisition of real property by purchase, condemnation, or otherwise, or the granting of any lease longer than one (1) year, the fixing, regulating, and altering schedules of rates, dockage, wharfage, tolls, and charges for all public-owned docks, piers, wharves, slips and other facilities, and for services rendered by the Port Department, and the adoption of all general rules and regulations of the Board, excepting administrative regulations of a temporary nature, shall be taken by ordinance.

(Amended by: Stats. November 1988.)

**Section 706. Powers and Duties or the Board.** The Board of Port Commissioners shall have the complete and exclusive power, and it shall be its duty for and on behalf of the City:

(1) To sue and defend in the name of the City in all actions and proceedings wherein there is involved any matters within the jurisdiction of the Board.

(2) To make provisions for the needs of commerce, shipping, and navigation of the port, to promote, develop, construct, reconstruct, alter, repair, maintain, equip and operate all water front properties including piers, wharves, sea walls, docks, basins, channels, slips, landings, warehouses, floating and other plants or works, dredge, and reclaim land, construct, equip and operate terminal trackage with sidings and turnouts and railroad connections between docks, piers and other port structures, and connect the same with mainline tracks, and to establish, equip and operate all other facilities or aids incident to the development, protection and operation of the port, as may be deemed proper and desirable in its judgment, and it may modify its plans from time to time as the requirements of commerce, shipping and navigation may demand, and as part of such development and operation to provide for tugs,

dredges, fireboats, barges, cold storage plants, and all other publicly owned facilities or appliances incident to the operation of the port, of such number and character, and in such places as the Board may deem feasible and proper.

(3)  To take charge of, control, and supervise the Port of Oakland, including all the water front properties, and lands adjacent thereto, or under water, structures thereon, and approaches thereto, storage facilities, and other utilities, and all rights and interests belonging thereto, which are now or may hereafter be owned or possessed by the City, including all salt or marsh or tidelands and structures thereon granted to the City in trust by the State of California for the promotion and accommodation of commerce and navigation.

(4)  To have control and jurisdiction of that part of the City hereinafter defined as the "Port Area" and enforce therein general rules and regulations, to the extent that may be necessary or requisite for port purposes and harbor development, and in carrying out the powers elsewhere vested in the Board.

Provided, however, that with the approval of the Council the Board may relinquish to the Council control of portions of the said area, and likewise, upon request of the Board, the Council may, by ordinance, enlarge the Port Area.

(5)  To require owners of water terminal properties and facilities within the port to keep the same in proper condition and repair and to maintain them with especial reference to the reduction of fire hazard or nuisances, and it shall have the right to inspect such terminal facilities at reasonable times.

(6)  To exercise all the powers pertaining to the waterfront, wharves, dredging machines, or the port and its operation and maintenance, which have been heretofore conferred upon the City and the Council by Section 106 of this Charter.

(7)  To regulate the berthing, anchoring, towing, loading, unloading and mooring of vessels within the port.

(8)  To handle, store and recondition all commodities; to sell or otherwise dispose of personal property within its possession or ownership, and, generally, to perform all services customary, necessary or expedient in connection with the development and operation of the port.

(9)  To issue receipts, negotiable or otherwise, for property or merchandise in its charge or possession.

(10)  To fix all rates, dockage, rentals, tolls, wharfage, and charges, for the use and occupation of the public facilities or appliances of the port, and for services rendered by the Port Department, and to provide for the collection thereof.

(11)

To use, for loading and unloading cargo; with the right to collect tolls, dockage and other terminal charges thereon, such portions of the streets of the City ending or fronting upon the water areas of the harbor of said City, as may be used for said purposes.

(12)  To build piers, wharves, docks, bulkheads, slips or other structures, across and upon such streets, provided only that access be provided to the public at the shoreward end thereof.

(13)  To lend its aid to secure the improvement of navigable tidal waters within or adjacent to the port, where, in its opinion, such improvements are economically justifiable, and in the general carrying out of its powers to cooperate with neighboring cities, other ports, the State of California, or the United States Government, and appear before state, federal and other public legislative and administrative authorities.

(14)  To manage the business of the Port and promote the maritime and commercial interests by proper advertisement of its advantages, and by the solicitation of business, within or without the port, within other states or in foreign countries, through such employees and agencies as it may deem expedient.

(15)  To acquire in the name of the City by purchase, condemnation, gift, lease, or otherwise take over and hold all lands, property, property rights, leases, or easements, and personal property of every kind, necessary or convenient for the development and operation of the port, or for the carrying out of the powers herein granted to the Board. Whenever the Board determines that any lands owned by the City within its jurisdiction have become unnecessary for port purposes or harbor development, it may in its discretion transfer such lands to the control of the Council, free from all restrictions, or it may sell or exchange such lands, by ordinance subject to the referendum provisions of this Charter.

(16)  To purchase materials and supplies.

(17)  To enter into contracts, agreements, or stipulations (other than leases) germane to the scope of its powers and duties.

(18)  To let all work by contract, or order it done by any labor, as the Board may determine.

(19)  To have and exercise the right of eminent domain within the "Port Area" on behalf of and in the name of the City for port purposes, harbor development or the carrying out of any of the powers granted to said Board, and to exclusively find and determine by ordinance adopted by a two-thirds vote of all of its members the public interest and necessity thereof.

(20)  To appoint a Port Attorney, whose duty it shall be to pass upon the form and legality of all contracts within the jurisdiction of the Board, give legal advice to the Board on official matters, defend and (subject to direction from the Board) prosecute or compromise all actions at law or in equity and special proceedings for or against the City or any officers thereof in the Port Attorney's official capacity, pertaining to matters within the jurisdiction of the Board. The Board shall fix and provide for the Port Attorney's compensation.

(21)  To employ and appoint an Executive Director, and such other officers, employees and agents as may be necessary in the efficient and economical carrying out of its functions and to prescribe and fix their duties, authority and compensation, and to require such officers, employees and agents to give a bond in such an amount as the Board may require for the faithful discharge of their duties. All offices and places of employment in the permanent service of the Board shall be created by ordinance duly passed.

(22)  To provide and equip offices.

(23)  To provide in the Port Area, subject to the provisions of Section 727, for other commercial development and for residential housing development; provided that any residential housing development shall be approved by the Board with the consent of the City Council.

(24)  To provide for financing of Port facilities through the issuance of bonds or other forms of debt instruments which are secured by a pledge of, or are payable from, all or any part of the revenues of the Port and/or which may be secured in whole or in part by interests, liens or other forms of encumbrance (other than in or on fee title in land) or lease in property. Such debt instruments shall be issued and sold in such manner and upon such terms and conditions, and shall contain such provisions and covenants, as the Board may fix and establish by the provisions of one or more procedural ordinances. Such debt instruments shall not constitute a debt, liability or obligation of the City of Oakland and shall be payable exclusively from revenues and other assets of the Port.

(25)  To provide for the issuance and sale, or to cause the issuance and sale, of any form of equity instruments or securities which represent interests in property (other than fee title and land) used or owned by the Port and which participate in incidents of ownership of such property; provided, that such property shall not include property of the Port which was owned or used by the Port prior to the date of the adoption of this Section. For the purpose of facilitating the issuance and sale of such equity instruments, the Port is authorized to create and to participate in legal entities, including but not limited to, trusts, corporations and partnerships, and to pledge and grant security interests, liens or other forms of encumbrance or lease in such property (other than fee title in land) to secure the repayment of such equity instruments. Such equity instruments, or combinations of debt and equity instruments, shall be issued and sold, and such entities created, in such manner and upon such terms and conditions, as the Board may fix and establish by the provisions of one or more procedural ordinances. Such equity instruments shall not constitute a debt, liability or obligation of the City of Oakland and shall be payable exclusively from revenues, other funds and property of the Port pledged thereto.

(26)  To expend all funds necessary to the carrying out of the powers and duties herein expressed.

(27)

To adopt and enforce such ordinances, orders, regulations and practices as are necessary for the proper administration and discharge of its duties and powers, or for the management and government of the port, and its facilities.

(28)  To prescribe fines, forfeitures and penalties for the violation of any provision of this Article, or of any ordinance, but no penalty shall exceed Five Hundred Dollars ($500.00) or six (6) months imprisonment, or both.

(29)  To have and exercise on behalf of the City all the rights, powers and duties in respect to the subject matters herein provided for, that are now or which may hereafter be vested in the City, or any of its departments or officers, or which may be provided for by general law.

(30)  To do and perform any and all other acts and things which may be necessary and proper to carry out the general powers of the City, or any of the provisions of this Article, and to exercise all powers not in conflict with the Constitution of the State, or with this Charter, germane to the scope of its powers, purposes and duties.

(Amended by: Stats. November 1988.)

(Res. No. 89280, 6-21-2022)

Section 707. Operation of Facilities. Notwithstanding any other provision of this Charter to the contrary, the Board shall not be required to directly operate all of the properties, facilities and utilities under its control or jurisdiction, and shall have the power to authorize the operation of any of such properties, facilities and utilities by a private person, firm, association or corporation, whether by lease, franchise, license, assignment, permit or otherwise, upon such terms and conditions as the Board shall prescribe, which terms and conditions shall include control over the rates, charges and practices of said private party to the extent permitted by law.

(Amended by: Stats. November 1988.)

Section 708. Building Permits. No person or persons shall construct, extend, alter, improve, erect, remodel or repair any pier, slip, basin, wharf, dock or other harbor structure, or any building or structure within the "Port Area" without first applying for and securing from the Board a permit so to do, in accordance with the rules and regulations adopted by it. In approving or denying the right to said permit, the Board shall consider the application therefor, the character, nature and size and location of the proposed improvement, and exercise a reasonable and sound discretion in the premises.

Provided, however, that applications for building permits pertaining to privately owned property within the "Port Area" shall be made to the Executive Director who shall consider and act upon them in the same manner as applications for such permits made to the Board. Any person excepting to any denial, suspension or revocation of a permit applied for or held by them pursuant to the provisions of this section, or any person excepting to the granting of, or to the refusal to suspend or revoke a permit applied for or held under the provisions of this section, may appeal to the Board by filing with the Secretary a written notice of

such appeal setting forth the specific grounds thereof. Such notice must be filed within fourteen (14) days after notice of such denial, suspension, revocation or granting, or refusal to suspend, revoke or grant, such permit, constituting the basis of such appeal, but in no event later than thirty (30) days after the date of the denial, suspension, revocation or granting of the permit. The Secretary shall forthwith set said matter for hearing before the Board and cause notice thereof to be given (1) to the appellant, and (2) to the adverse party or parties, or to the attorney, spokesperson or representative thereof, not less than five (5) days prior to such hearing. At such hearing the appellant shall show cause, on the grounds specified in the notice of appeal, why the action excepted to should not be approved. The Board may continue such hearing from time to time, and its findings and conclusions on the appeal shall be final and conclusive in the matter.

Such permit issued by the Board or the Executive Director shall be in addition to any permit which may be required by law from the Building Inspector of the City.

(Amended by: Stats. November 1988.)

(Res. No. 89280, 6-21-2022)

**Section 709. Leases.** The Board shall have the power to make and enter into any lease of any properties belonging to or possessed by the City under its jurisdiction for a term of not to exceed sixty-six (66) years, provided that all leases made shall be subject to referendum.

(Amended by: Stats. November 1988.)

**Section 710. Contracts.** All contracts shall be made and entered into in accordance with the conditions and procedures established by the Board, but subject to bid limit and race and gender participation programs established by the Council pursuant to the provisions of Sections 807 and 808 of this Charter.

(Amended by: Stats. November 1988, March 1996.)

**Section 711. Supervision of Leases, etc.** The Board shall take over and control, and shall have the power to grant, all leases, concessions, easements, privileges, spur tracks and other permits, wharfing-out rights, and waterfront or other franchises relating to the harbor or port and located within the "Port Area" and receive the income therefrom, but this shall not include franchises for the construction and maintenance of railroads, power lines, gas mains and other utilities of a general nature which may extend through other portions of the City into the Port Area and which are within the jurisdiction of the Council pursuant to the provisions of Article X of this Charter, and subject to the supervision of the City Administrator.

It shall be the duty of the Board to see that all provisions of such leases, concessions, easements, privileges, permits, rights or franchises within its jurisdiction are faithfully observed, and it may cause to be instituted such actions or proceedings in the name of the City as may be necessary to enforce the provisions thereof, or to revoke, cancel, or annul them when they have become forfeitable in whole or in part, or are illegal, or void or voidable.

(Amended Stats. November 1988 and March 2004.)

**Section 712. Restrictions of Powers of Council.** No franchise shall be granted, no property shall be acquired or sold, no street shall be opened, altered, closed or abandoned, and no sewer, street, or other public improvement shall be located or constructed in the "Port Area," by the City of Oakland, or the Council thereof, without the approval of the Board.

(Amended by: Stats. November 1988.)

**Section 713. Public Streets.** Whenever the Board shall determine that it is necessary to open, close, improve, alter or vacate a public street or part of a public street within the "Port Area," a certified copy of the resolution so determining such necessity shall be filed by the Board in the Office of the City Clerk, with the request that the City Administrator and the Council initiate and carry to completion the proceedings necessary to effect said proposal.

(Amended by: Stats. November 1988 and March 2004.)

**Section 714. Personnel System.** All permanent places of employment in and under the Board shall be included within the personnel system of the City established pursuant to and subject to the provisions of Article IX of this Charter, except the Executive Director and the Executive Director's two principal assistants, the Secretary of the Board, the Port Attorney and Legal Assistants, chief wharfinger, field and traffic representatives, and all persons employed in the physical or mechanical handling, moving or checking of cargo and freight. The exemption of such personnel from the operation of civil service rules shall not in any way affect such pre-existing civil service rights as such employee may hold.

(Amended by: Stats. November 1988.)

(Res. No. 89280, 6-21-2022)

**Section 715. Annual Budget.** The Board shall annually, on or before the fourth Monday of May, or not less than one week prior to the submission of the annual appropriation ordinance by the City Administrator, should the Council advance the date therefor, but not later than the third Monday of July, carefully prepare a budget setting forth the estimated receipts of the Port, and revenue from other sources, for the ensuing year, and the sums of money necessarily required for the administration of the department, and for maintenance, operation, construction and development of the port and its facilities for the ensuing year, and stating the amount necessary to be raised by tax levy for said purposes. Said budget when so prepared, shall be certified by the President and Secretary of the Board, and a certified copy thereof shall, on or before said date, be filed with the Council, one with the City Administrator, and one with the Auditor.

(Amended by: Stats. November 1988 and March 2004.)

Section 716. Tax Levy Funds. In the event that said Port budget, as provided for in the foregoing section, shall request or provide for the allocation or appropriation to the Port by the Council of any funds raised or to be raised by tax levy or in any manner to be obtained from general revenues of the City, or shall request the incurring or payment of any financial obligation by the City for the Port's use and benefit, or shall not provide for Board servicing of existing or future general obligation bonds of the City issued for Port purposes, the Council shall have the authority to reject said budget and to require it to be revised to meet with Council approval, subject, however, to the Board's covenants with the holders of all of the then outstanding revenue bonds issued by the Board.

The Treasurer shall keep all Port funds separate from other funds in the Treasurer's possession, and the Board shall have the exclusive management and disbursement of the same.

(Amended by: Stats. November 1988.)

(Res. No. 89280, 6-21-2022)

### Allocation of Funds.

Section 717 (1). All Port facilities, airport facilities and terminal facilities of any kind or character are hereby consolidated and shall be operated as a single project by the Board in the interest of transportation by land, by sea and by air, it being hereby found and determined that transportation facilities of all classes implement and augment each other to such an extent that the same must in the public interest be operated singly and under one central supervision and control. Wherever in this Charter the terms "port", "project", or "facilities" are used, the same shall include all facilities under the jurisdiction of the Board, irrespective of whether the same shall be port or airport facilities or other real or personal property or equipment of the Port and related improvements, structures or facilities.

(Amended by: Stats. November 1988.)

Section 717 (2). All moneys once apportioned or appropriated to the Board, including, without limiting the generality of the foregoing, all moneys heretofore apportioned or appropriated to and now under the control of the Board, shall be and remain under the control and order of and shall be expended by the Board for the purpose for which apportioned or appropriated and shall be kept separate and apart from all other moneys of the City or the Board. All surplus moneys which, in the judgement of the Board, are not needed for the purpose for which apportioned or appropriated, shall be allocated to and deposited in the Revenue Fund provided for in Section 717 (3).

(Amended by: Stats. November 1988.)

Section 717 (3). All income and revenue from the operation of the port or from the facilities of the port, of whatever kind or nature, and all net income from leases or any other source of income or revenue, including, without limiting the generality of the foregoing, all such income and revenue now under the

control of the Board, shall be and remain under the control and order of and shall be expended by the Board; provided that all such income and revenue shall be allocated to and deposited in a special fund in the City Treasury (which is hereby created) designated "Port Revenue Fund" and shall be kept separate and apart from all other moneys of the City or the Board and shall be used and applied for the following purposes and in the following order of priority, to wit:

**First:** For the payment, as the same become due and payable, of the principal of and interest on any or all general obligation bonds of the City of Oakland heretofore and hereafter issued for port purposes, but only to the extent required by the Constitution of the State of California or otherwise as determined by resolution of the Board.

**Second:** For the payment of the principal of and interest on revenue bonds, or other evidences of indebtedness payable solely from revenues as in Section 718 provided, which are due or become due during the fiscal year in which the revenues in said funds, or either thereof, are received or are to be received, together with reserve fund payments, sinking fund payments or similar charges in connection with such revenue bonds due or to become due in such fiscal year, including all payments required to be made pursuant to the terms of any resolution authorizing the issuance of revenue bonds, or required by the terms of the contract created by or upon the issuance of revenue bonds.

**Third:** For the payment of all costs of maintenance and operation of the facilities from or on account of which such money was received. General costs of administration and overhead of the Board not directly chargeable to each facility under its control shall be apportioned fairly by the Board, upon such reasonable basis as it may determine, to each such facility.

**Fourth:** For defraying the expenses of any pension or retirement system applicable to the employees of the Board.

**Fifth:** For necessary additions, betterments, improvements, repairs or enlargements of any facilities, and, to the extent determined by a resolution or resolutions of the Board, for replacements, renewals or reconstruction of any facilities.

**Sixth:** For establishing and maintaining reserve or other funds to insure the payment on or before maturity of any or all general obligation bonds of the City now outstanding or hereafter issued for any facility under the control of the Board, but only to the extent required by the Constitution of the State of California or otherwise as determined by resolution of the Board.

**Seventh:** For establishing and maintaining reserve or other funds to insure the payment on or before maturity of any or all revenue bonds of the Board hereafter issued.

**Eighth:** For establishing and maintaining such other reserve funds pertaining to the facilities of the Board as shall be determined by a resolution or resolutions of the Board.

**Ninth:** For transfer to the General Fund of the City, to the extent that the Board shall determine that surplus moneys exist in such fund which are not then needed for any of the purposes above stated.

(Amended by: Stats. November 1988.)

### Financing of Harbor and Airport Operations.

**Section 718 (1). General Obligation Bonds of the City.** The City of Oakland may from time to time incur general obligation bonded indebtedness in the manner provided by law for the acquisition, construction or completion of any port facilities or improvements of the Port of Oakland, including land, rights of way and air easements. The proceeds from the sale of any general obligation bonds now authorized, or which may hereafter be authorized, for any such purposes, shall be under the control of, and shall be expended by, the Board for the objects and purposes for which such general obligation bonded indebtedness was incurred. Whenever, in the opinion of the Board, it is desirable for the City of Oakland to incur additional general obligation bonded indebtedness for any project within the jurisdiction or control of the Board, the Board shall prepare tentative plans, estimates and bond retirement schedules and submit its recommendations in writing to the City Council, which shall thereupon take such action as it deems advisable to reject or carry out such recommendations.

(Amended by: Stats. November 1988.)

**Section 718 (2). Methods of Financing Not Exclusive.** Nothing in this Section 718 contained shall in any way abridge, control, limit, restrict or revoke the power of the electors of the City of Oakland to vote for and cause to be authorized and issued general obligation bonds of the City of Oakland for the acquisition, construction or completion of any project herein defined, or any additions thereto or betterments or improvements thereof, irrespective of whether or not revenue bonds for such purpose have been, or may thereafter be issued hereunder, and nothing herein contained shall prevent the financing of any project or any additions, betterments or improvements thereof from any other funds which may be legally available for that purpose. Revenue bonds authorized to be issued hereunder shall not be subject to charter limitations as to the amount of general obligation bonded indebtedness of the City of Oakland nor be taken into consideration in determining the amount of general obligation bonded indebtedness which the City of Oakland is authorized to incur, and the issuance of revenue bonds as in this Article VII provided shall be deemed to constitute a supplemental and additional method of providing funds for the financing of harbor, airport or other real or personal property or equipment of the Port and related improvements, structures or facilities. Such revenue bonds shall be issued in the name of the Board of Port Commissioners of the City of Oakland and shall constitute obligations only of the Board, payable in accordance with their terms from revenues of any project, as in this Article VII authorized.

(Amended by: Stats. November 1988.)

**Section 718 (3). Rates, Tolls and Charges.** Without limiting any power in this Charter conferred upon the Board, the Board has power for any of the purposes of this Section 718 to fix rates, tolls, fees, rentals or charges for the use of the facilities provided by any project, or for any services rendered in connection therewith, and to alter, change or modify the same at its pleasure, subject to any contractual obligation which may be entered into by the Board with respect to the fixing of such rates, tolls, fees, rentals or other charges; and, by a resolution of issue or otherwise, to enter into covenants to increase rates, tolls, fees, rentals or other charges from time to time; provided, however, that any person shall be permitted to use or operate any facilities provided by any project only upon payment of the regularly established charge therefor, except as may be otherwise specifically provided in a resolution of issue. All rates, fees, rentals and other charges shall be paid only in such coin or currency as on the date of payment is legal tender for public and private debts.

(Amended by: Stats. November 1988.)

**Section 718 (4). Authorization of Revenue Bonds.** Each issue of revenue bonds shall be authorized by the Board by a resolution of issue adopted by the affirmative votes of at least five (5) members of the Board at a duly assembled meeting. Each resolution of issue shall prescribe the purpose or purposes for which, and the terms and conditions on which, said revenue bonds are to be issued.

(Amended by Stats. November 1988.)

**Section 718 (5). Validity of Revenue Bonds Not Affected by Actions of City or Boards Relative to Project.**

(a)  The validity of the authorization and issuance of any revenue bonds by the Board shall not be dependent on or affected in any way by:

(i)  Proceedings taken by the City or the Board for the acquisition, construction or completion of any project or any part thereof;

(ii)  Any contracts made in connection with the acquisition, construction, or completion of any project; or

(iii)  The failure to complete any project for which bonds are authorized to be issued.

(Amended by: Stats. November 1988.)

**Section 718 (6). Rights of Bondholders.** Except as provided otherwise in any resolution of issue, the holder of any bond issued pursuant to this Section 718 may, by mandamus or other appropriate proceedings, require and compel the performance of any of the duties imposed upon the Board or the City or the Council or any official or employee of the Board or the City or assumed by any thereof in connection with the acquisition, construction, completion, operation, maintenance, repair, reconstruction or insurance of any project, or the collection, deposit, investment, application and disbursement of rates, fees and charges derived from the operation and use of any project and all other revenues, or in connection with the

deposit, investment or disbursement of the proceeds received from the sale of the bonds under this Section. The enumeration of such rights and remedies does not, however, exclude the exercise or prosecution of any other rights or remedies available to the holders of bonds issued pursuant to this Section 718.

(Amended by: Stats. November 1988.)

Section 718 (7). Section Confers Complete Authority. The provisions of this Section constitute full and complete authority for the issuance of revenue bonds as herein provided by the Board and no other procedure, or proceedings, consents, approvals, orders or permission from the Council or any municipal officer or board of the City of Oakland, shall be required for the acquisition, construction or completion of any project, or the issuance of any revenue bonds under this Section 718 except as specifically provided in this Section 718. The powers and authorities conferred by this Section are in addition to and supplemental to all other powers and authorities conferred upon the Board.

(Amended by: Stats. November 1988.)

Section 719. Moneys on Hand. All moneys in the Harbor Maintenance and Improvement Fund at the time of the adoption of this Charter and all other revenues and funds in the possession of the City set aside for port purposes, shall immediately be under the jurisdiction and control of the Board.

(Amended by: Stats. November 1988.)

Section 720. Duties of Treasurer. All moneys under the control of the Board shall be immediately paid over to the Treasurer of the City of Oakland, who shall have the care and custody of said funds, and shall keep separate accounts thereof, and pay out the same, as provided in this Charter.

(Amended by: Stats. November 1988.)

Section 721. Revolving Fund. The Board shall have authority to set up by ordinance a sufficient contingent or revolving fund from which the Executive Director shall be entitled to draw warrants directly upon the Treasurer for the prompt payment of transient laborers, and the Treasurer shall upon presentation of same, pay such warrants. Statements of such payments shall be filed with the Board at its regular meetings and shall be approved by the Board and endorsed by the President and Secretary thereof, and audited as in the case of ordinary claims.

(Amended by: Stats. November 1988.)

Section 722. Additional Powers. The City Council, subject to the approval of the Board, may by ordinance confer upon and delegate to the Board, from time to time, such additional powers and duties which may be vested in it, and which it may deem necessary or convenient to carry out the general purposes of such Board.

(Amended by: Stats. November 1988.)

**Section 723. Liberal Construction.** If any section, clause, word, or provision of this Article shall be held unconstitutional, the other sections, clauses, words, or provisions of this Article shall not be affected thereby. All the provisions of this Article shall be liberally construed.

(Amended by: Stats. November 1988.)

**Section 724.** The provisions of this Article shall supersede and control all other provisions of the Charter in conflict therewith. To all other extent, the powers, duties, and functions heretofore vested in the Council, or any of the officials, boards, or departments of the City, shall be unimpaired.

(Amended by: Stats. November 1988.)

**Section 725. Port Area.** The "Port Area" under the exclusive jurisdiction of the Board of Port Commissioners shall be the same area that existed immediately prior to the adoption of this Section, as it has been defined by Charter and by ordinance, and as it may hereafter be altered by Council ordinance in accordance with and upon the recommendation of the Board, or by amendment of this Charter.

(Amended by: Stats. November 1988.)

**Section 726.** Without denial or disparagement of other powers now held by or that may hereafter be given to the City of Oakland or its legislative bodies under or by the Constitution or the laws of the State of California, the City Council and Board of Port Commissioners are hereby authorized and empowered to grant and convey all or any portion of or interest in the tidelands and submerged lands located in the Middle Harbor area of the City, lying between the Estuary of San Antonio and Seventh Street, and westward of Bay Street extended southerly, to the United States of America for public and governmental (including military or naval) purposes, subject to such terms, conditions, and reservations, if any, as the Council and Board shall deem proper. No ordinance or other measure passed in respect to any such grant shall be subject to the referendum provisions of this Charter. All proceedings heretofore taken to accomplish such a grant are hereby ratified, confirmed and approved, and the completion thereof and making of such grant is hereby authorized.

(Amended by: Stats. November 1988.)

**Section 727. Land Use and Development.** The Board shall develop and use property within the Port Area for any purpose in conformity with the General Plan of the City. Any variation therefrom shall have the concurrence of the appropriate City board or commission; provided, that the Board may appeal to the Council for final determination of adverse decisions of such board or commission, in accordance with uniform procedures established by the Council.

(Amended by: Stats. November 1988.)

**Section 728. Living Wage and Labor Standards at Port-Assisted Businesses.**

(1)

Scope and Definitions. The following definitions shall apply throughout this Section:

(A) "Port" means the Port of Oakland.

(B) "Port-Assisted Business" or "PAB" means (1) any person involved in a Port Aviation or Port Maritime Business receiving in excess of $50,000 worth of financial assistance from the Port, or (2) any Port Contractor involved in a Port Aviation or Port Maritime Business if the person employs more than 20 persons per pay period, unless in the prior 12 pay periods the person has not had more than 20 such employees and will not have more than 20 persons in the next 12 pay periods. A PAB shall be deemed to employ more than 20 persons if it is part of an 'enterprise' as defined under the Fair Labor Standards Act employing more than 20 persons. "Port Contractor" means any person party to a Port Contract as herein defined.

(C) "Port Contract" means:

(1) Any service contract with the Port for work to be performed at the Port under which the Port is expected to pay more than $50,000 over the term of the contract;

(2) Any contract, lease or license from the Port involving payments to the Port expected to exceed $50,000 either (a) over the term of the contract, lease or license, or (b) during the next 5 years if the current term is less than 1 year but may be renewed or extended, either with or without amendment;

(3) Any subcontract, sublease, sublicense, management agreement or other transfer or assignment of any right, title or interest received from the Port pursuant to any of the foregoing contracts, leases or licenses.

A contract, lease or license with the Port or any agreement derived therefrom shall not be deemed a Port Contract unless entered into after enactment of this Section, or amended after enactment of this Section to benefit in any way the party dealing with the Port.

(D) "Employee" means any individual employed by a PAB in Port related employment.

(E) "Person" includes any natural person, corporation, partnership, limited liability company, joint venture, sole proprietorship, association, trust or any other entity.

(F) "Valid collective bargaining agreement" as used herein means a collective bargaining agreement entered into between the person and a labor organization lawfully serving as the exclusive collective bargaining representative for such person's employees.

(G) "Port Aviation or Port Maritime business" means any business that principally provides services related to maritime or aviation business related services or whose business is located in the maritime or aviation division areas as defined by the Port.

(2) Exemptions from Coverage. In addition to the above exemption for workforces of fewer than 20 workers, the following persons shall also be exempt from coverage under this Section:

    (A)  An Employee who is (1) under twenty-one (21) years of age and (2) employed by a nonprofit entity for after-school or summer employment or for training for a period not longer than ninety (90) days, shall be exempt.

    (B)  An Employee who spends less than 25 percent of their work time on Port-related employment.

    (C)  A person who employs not more than 20 employees per pay period.

(3)  Payment of Minimum Compensation to Employees. Port-Assisted Businesses shall provide compensation to each Employee of at least the following:

    (A)  Minimum Compensation. The minimum compensation shall be wages and health benefits totaling at least the rate of the living wage ordinance of the City of Oakland.

    (B)  Credit for Health Benefits. The PAB shall receive a credit against the minimum wage required by this Section for health benefits in the amount provided by and in accordance with the living wage ordinance of the City of Oakland.

(4)  Notifying Employees of their Potential Right to the Federal Earned Income Credit. Each PAB shall inform each Employee who makes less than twelve dollars ($12.00) per hour of the Employee's possible right to the Federal Earned Income Credit ("EIC") under Section 2 of the Internal Revenue Code of 1954, 26 U.S.C. § 32, and shall make available the forms required to secure advance EIC payments from the business. These forms shall be provided to the eligible Employees in English (and other languages spoken by a significant number of such Employees) within thirty (30) days of employment under this Section and as required by the Internal Revenue Code.

(5)  Preventing Displacement of Workers. Each PAB, which is to replace a prior PAB shall offer employment to the Service Employees of the prior PAB, if, these Employees worked for the prior PAB for at least 90 calendar days. Such Employees may be not be terminated by the new PAB during the first 90 workdays except for just cause. The new PAB may operate at lower staffing levels than its predecessor but in such event, shall place the prior Employees on a preferential reinstatement list based on seniority. For purposes of this Section, a PAB "replaces" another if it (1) assumes all or part of the lease, contract or subcontract of a prior employer or obtains a new lease, contract, or sublease, and (2) offers employment which Employees of the prior PAB can perform. In the case of a replacement connected to the new PAB relocating from another location, in staffing decisions the new PAB may recognize seniority from its prior locations in addition to the seniority of the prior PAB's workforce. "Service Employees" means all employees except manager, supervisors, professionals, paraprofessionals, confidential and office employees.

(6)  Waiver.

    (A)

A PAB who contends it is unable to pay all or part of the living wage must provide a detailed explanation in writing to the Port Executive Director who may recommend a waver to the Port board. The explanation must set for the reasons for its inability to comply, including a complete cost accounting for the proposed work to be performed with the financial assistance sought, including wages and benefits to be paid all employees, as well as an itemization of the wage and benefits paid to the five highest paid individuals employed by the PAB. The PAB must also demonstrate that the waiver will further the public interests in creating training positions which will enable employees to advance into permanent living wage jobs or better and will not be used to replace or displace existing positions or employees or to lower the wages of current employees.

(B) The Port Board will grant a waiver only upon a finding and determination that the PAB has demonstrated the necessary economic hardship and that waiver will further the public interests in providing training positions which will enable employees to advance into permanent living wage jobs or better. However, no waiver will be granted if the effect of the waiver is to replace or displace existing positions or employees or to lower the wages of current employees.

(C) Such waivers are disfavored, and will be granted only where the balance of competing interests weighs clearly in favor of granting the waiver. If waivers are to be granted, partial waivers are favored over blanket waivers. Moreover, any waiver shall be granted for no more than one year. At the end of the year the PAB may reapply for a new waiver which may be granted subject to the same criteria for granting the initial waiver.

(D) Any party who objects to the grant of a waiver by the Port Board may appeal such decision to the City/Port Liaison Committee, who may reject such waiver.

(7) Retaliation and Discrimination Barred, No Waiver of Rights.

(A) A PAB shall not discharge, reduce the compensation of or otherwise discriminate against any person for making a complaint to the Port, participating in any of its proceedings, using any civil remedies to enforce such person's rights, or otherwise asserting such person's rights under this Section.

(B) Any waiver by an individual of any of the provisions of this Section shall be deemed contrary to public policy and shall be void and unenforceable, except that Employees shall not be barred from entering into a written valid collective bargaining agreement waiving a provision of this Section if such waiver is set forth in clear and unambiguous terms. Any request to an individual by a PAB to waive the individual's rights under this Section shall constitute a violation of this Section.

(8) Enforcement.

(A)

Each PAB shall maintain for each person in Port-related employment a record of the person's name, pay rate and, if the PAB claims credit for health benefits, the sums paid by the PAB for the Employee's health benefits. The PAB shall submit a copy of such records to the Port at least by March 31st, June 30th, September 30th and December 31st of each year, unless the PAB has employed less than 20 persons during the preceding quarter in which case the PAB need only submit a copy of such records every December 31st. Failure to provide a copy of such records within five days of the due date will result in a penalty of five hundred dollars ($500.00) per day. Each PAB shall maintain a record of the name, address, job classification, hours worked, and pay and health benefits received of each person employed, and shall preserve them for at least three years.

(B)  If a PAB provides health benefits to persons in Port-related employment but does not pay for them on a per-hour basis, then upon the PAB's request, the amount of the hourly credit against its wage obligation shall be the Port's reasonable estimate of the PAB's average hourly cost to provide health benefits to its Employees in Port-related employment. The PAB shall support its request with such documentation as is reasonably requested by the Port or any interested party, including labor organizations in such industry.

(C)  Each PAB shall give written notification to each current Employee, and to each new Employee at time of hire, of their rights under this Section. The notification shall be in the form provided by the Port in English, Spanish and other languages spoken by a significant number of the Employees, and shall also be posted prominently in areas at the work site where it will be seen by all Employees.

(D)  Each PAB shall permit access to work sites and relevant payroll records for authorized Port representatives for the purpose of monitoring compliance with this Section, investigating employee complaints of noncompliance and evaluating the operation and effects of this Section, including the production for inspection and copying of its payroll records for any or all persons employed by the PAB. Each PAB shall permit a representative of the labor organizations in its industry to have access to its workforce at the Port during non-working time and in non-work areas for the purpose of ensuring compliance with this Section.

(E)  Notwithstanding any provision in Article VI of this Charter to the contrary, the City Administrator may develop rules and regulations for the Port's activities in (1) Port review of contract documents to ensure that relevant language and information are included in the Port's RFP's, agreements and other relevant documents, (2) Port monitoring of the operations of the contractors, subcontractors and financial assistance recipients to insure compliance including the review, investigation and resolution of specific concerns or complaints about the employment practices of a PAB relative to this section, and (3) provision by the Port of notice and hearing as to alleged violations of this section.

(9)   Private Rights of Action.

   (A)   Any person claiming a violation of this Section may bring an action against the PAB in the Municipal Court or Superior Court of the State of California, as appropriate, to enforce the provisions of this Section and shall be entitled to all remedies available to remedy any violation of this Section, including but not limited to back pay, reinstatement or injunctive relief. Violations of this Section are declared to irreparably harm the public and covered employees generally.

   (B)   Any employee proving a violation of this Section shall recover from the PAB treble their lost normal daily compensation and fringe benefits, together with interest thereon, and any consequential damages suffered by the employee.

   (C)   The Court shall award reasonable attorney's fees, witness fees and costs to any plaintiff who prevails in an action to enforce this Section.

   (D)   No criminal penalties shall attach for any violation of this Section, nor shall this Section give rise to any cause of action for damages against the Port or the City.

   (E)   No remedy set forth in this Section is intended to be exclusive or a prerequisite for asserting a claim for relief to enforce any rights hereunder in a court of law. This Section shall not be construed to limit an employee's right to bring a common law cause of action for wrongful termination.

(10)   Severability. If any provision or application of this Section is declared illegal, invalid or inoperative, in whole or in part, by any court of competent jurisdiction, the remaining provisions and portions thereof and applications not declared illegal, invalid or inoperative shall remain in full force or effect. The courts are hereby authorized to reform the provisions of this Section in order to preserve the maximum permissible effect of each subsection herein. Nothing herein may be construed to impair any contractual obligations of the Port. This Section shall not be applied to the extent it will cause the loss of any federal or state funding of Port activities.

**(Amended by: Stats. March 2002 and March 2004)**

**(Res. No. 89280, 6-21-2022)**

# EXHIBIT 4



LEGEND

Port-owned property

Port Area jurisdiction

Port Area jurisdiction subject to City Ordinance 12229 C.M.S. *

* City Ordinance 12229 C.M.S. temporarily relinquishes planning authority within a portion of the Port Area jurisdiction for the Estuary Policy Plan Area.

SCALE IN FEET

GRID

INDEX SHEET
PROPERTY OWNED BY
PORT OF OAKLAND

FILENAME: PORT-PROP.DWG

DRAWN BY: D.A.M
CHECKED BY:
JOB:
DATE: 9/4/12
SCALE: 1" = 5000'
PAGE 1 OF 5

**PORT OF OAKLAND**
LAND SURVEYS AND MAPPING
530 Water Street
Oakland, California
(510) 627-1100



AIRPORT & VICINITY

PROPERTY OWNED BY
PORT OF OAKLAND

PAGE 5 OF 5

SCALE: 1" = 1200'

DATE: 9/4/12

JOB:

CHECKED BY:

DRAWN BY:    D.A.M

FILENAME: PORT—PROP.DWG

**PORT OF OAKLAND**
LAND SURVEYS AND MAPPING

530 Water Street
Oakland, California
(510) 627-1100



# EXHIBIT 5

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DERRON THIBODEAUX,

          Plaintiff,

    v.

PORT OF OAKLAND,

          Defendant.

Case No. 18-cv-03353-KAW

**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS**

Re: Dkt. No. 8

On June 7, 2018, Plaintiff Derron Thibodeaux filed the instant case against Defendant Port of Oakland, asserting violations of the Clean Water Act ("CWA"). (Compl. ¶ 1, Dkt. No. 1.) Defendant now moves to dismiss the case. (Def.'s Mot. to Dismiss, Dkt. No. 8.) Having considered the papers filed by the parties, the relevant legal authority, and the arguments advanced by counsel at the September 20, 2018 hearing, the Court GRANTS IN PART AND DENIES IN PART Defendant's motion to dismiss.

## I.    BACKGROUND

On September 26, 2016, Plaintiff sent Defendant a "Notice of Violations and Intent to File Suit Under the Clean Water Act." (Blanchard Decl., Exh. A ("9/26/2016 Notice"), Dkt. No. 8-2.) On October 4, 2016, Defendant requested to meet with Plaintiff, seeking additional information on the CWA allegations. (Blanchard Decl. ¶ 4.) On March 22, 2017, Plaintiff sent Defendant an "AMENDED Notice of Violations and Intent to File Suit Under the Clean Water Act." (Blanchard Decl., Exh. D ("3/22/2017 Notice").)

The Amended Notice first provides a general overview of the CWA. (3/22/2017 Notice at 1-2.) Next, the Amended Notice states that sewage transmission pipes servicing Buildings 803 and 804 and running adjacent to 19th Street "have a chronic history of inflow and infiltration . . .

as well as cracks in the piping in the system [that] releas[e] raw and untreated sewage underground into the soil, thereby releasing untreated wastewater and raw sewage into the ground water and San Francisco Bay." (*Id.* at 2.)

The Amended Notice then describes "107,500 linear feet of storm drains and 25,000 feet of sanitary sewers within the 366 acre OGDA property," which Plaintiff asserts has been shown by several studies to be in poor condition and to have defects. (3/22/2017 Notice at 2.) Defects are defined as pipes with sags, plant root intrusion, cracked sections, holes or collapses, joints that have been separated or become misaligned, or blockages caused by sediment accumulation. The poor condition of the drains has resulted in contaminated sediment within the pipes and catch basins, as well as contaminated soil and groundwater adjacent to portions of the defective pipes. (*Id.*) Of concern are chemicals including petroleum hydrocarbons, polycyclic aromatic hydrocarbons, lead and other heavy metals, polychlorinated biphenyls, pesticides, and raw sewage. The Amended Notice asserts that materials from the contaminated soil and sanitary sewers are leaking into the storm drains that empty into the Bay.

Additionally, the Amended Notice discusses Defendant's "history of major discharges from the facility's collection system, caused by ruptured pipelines due to inflow and infiltration during periods of heavy rainfall and because the [Defendant']s freshwater delivery lines also leak causing a back of head pressure which in turn, forces the leaked raw effluent into Bay waters." (3/22/2017 Notice at 2.) The Amended Notice explains that these discharges of raw sewage and treated effluent violate the CWA because the discharge is occurring without a National Pollution Discharge Elimination System ("NPDES") permit. (*Id.* at 2-3.)

Finally, the Amended Notice notes that the "sewage collection lines are over 100 years old and in need of immediate replacement," and that Defendant and the City of Oakland are under a Clean Up and Abatement Order issued by the Regional Water Quality Control Board ("RWQCB") concerning the former Oakland Army Base, Order No. R2-2004-0086. (3/22/2017 Notice at 3.)

Based on the Amended Notice, Plaintiff filed the instant action against Defendant. (Compl. ¶ 2.) In his complaint, Plaintiff describes Defendant as "an industrial facility hosting an industrial railway storage yard, hog export terminal, asphalt recycling, fumigation services, truck

United States District Court
Northern District of California

repair, truck operations, and multiple industrial warehouse rentals totaling 283,896 square feet[1]

(hereinafter the 'Facility')." (Compl. ¶ 30.) The complaint then restates the assertions of the

Amended Notice. (Compl. ¶¶ 31-35.) Based on these allegations, Plaintiff brings four causes of

action: (1) discharge of pollutants without a NPDES permit, (2) discharges of contaminated storm

water in violation of permit conditions and the CWA, (3) failure to develop and implement an

adequate Storm Water Pollution Prevention Plan ("SWPPP") and best available and best

conventional control technologies, and (4) failure to develop and implement an adequate

monitoring and reporting program. (Compl. at 9-12.)

On August 9, 2018, Defendant filed the instant motion to dismiss, asserting that dismissal

was warranted because: (1) the Court lacked jurisdiction over the case because Plaintiff's notice

was defective, (2) Plaintiff failed to state a claim, (3) certain claims were moot, (4) Plaintiff did

not adequately plead standing, and (5) Plaintiff failed to name indispensable parties. (Def.'s Mot.

to Dismiss at 2.) Defendant also filed a request for judicial notice. (Def.'s RJN, Dkt. No. 8-1.)

On August 23, 2018, Plaintiff filed his opposition, as well as a request for a judicial notice. (Plf.'s

Opp'n, Dkt. No. 16; Plf.'s RJN, Dkt. Nos. 17-18.) On August 30, 2018, Defendant filed its reply,

along with a supplemental request for judicial notice. (Def.'s Reply, Dkt. No. 20; Def.'s Supp.

RJN, Dkt. No. 20-1.)

## II.    LEGAL STANDARD

### A.    Request for Judicial Notice

A district court may take judicial notice of facts not subject to reasonable dispute that are

"capable of accurate and ready determination by resort to sources whose accuracy cannot

reasonably be questioned." Fed. R. Evid. 201(b); *United States v. Bernal-Obeso*, 989 F.2d 331,

333 (9th Cir. 1993). A court may, therefore, take judicial notice of matters of public record.

*United States v. Wilson*, 631 F.2d 118, 119 (9th Cir. 1980).

### B.    Rule 12(b)(1) Motion to Dismiss

A defendant may move to dismiss an action for lack of subject matter jurisdiction pursuant

---

[1] Approximately 6.5 acres.

United States District Court
Northern District of California

United States District Court
Northern District of California

to Federal Rule of Civil Procedure 12(b)(1). A Rule 12(b)(1) motion tests whether a complaint alleges grounds for federal subject matter jurisdiction. A motion to dismiss for lack of subject matter jurisdiction will be granted if the complaint on its face fails to allege facts sufficient to establish subject matter jurisdiction. *See Savage v. Glendale Union High Sch.*, 343 F.3d 1036, 1039 n.2 (9th Cir. 2003). In considering a Rule 12(b)(1) motion, the Court "is not restricted to the face of the pleadings, but may review any evidence, such as affidavits and testimony, to resolve factual disputes concerning the existence of jurisdiction." *McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir. 1988). Once a party has moved to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), the opposing party bears the burden of establishing the court's jurisdiction. *See Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010).

### C. Rule 12(b)(6) Motion to Dismiss

Under Federal Rule of Civil Procedure 12(b)(6), a party may file a motion to dismiss based on the failure to state a claim upon which relief may be granted. A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the claims asserted in the complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).

In considering such a motion, a court must "accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam) (citation omitted), and may dismiss the case or a claim "only where there is no cognizable legal theory" or there is an absence of "sufficient factual matter to state a facially plausible claim to relief." *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009); *Navarro*, 250 F.3d at 732) (internal quotation marks omitted).

A claim is plausible on its face when a plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citation omitted). In other words, the facts alleged must demonstrate "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

"Threadbare recitals of the elements of a cause of action" and "conclusory statements" are

inadequate.  *Iqbal*, 556 U.S. at 678; *see also Epstein v. Wash. Energy Co.*, 83 F.3d 1136, 1140 (9th Cir. 1996) ("[C]onclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim.").  "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully . . .  When a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557) (internal citations omitted).

Generally, if the court grants a motion to dismiss, it should grant leave to amend even if no request to amend is made "unless it determines that the pleading could not possibly be cured by the allegation of other facts."  *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (citations omitted).

## III.    DISCUSSION

### A.    Request for Judicial Notice

Defendant and Plaintiff each requests that the Court take judicial notice of various documents created by and available from public agencies. [2]  Neither party challenges the requests for judicial notice, except that Plaintiff challenges to what extent the Connection Agreement submitted as Exhibit 15 covers the claims at issue.  (Plf.'s Opp'n at 1.)  Less than a week before the hearing, Plaintiff also filed an objection to Defendant's supplemental request for judicial notice. (Dkt. No. 21.)  The objection was, however, focused solely on the introduction of "new evidence" with the reply brief, but did not assert that the materials at issue were not judicially noticeable. (*Id.* at 1-2.)

Because all of the materials are public documents created by public agencies, the Court GRANTS the parties' requests for judicial notice.

### B.    Clean Water Act

"Congress enacted the Clean Water Act in 1972 in order to 'restore and maintain the

---

[2] In total, the parties' requests for judicial notice covered approximately 975 pages of exhibits, the vast majority of which is never cited to by the parties.  In the future, the parties should be judicious when deciding which exhibits will aid the Court's resolution of the motion.

United States District Court
Northern District of California

chemical, physical, and biological integrity of the Nation's waters.'" *WaterKeepers N. Cal. v. AG Indus. Mfg.*, 375 F.3d 913, 915 (9th Cir. 2004) (quoting 33 U.S.C. § 1251).  The CWA "prohibits the discharge of pollutants into United States waters except as authorized by the statute." *Id.* (citing 33 U.S.C. § 1311.)  The CWA is administered through the NPDES permit program, and "[t]he discharge of pollutants without an NPDES permit, or in violation of a permit, is illegal." *Id.*

### i.  Adequacy of Notice

Defendant challenges the adequacy of the Amended Notice.  Under the citizen suit provision, the CWA permits private persons and entities to enforce many of its provisions.  *Ctr. for Biological Diversity v. Marina Point Dev. Co.*, 566 F.3d 794, 799-800 (9th Cir. 2009).  Before a citizen suit may commence, however, "the citizen must give a 60-day notice of intent to sue" to the alleged violator, the EPA, and the state where the alleged violation occurred.  *Id.* at 800.  Part of the purpose of the notice is to give the government agencies the opportunity to enforce environmental regulations, as well as to give the alleged violator the chance to bring itself into compliance, thus obviating the need for legal action.  *Id.*

The 60-day notice "is a jurisdictional necessity," *Ctr. for Biological Diversity*, 566 F.3d at 800.  If a party does not comply with the notice requirements, the case must be dismissed.  *Id.* The EPA requires that the notice:

> include sufficient information to permit the recipient to identify the specific standard, limitation, or order alleged to have been violated, the activity alleged to constitute a violation, the person or persons responsible for the alleged violation, the location of the alleged violation, the date or dates of such violation, and the full name, address, and telephone number of the person giving notice.

40 C.F.R. § 135.3(a).  "The key language in the notice regulation is the phrase 'sufficient information to permit the recipient to identify' the alleged violations and bring itself into compliance." *WaterKeepers N. Cal.*, 375 F.3d at 916 (internal quotation omitted).  Thus, "[n]otice is sufficient if it is reasonably specific and if it gives the accused company the opportunity to correct the problem.  Although the [CWA]'s notice requirement is strictly construed, plaintiffs are not required to list every specific aspect or detail of every alleged violation." *Id.* at 917 (internal quotations omitted).  At the same time, a satisfactory notice must "tell[] a target precisely what it

United States District Court
Northern District of California

allegedly did wrong, and when.  The target is not required to play a guessing game in that respect."

*Ctr. for Biological Diversity*, 566 F.3d at 801.

   a.  Failure to Mention "Facility," "Storm Water Discharges," or "General Permit"

Defendants argue that the Amended Notice is inadequate because it fails to reference the facility, storm water discharges, or the General Permit.  (Def.'s Mot. to Dismiss at 18.)

### 1.  Facility

Defendants contend that the Amended Notice does not describe the "facility," which the complaint describes as an "industrial facility" that is 283,896 square feet in size, devoted to certain specified uses.  (Def.'s Mot. to Dismiss at 18; Def.'s Reply at 3.)  Plaintiff does not dispute that he failed to provide the description of the facility.  (Plf.'s Opp'n at 5.)  Ultimately, however, the Court finds that the description of the "facility" is a description of what Defendant is supposed to be, rather than the location of where the violation is happening.  (*See* Compl. ¶ 30 ("The PORT OF OAKLAND . . . is an industrial facility hosting an industrial railway storage yard, hog export terminal, asphalt recycling, fumigation services, truck repair, truck operations, and multiple industrial warehouse rentals totaling 283,896 square feet (hereinafter the 'Facility')").)  The location of the alleged violation, in contrast, is the sewage and storm drain system.  (Compl. ¶¶ 31-34; 3/22/2017 Notice at 2-3.)  The expanded description in the complaint does not modify that; instead, it simply provides more information on what Defendant is alleged to be.  The mere failure to describe the facility does not render the notice defective.

### 2.  Storm Water Discharges

Defendant argues that the Amended Notice "focuses solely on sanitary sewer discharges, which falls under a completely different regulatory scheme under the CWA than industrial storm water discharges."  (Def.'s Mot. at 18-19.)  The Court disagrees.  While the Amended Notice does not use the term "storm water discharges," it describes "major discharges from the facility's collection system, caused by ruptured pipelines due to inflow and infiltration during *periods of heavy rainfall* . . . ."  (3/22/2017 Notice at 2 (emphasis added).)  Those inflow and infiltration problems then "caused discharges of raw sewage and treated effluent to surface waters in violation of the prohibition of [the CWA]."  (*Id.*)  Such information gives Defendant sufficient notice

7

because the complained of discharges are allegedly occurring during and caused by storm events.

### 3. General Permit

Finally, Defendant contends that Plaintiff never refers to the General Permit, thus failing to identify the standard, limitation, or order at issue. (Def.'s Mot. to Dismiss at 18; Def.'s Reply at 4.) In California, the state is responsible for administering the NPDES program, including the issuance of individual permits to industrial dischargers. *WaterKeepers N. Cal.*, 375 F.3d at 915. California has also issued a General Permit, which covers dischargers who file a notice of intent with the state. *Id.* at 915-16.

The Court agrees that Plaintiff fails to refer to the General Permit. While the Amended Notice generally states that the RWQCB issues NPDES permits and otherwise regulates discharges, it does not identify the General Permit nor assert that Defendant's actions violate the General Permit. At the hearing, Plaintiff conceded that he failed to identify the General Permit, but argued that he did not need to. The Court disagrees. Because Plaintiff fails to identify the General Permit, Plaintiff does not "identify the specific standard, limitation, or order alleged to have been violated." 40 C.F.R. § 135.3(a); *see also Frilling v. Vill. of Anna*, 924 F. Supp. 821, 834 (S.D. Ohio 1996) (finding that the plaintiff failed to identify the specific standard at issue where the plaintiff "*completely failed* to identify the Indirect Discharge permit anywhere in their Notice Letter"); *cf. WaterKeepers N. Cal.*, 375 F.3d at 919 (finding notice letter sufficient where it "point[ed] to the specific provisions of the General Permit allegedly violated"). Therefore, the Court lacks jurisdiction to consider Plaintiff's second through fourth causes of actions, which concern Defendant's alleged failure to comply with the General Permit's Discharge Prohibition A(2), Defendant's failure to develop and implement a SWPPP as required by General Permit Section A, and Defendant's failure to develop and implement an adequate monitoring and reporting program as required by General Permit Section B.[3] (Compl. ¶¶ 44, 52, 57.)

Contrary to Defendant's suggestion, however, the failure to refer to the General Permit is not dispositive as to the entire case. Plaintiff's first cause of action is not dependent on the General

---

[3] The Amended Notice also never mentions that Defendant failed to develop and implement a SWPPP, or that it failed to develop and implement an adequate monitoring reporting plan.

United States District Court
Northern District of California

1   Permit, but instead concerns Defendant's alleged operations "without NPDES permit coverage for

2   their polluted storm water discharges, a violation of Sections 301(a) and 402(p)(2)(B) of the

3   [CWA] . . . ."  (Compl. ¶ 41.)  The Amended Notice, likewise, alleges that Defendant violated the

4   CWA "by discharging a pollutant from a point source to waters of the United States *without a*

5   *NPDES permit*.  Clean Water Act § 301(a) . . . ."  (3/22/2017 Notice at 2-3 (emphasis added).)

6   Thus, Plaintiff has adequately identified the specific standard or limitation at issue as to his first

7   claim.  Therefore, the Court finds dismissal of only the second through fourth causes of actions to

8   be appropriate based on Plaintiff's failure to identify the General Permit.

9                    b.   Time or Place of Discharge

10          Next, Defendant argues that Plaintiff fails to identify the time or place of discharge.

11  (Def.'s Mot. to Dismiss at 19-21; Def.'s Reply at 4-6.)  The Court disagrees.

12                        1.   Timing

13          Defendant contends that the allegations regarding timing are not adequate because the

14  Amended Notice only states that the violations are ongoing and have occurred within the last five

15  years.  (Def.'s Mot. to Dismiss at 19.)  Plaintiff responds that the Amended Notice also specifies

16  that the alleged discharges occurred "during periods of heavy rainfall."  (Plf.'s Opp'n at 7; *see also*

17  3/22/2017 Notice at 2.)  Defendant argues that this additional specification is still inadequate

18  because it should not be required to conduct historic meteorological research and that "it defies

19  meteorological science to suggest that every single time it rained, an illicit discharge was caused."

20  (Def.'s Reply at 6.)  The Ninth Circuit, however, has found similar allegations regarding timing to

21  be sufficient.

22          In *San Francisco BayKeeper, Inc. v. Tosco Corp.*, the plaintiff alleged that the defendant

23  was causing illegal discharges "'on each day when the wind has been sufficiently strong to blow

24  coke from the piles into the slough.'"  309 F.3d 1153, 1159 (9th Cir. 2002).  The plaintiff did not

25  provide any specific dates other than the general date range covered by its notice.  *Id.*  The Ninth

26  Circuit found this sufficient to inform the defendant what it was doing wrong with respect to the

27  wind-related discharges.  *Id.*  Relying on *Tosco Corp.*, the Ninth Circuit in *WaterKeepers*

28  *Northern California* likewise found that the plaintiff's notice stating that the defendant violated the

                                                    9

1    CWA by discharging polluted storm water "'during at least every rain event over 0.1 inches'" was

2    sufficient.  375 F.3d at 917-18.  While the plaintiff also attached two tables listing daily rain

3    accumulation at the area sites, the Ninth Circuit noted that the plaintiff was not actually "required

4    to include any rain tables."  *Id.*  Additionally, although the district court had found it significant

5    that the defendant's expert had testified that storm water will not always be discharged from the

6    defendant's facility after a 0.1 inch rainfall, the Ninth Circuit explained that this went to the merits,

7    not the adequacy of the notice letter.  *Id.* at 918.

8         In light of *Tosco Corp.* and *WaterKeepers Northern California*, the Court concludes that

9    Plaintiff provided sufficient notice of the timing by stating that the discharges occurred during the

10   last five years during periods of heavy rainfall.  *See N. Cal. River Watch v. Oakland Mar. Support

11   Servs.*, Case No. 10-cv-3912-CW, 2011 U.S. Dist. LEXIS 14551, at *14 (N.D. Cal. Feb. 14, 2011)

12   (finding adequate allegations where the notice did not identify specific dates but stated that the

13   discharges occurred during "every significant rain event" since a specified date).

          2.   Location

14

15        Defendant argues that the Amended Notice does not adequately identify a location because

16   its references to "107,500 linear feet of storm drains and 25,000 linear feet of sanitary sewers

17   within the 366 acre OGDA property" and "transmission pipes within the Port of Oakland servicing

18   Buildings 803 and 804 and running adjacent to 19th Street" is too generalized.  (Def.'s Mot. to

19   Dismiss at 20.)  Specifically, Defendant contends that these areas are vast, with the OGDA

20   containing "tens of thousands of feet of utility across hundreds of acres of land," including areas

21   that are under the exclusive jurisdiction of the City of Oakland.  (*Id.*)  Likewise, the transmission

22   pipes near Buildings 803 and 804 are serviced by tens of thousands of feet of sewer lines, which

23   Defendant also asserts is "unrelated to the industrial storm water concerns raised in the

24   Complaint."  (*Id.* at 21.)

25        To the extent Defendant argues that it may not be responsible for certain pipes, this is an

26   issue on the merits, not whether notice is adequate.  (*See* Def.'s Reply at 4-5.)  As to Defendant's

27   contention that Plaintiff's other allegations are too "general," the Court disagrees.  Defendant

28   would seem to require that a notice challenging the condition of a sewer system specify every

United States District Court
Northern District of California

10

location where there is a defect, but Defendant cites no authority that requires this level of specificity.  Instead, cases in this district concerning storm water conveyance systems or sewer systems have found more general allegations to be sufficient.

In *California Sportfishing Protection Alliance v. Shiloh Group, LLC*, the notice alleged that the defendant was unlawfully discharging polluted storm water "'through numerous discharge points connected to a system of underground storm water conveyances throughout the 31-acre Facility and into Pruitt Creek . . . .'" 268 F. Supp. 3d 1029, 1051 (N.D. Cal. 2017).  The district court found that this sufficiently identified the location of the alleged violation as the underground storm water conveyance system.  Similarly, in *Northern California River Watch v. Honeywell Aerospace*, the notice identified discharge from "'numerous point sources within the Site including: the above and below ground storage tanks; chemical storage; recycling equipment; waste ponds and solvent transfer equipment identified in the various records of Polluters and the regulatory agencies which have oversight of the Site.'" 830 F. Supp. 2d 760, 768 (N.D. Cal. 2011).  The notice also stated that the discharge occurred "through conduits." *Id.*  The district court concluded that this sufficiently identified the point sources at issue, despite the lack of specifics about each alleged problematic source.

Although the Amended Notice covers a significant area, the Court finds that the allegations regarding location are sufficient.  The Amended Notice explains that the sewer system is problematic, points to specific areas of particular concern, and explains that the problems cause leakage from the defective pipes into the Bay.  (3/22/2017 Notice at 2-3.)

c.  Activity that Caused Discharge

Finally, Defendant asserts that there is insufficient information about the activity that caused the discharges because it only states that Defendant has serious ongoing violations, owns and operates sewage transmission pipes with a chronic history of inflow and infiltration and cracks, and has a major history of discharges.  (Def.'s Mot. to Dismiss at 22.)  Again, the Court disagrees.  The Amended Notice states that there are cracks in the piping of the sewage transmission pipes servicing Buildings 803 and 804.  (3/22/2017 Notice at 2.)  It also states that the storm drains and sanitary sewers within the OGDA property have defects, describes those

United States District Court
Northern District of California

United States District Court
Northern District of California

defects, and states that the defects have resulted in the contamination of soil and groundwater by certain specified chemicals. (*Id.*) Those materials then leach into storm drains that empty into the Bay. The Amended Notice further describes problems with the collection system during periods of heavy rainfall, where leakage causes "a back of head pressure which in turn, forces the leaked raw effluent into Bay waters." (*Id.*) In short, the Amended Notice sufficiently describes the alleged problems with the sewage system and storm drains, which in turn cause pollutants to enter the Bay. *Compare with Honeywell Aerospace*, 830 F. Supp. 2d at 768 (finding sufficient allegations where the notice letter explained that solid and hazardous wastes were being discharged from tanks and through conduits to an estuary).

### ii.    Failure to State a Claim

Defendant argues that Plaintiff has failed to state a claim because Plaintiff describes Defendant as "an industrial facility hosting an industrial railway storage yard, hog export terminal, asphalt recycling, fumigation services, truck repair, truck operations, and multiple industrial warehouse rentals totaling 283,896 square feet (hereinafter the 'Facility')." (Compl. ¶ 30.) Defendant contends that this description is not accurate, and that there is no location in the Port that contains a facility of 283,896 square feet dedicated to the uses identified by Plaintiff. (Def.'s Mot. to Dismiss at 23-24; Def.'s Reply at 9.)

Plaintiff does not dispute that this description appears to be inaccurate, focusing solely on whether the "Port of Oakland" exists. (Plf.'s Opp'n at 8-9.) At the same time, it is not clear that the failure to adequately describe Defendant is fatal to the complaint when what Defendant is precisely is not at issue as to whether the CWA was violated based on Defendant's maintenance of its sewer systems. At the hearing, Plaintiff agreed to modify the description.

### iii.    Mootness

Defendant argues that to the extent Plaintiff is bringing claims based on the RWQCB Order No. R2-2004-00086 ("RWQCB Order") or the cracks in sewage transmission pipes servicing Buildings 803 and 804, these claims are moot. (Def.'s Mot. to Dismiss at 24.)

"Longstanding principles of mootness . . . prevent the maintenance of suit when there is no reasonable expectation that the wrong will be repeated." *Gwaltney of Smithfield v. Chesapeake*

United States District Court
Northern District of California

*Bay Found.*, 484 U.S. 49, 66 (1987) (internal quotations omitted). Thus, "[a] citizen suit is moot if it is based on wholly past violations, and if there is no reasonable expectation that the alleged wrong will be repeated." *Shiloh Grp., LLC*, 268 F. Supp. 3d at 1041 (citing *Gwaltney*, 484 U.S. at 66-67). "In seeking to have a case dismissed as moot, however, the defendant's burden is a heavy one. The defendant must demonstrate that it is *absolutely clear* that the allegedly wrongful behavior could not reasonably be expected to recur." *Gwaltney*, 484 U.S. at 66 (internal quotations omitted).

a. Regional Water Quality Control Board Order

Defendant contends that to the extent Plaintiff's suit is based on the RWQCB Order, the case is moot because Defendant has fully complied with the order, relying on a No Further Action letter issued by the RWQCB on December 20, 2013. (Def.'s Mot. to Dismiss at 25; *see also* Def.'s RJN, Exh. 17.) Moreover, Defendant states that this order "was issued in relation to former underground and aboveground petroleum storage tanks and had absolutely nothing to do with sanitary sewer lines or any wrongdoing by" Defendant. (*Id.*) Plaintiff responds that it is not clear that the December 20, 2013 No Further Action letter covers the entirety of the RWQCB Order. (Plf.'s Opp'n at 10.) In its reply, Defendant for the first time presents evidence that every Petroleum case at the former Oakland Army Base has been closed. (Def.'s Reply at 9-10; Def.'s Supp. RJN, Exh. 21.)

The Court finds that anything covered by the December 20, 2013 No Further Action letter is moot. Plaintiff does not argue otherwise, as Plaintiff's argument is focused solely on whether the December 20, 2013 No Further Action is for the entire RWQCB Order.

It is, however, entirely unclear to the Court why the RWQCB Order is relevant to the claims in this case. The RWQCB Order appears to be concerned with petroleum releases from underground storage tanks and drums of solvents, paints, or other chemicals. (Plf.'s RJN, Exh. A ("RWQCB Order") at 4-5.) At the hearing, Plaintiff also agreed that the RWQCB Order was only relevant to the removal of the underground storage tanks.[4] The RWQCB also focuses its concerns

---

[4] Plaintiff argued that there may be additional land use controls and covenants being imposed by California's Department of Toxic Substances Control ("DTSC"). (*See* Plf.'s Opp'n at 10.) It is not

13

United States District Court
Northern District of California

on the release of VOCs into groundwater, including vinyl chloride, cis-1,2-dichloroethene, trans-1,2-dichloroethene, trichloroethene, and 1,1,2,2-tetrachloroethane. (*Id.* at 5.) In contrast, the Amended Notice is concerned with storm water and sewage discharges into the Bay, with chemicals of concern being petroleum hydrocarbons, polycyclic aromatic hydrocarbons, lead and other heavy metals, polychlorinated biphenyls, pesticides, and raw sewage. (3/22/2017 Notice at 2.) Likewise, the first cause of action is focused on the release of polluted storm water discharges without a NPDES permit. (Compl. ¶¶ 38, 41.) This claim does not raise any concerns about petroleum discharges into groundwater. While this is a distinct issue from mootness, the Court notes that the RWQCB Order does not seem to have any relevance to this case, and it is unclear how Plaintiff can raise any claims based on the RWQCB Order.

b. Buildings 803 and 804

Defendant also argues that any claims related to Buildings 803 and 804 are moot because work on the sanitary sewer lines servicing these buildings was completed in May 2018, pursuant to a Connection Agreement between Defendant and the City of Oakland. (Def.'s Mot. to Dismiss at 26.) Defendant contends that this work included the replacement, abandonment, and/or slip lining of the subject sewer lines. (*Id.*)

The Court finds that at this juncture, Defendant has failed to satisfy its "heavy burden" that it is "*absolutely clear* that the allegedly wrongful behavior could not reasonably be expected to recur." *Gwaltney*, 484 U.S. at 66 (internal quotation omitted). Defendant makes no showing as to the full scope of the work of the sewer lines, and whether it would cover the entirety of the cracks discussed by the Amended Notice. Indeed, the Connection Agreement appears to have a very limited scope of "proposed temporary restroom installation/connection work" to update the infrastructure and facilitate connections between the 800 Series Buildings to a new sewer system. (Def.'s RJN, Exh. 15 ("Connection Agreement") at ¶ D.) It is not clear this "proposed temporary restroom installation/connection work" necessarily fixes every alleged cracks in the sewage

clear how this is relevant to this case either. Such controls are separate from the RWQCB Order, the only order specifically mentioned in the Amended Notice. Thus, to the extent Plaintiff is depending on an unspecified DTSC order, the Court will likely lack jurisdiction over any such claims.

1    transmission pipes servicing Buildings 803 and 804 and running adjacent to 19th Street.  The

2    Court therefore cannot conclude that Plaintiff's claims related to Buildings 803 and 804 are moot.

3        **iv.    Standing**

4        Defendant argues that Plaintiff has failed to establish Article III standing.  "[T]o satisfy

5    Article III's standing requirements, a plaintiff must show (1) it has suffered an 'injury in fact' that

6    is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2)

7    the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as

8    opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Friends*

9    *of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000).

10       First, Defendant argues that Plaintiff fails to adequately allege injury.  (Def.'s Mot. to

11   Dismiss at 27-28.)  The Court disagrees.  In his complaint, Plaintiff alleges that he "uses and

12   enjoys the waters of the San Francisco Bay," including "us[ing] these areas to fish, sail, boat,

13   kayak, swim, birdwatch, view wildlife, and engage in scientific studies."  (Compl. ¶ 8.)  Defendant

14   argues that this is inadequate because Plaintiff cannot perform these activities in the Port or the

15   areas immediately adjacent to the Port.  (Def.'s Mot. to Dismiss at 28; Def.'s Reply at 10.)

16   Defendant cites no authority that Plaintiff must perform activities immediately adjacent to the

17   allegedly polluting site, particularly when contaminants are capable of spreading.  *Contrast with*

18   *Laidlaw*, 528 U.S. at 181-82 (finding that injury in fact was adequately documented where one of

19   the plaintiff members alleged that "he would like to fish, camp, swim, and picnic in and near the

20   river between *3 and 15 miles downstream from the facility*").

21       In the alternative, Defendant argues that the Bay is publicly accessible to and used by

22   millions of people, which means Plaintiff's injury is not "particularized" and no greater than any

23   other member of the public residing in the Bay Area.  (Def.'s Mot. to Dismiss at 28.)  The Court

24   rejects this argument.  The Supreme Court does not require that a plaintiff engage in a use that is

25   different from any other use that members of the public could engage in; it requires that the

26   plaintiff does use or would use the affected area if not for the alleged pollution.  In *Laidlaw*, the

27   Supreme Court explained that "environmental plaintiffs adequately allege injury in fact when they

28   aver that they use the affected area and are persons for whom the aesthetic and recreational values

United States District Court
Northern District of California

15

of the area will be lessened by the challenged activity." 528 U.S. at 183. The Supreme Court did not require that the plaintiffs use the affected area in a unique way; the sole issue was whether their recreational, aesthetic, and/or economic interests were affected. *Id.* at 183-84. Thus, the Supreme Court found that injury in fact was adequately alleged where the plaintiff members asserted that they would use the affected river for fishing, swimming, birdwatching, boating, and other recreational purposes, if not for the pollution. *Id.* at 181-83. As applied here, Plaintiff is not obligated to assert that he would use the Bay differently from how the rest of the public could use it; he need only aver that he does use or would use the area if not for the alleged pollution, which he has done. Therefore, the Court finds that Plaintiff has adequately alleged injury.

Second, Defendant argues that Plaintiff does not allege causation because other entities may also be responsible for discharges. (Def.'s Mot. to Dismiss at 29.) Defendant relies on *Lujan v. Defenders of Wildlife*, in arguing that "[P]laintiff must demonstrate there are not 'independent actors not before the court[] and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict.'" (*Id.* (quoting *Lujan*, 504 U.S. 555, 562 (1992).) This discussion in *Lujan*, however, concerned the specific situation of "[w]hen the suit is one challenging the legality of government action or inaction," specifically when "a plaintiff's asserted injury arises from the government's alleged unlawful regulation (or lack of regulation) of *someone else*." *Lujan*, 504 U.S. at 561-62. In those circumstances, causation is reliant "on the response of the regulated (or regulable) third party to the government action or inaction," who might not be before the court. *Id.* at 562. *Lujan* does not, however, suggest that the fact that other entities may pollute as well absolves a polluter from having caused or contributed to a plaintiff's injury. The Court rejects this argument, and finds that Plaintiff has adequately alleged causation.

### v. Indispensable Parties

Finally, Defendants seek dismissal under Rule 12(b)(7) based on Plaintiff's failure to join indispensable parties, including the City of Oakland and private leaseholders. (Def.'s Mot. to Dismiss at 30-31.) "Rule 19(a) requires joinder of persons whose absence would preclude the grant of complete relief, or whose absence would impede their ability to protect their interests, or would subject any of the parties to the danger of inconsistent obligations." *Barnes & Noble, Inc.*

16

1   *v. LSI Corp.*, 823 F. Supp. 2d 980, 986 (N.D. Cal. 2011). Where a party is required to be joined

2   but cannot be joined, "the court must determine whether, in equity and good conscience, the action

3   should proceed among the existing parties or should be dismissed." Fed. R. Civ. P. 19(b).

4        As an initial matter, Defendant's motion to dismiss under Rule 12(b)(7) must be denied

5   because Defendant does not assert that the other parties *cannot* be joined to the current action. In

6   *Barnes & Noble, Inc.*, the district court denied the defendant's motion to dismiss for failure to join

7   necessary parties because the motion "makes no attempt . . . to explain how these parties cannot be

8   joined to the current action . . . ." 823 F. Supp. 2d at 986; *see also Treefrog Devs. v. Klearkase,*

9   *LLC*, Case No. 13-cv-1575 H (KSC), 2013 U.S. Dist. LEXIS 197894, at *12 (S.D. Cal. Oct. 25,

10  2013) ("denial is appropriate because Defendants do not provide the Court with any reasons why

11  either Otter entity cannot be joined").

12       To the extent Defendant argues that Plaintiff should be required to name the City of

13  Oakland, this does not seem to be an issue of joinder, but rather a claim that the "Port of Oakland"

14  is an informal nickname while its proper name is "the City of Oakland, a municipal corporation,

15  acting by and through its Board of Port Commissioners." (Def.'s Mot. to Dismiss at 30; Def.'s

16  Reply at 11.) At the hearing, Defendant explained that there are two issues. First, Defendant

17  stated that "Port of Oakland" is not the proper name, and that this should be modified. Second,

18  Defendant argued that Plaintiff should be required to add the City of Oakland, the municipal

19  corporation, acting through its City Council. Defendant contends this addition is necessary

20  because the OGDA is half-owned by the City acting through the City Council, and half-owned by

21  the City acting through the Board of Port Commissioners.

22       The Court agrees that Plaintiff should amend the complaint to name the "City of Oakland,

23  a municipal corporation, acting by and through its Board of Port Commissioners," in place of

24  "Port of Oakland." At the hearing, Plaintiff also agreed to do so. With respect to naming the City

25  of Oakland, acting through its City Council, it is not as clear this is a necessary party. While the

26  OGDA property may be owned by both entities, any claims against the City of Oakland acting

27  through the Board of Port Commissioners would presumably be limited to the property owned by

28  that entity. Plaintiff may name the City of Oakland, acting through its City Council, if he believes

United States District Court
Northern District of California

it is warranted to fully address his claims.

As to leaseholders, the Court disagrees that these are indispensable parties.  Plaintiff has alleged that Defendant's failure to maintain its sewage and storm drain systems has resulted in the release of polluted storm water into the Bay.  (*See* Compl. ¶¶ 38, 41.)  Defendant cites no authority that in such circumstances, the leaseholders must be added to the litigation.  Indeed, this argument appears contrary to Ninth Circuit authority, which finds that the CWA "prohibit[s] discharge by those who merely *convey* pollutants, and who do not generate pollutants or add them to storm water."  *Shiloh Grp., LLC*, 268 F. Supp. 3d at 1044.  In *Natural Resources Defense Council, Inc. v. County of Los Angeles*, the defendants operated a municipal separate storm sewer system ("MS4") that collected, transported, and discharged storm water.  673 F.3d 880, 899-900 (9th Cir. 2011), *overturned on other grounds by L.A. Cty. Flood Control Dist. v. Nat. Res. Def. Council, Inc.*, 568 U.S. 78, 80 (2013) (limiting review of case to the single question of whether flow of water out of a concrete channel within a river constitute a discharge of a pollutant).  The Ninth Circuit rejected the defendants'[5] argument that channeling pollutants created by other municipalities or industrial NPDES permitees did not create liability, explaining that "the [CWA] does not distinguish between those who add and those who convey what is added by others--the Act is indifferent to the originator of water pollution."  *Id.* at 900.  In other words, the CWA "bans the discharge of any pollutant by any person regardless of whether that person was the root cause or merely *the current superintendent of the discharge*."  *Id.* (internal quotation omitted).  Thus, Defendant's liability here for failing to maintain its sewage and storm drain systems is not affected by whether the leaseholders were the ultimate creators of the pollutants.  *See also Shiloh Grp., LLC*, 268 F. Supp. 3d at 1046.  Because the actions of any leaseholders does not impact Defendant's liability, the Court finds they are not essential parties.

## IV.    CONCLUSION

For the reasons stated above, the Court GRANTS Defendant's motion to dismiss as to the second through fourth causes of action, and DENIES Defendant's motion to dismiss as to the first

[5] Notably, the case was brought solely against the county and the county individuals who were responsible for the MS4, and not against any of the entities that actually created the pollutants.

18

cause of action.  The Court, however, ORDERS Plaintiff to file an amended complaint that
modifies the description of Defendant and names the "City of Oakland, a municipal corporation,
acting by and through its Board of Port Commissioners," in place of "Port of Oakland."  The
amended complaint shall be filed by **October 22, 2018**, and may not add any new causes of action
without Court approval.

     IT IS SO ORDERED.

Dated: October 5, 2018

_____
KANDIS A. WESTMORE
United States Magistrate Judge