1
2
3
4                          UNITED STATES DISTRICT COURT

5                        NORTHERN DISTRICT OF CALIFORNIA

6

7    CITY AND COUNTY OF SAN                    Case No.  24-cv-02311-TSH
     FRANCISCO,
8
                   Plaintiff,
9                                              **ORDER GRANTING IN PART AND**
           v.                                  **DENYING IN PART SAN**
10                                             **FRANCISCO'S MOTION FOR A**
                                               **PRELIMINARY INJUNCTION**
     CITY OF OAKLAND, et al.,
11                                             Re: Dkt. No. 35
                   Defendants.
12

13          Plaintiff City and County of San Francisco filed a motion for a preliminary injunction.

14   ECF No. 35.  Defendants Port of Oakland and City of Oakland filed oppositions.  ECF Nos. 49,

15   50.  San Francisco filed replies.  ECF Nos. 61, 67.  The Court held a hearing on November 7,

16   2024, and now issues the following order.[1]

17                             **I.    BACKGROUND**

18   **A.    San Francisco International Airport**

19          In May 1927, San Francisco inaugurated the Mills Field Municipal Airport of San

20   Francisco, which formally rebranded as the San Francisco Airport in 1931, and again as San

21   Francisco International Airport in 1954.  Declaration of Melissa Andretta, ECF No. 37 ("Andretta

22   Decl.") ¶ 3.  SFO is a major west coast hub airport serving travelers to and from the Bay Area and

23   has grown to become one of the busiest airports in the United States.  Every year SFO welcomes

24   tens of millions of travelers from around the world.  This included more than 50 million travelers

25   in 2023.  By passenger count, SFO is among the top 12 busiest airports in the United States.  *Id.* ¶

26   4 & Ex. A.  SFO receives more than twice the number of travelers serviced by the neighboring

27   ─────────────────

28   [1] The parties consent to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c).  ECF Nos.
     11, 26, 29.

airports in Oakland and San Jose combined. *Id.* ¶ 5 & Ex. B. SFO has had average annual operating revenues of approximately $1 billion over the past five years. Declaration of Jessica Williams, ECF No. 36 ("Williams Decl.") ¶ 2 & Ex. A.

San Francisco owns SFO, and acting through its Airport Commission, has complete authority to use, operate, maintain, manage, regulate, improve, and control SFO. Declaration of Charles Schuler, ECF No. 39 ("Schuler Decl.") ¶ 4. San Francisco has made thoughtful investments in the airport's infrastructure and facilities in order to attract and support airlines and to ensure that travelers are comfortable and well-served throughout their journey. This includes having nearly 70 restaurants at the airport, high-end shopping options for visitors, several prestigious club lounges, an on-airport Hyatt Hotel, and a fully accredited museum. *Id.* ¶¶ 4-7. SFO has won many awards and recognitions. *Id.* ¶¶ 8-9 & Exs. B & C.

San Francisco has a registered trademark for "San Francisco International Airport" (the "Mark") covering "airport services" in Class 39. Williams Decl. ¶ 6 & Ex. E. The registration indicates a first use in 1954. *Id.* Ex. E. The Mark became incontestable in 2017. *Id.* ¶ 7 & Ex. F.

As a result of San Francisco's marketing efforts and the recognitions SFO has received for its services, the name and trademark San Francisco International Airport is widely known among air travelers and within the travel industry. Schuler Decl. ¶ 10. Travelers making their way through the airport encounter the Mark in some from. The Mark appears on signs in and around the airport and in connection with airport parking or other airport related services. *Id.* ¶ 11. (The parties dispute whether and how often the Mark appears to customers in connection with purchasing plane tickets. The Court addresses that issue below.)

San Francisco displays its Mark in advertising materials promoting the airport. The City invests millions of dollars annually to promote its airport services under the San Francisco International Airport trademark. San Francisco's annual marketing and promotion investment for the airport combined with its aviation marketing investment over the last 10 years is approximately $34 million. *Id.* ¶ 12. SFO's website and radio ads for the airport use the Mark. *Id.* ¶¶ 13, 14 & Exs. E & F. The Mark embodies the goodwill San Francisco has bult up in the Mark over decades of hard work making SFO a first class airport. *Id.* ¶ 17. The San Francisco

International Airport brand is routinely ranked among the top 25 airport brands by Brand Finance, a respected independent evaluator of international brands.  *Id*. ¶ 17 & Ex. I.

**B.    Oakland International Airport**

The Port of Oakland owns and manages a seaport, nearly 20 miles of waterfront along the San Francisco Bay, submerged lands beneath the Bay, the Oakland airport, and a publicly owned utility.  Declaration of Danny Wan, ECF No. 54 ("Wan Decl.") ¶ 10.  The Port and its airport are an important part of the San Francisco Bay Area.  They are an economic engine for Oakland and the Bay Area, and facilitate the movement of goods and people that enables the region to function and flourish.  *Id*. ¶ 12.  The Port strives to provide a convenient and positive airport experience and promote the economic and community benefits of the Port for Oakland and Bay Area residents.  *Id*. ¶ 13.

The Oakland airport opened in 1927.  It later opened for commercial activity in 1962.  Williams Decl. ¶ 8 & Ex. G.  It was originally named the Oakland Municipal Airport (Declaration of Craig Simon, ECF No. 55 ("Simon Decl.") ¶ 7)), but in 1954, the Port of Oakland adopted Metropolitan Oakland International Airport as the "full formal name" of the airport.  Wan Decl. ¶ 26 & Ex. H.  However, since 1963 the Port has used the name and trademark Oakland International Airport to refer to the airport.  Williams Decl., Exs. H (use since 1963) & I ("exclusive and continuous" use of Oakland International Airport mark for at least 5 years before 2020).[2]  The Port owns this mark, which covers "airport services" in Class 39.  *Id*., Ex. H.

The Oakland airport sits in the southern part of the City of Oakland in the East Bay.  Andretta Decl. ¶ 6; *see generally* Wan Decl. ¶ 10 (picture of Port's facilities, including the airport).  The Port takes pride in providing an array of concessions at the airport that showcase the extensive and unique food and beverage, as well as retail, offerings from Oakland and the greater East Bay.  Simon Decl. ¶ 15.

The Oakland airport received the International Air Transport Association ("IATA") code OAK in or around the 1930s and has used it ever since.  Simon Decl. ¶ 17.  The Port has used the

---

[2] At the hearing, counsel for the Port agreed that at least in recent years, the Port did not use the word "Metropolitan" in the name of the airport in its branding.

United States District Court
Northern District of California

1    IATA code as part of its brand campaign and "I Fly OAK" logo.  *Id*. ¶ 19.  This logo and branding

2    are prominently featured throughout the airport and in the Port's marketing materials.  *Id*. ¶ 20; *see*

3    *generally* Declaration of John Albrecht, ECF No. 56 ("Albrecht Decl.") ¶¶ 8-14 (describing the "I

4    Fly OAK" branding).  The Port has three registered trademarks for variations on the "I Fly OAK"

5    logo.  Declaration of Tiffany Yamasaki, ECF No. 57 ("Yamasaki Decl."), Exs. 6-8.

6         The Oakland airport is much smaller than SFO, with more limited infrastructure to support

7    airlines.  Andretta Decl. ¶ 7.  It has far fewer flights than SFO.  For example, in August 2023,

8    which is typically the busiest month of the year, OAK averaged 140 flights per day, whereas SFO

9    averaged 518 flights per day.  As a result, OAK services far fewer passengers than SFO, around

10   11.2 million in 2023.  *Id*. ¶ 7 & Exs. B & C.  SFO and OAK share some of the same airlines.

11   These include Alaska Airlines, Delta, Hawaiian Airlines, and Southwest.  *Id*. ¶ 13.

12        In a recent North America Airport Satisfaction Study conducted by J.D. Power, SFO

13   ranked near the top of all "mega" airports in overall customer satisfaction, whereas OAK ranked

14   near the bottom of its category of "large" airports.  *Id*. ¶ 8 & Ex. D.

15   **C.    Oakland International Airport's New Name**

16        In theory, one of OAK's greatest assets should be its location.  The airport is well

17   positioned to offer easy access to air travel into and out of the San Francisco Bay Area, including

18   into downtown Oakland, across the Bay Bridge to downtown San Francisco, to major universities,

19   wine country, most major Bay Area employers, and other local Bay Area attractions and

20   destinations.  Wan Decl. ¶ 11.  However, from research and analysis conducted by the Port's

21   Aviation Division and others, the Port concluded that OAK's actual geographic location is not

22   well known outside of the Bay Area.  This is especially true outside of California and gets worse

23   the farther away from the region one is.  *Id*. ¶ 15.  The Port believes that this lack of awareness

24   combined with how flight search results are organized and displayed has created challenges for the

25   Port in maintaining and securing nonstop flight routes that otherwise seem supportable by local

26   population and related travel data.  *Id*.; *see also* Simon Decl. ¶¶ 24-27; Declaration of Sabine

27   Reim, ECF No. 53 ("Reim Decl.") ¶¶ 20-25; Albrecht Decl. ¶¶ 22-26.

28        On March 29, 2024, the Port informed San Francisco of its intent to rename the Oakland

International Airport the San Francisco Bay Oakland International Airport.  Declaration of Ivar Satero, ECF No. 40 ("Satero Decl.") ¶ 2.  San Francisco formally objected to the name change on April 1, 2024, citing its Mark and the likelihood of confusion.  *Id*., Ex. A.  The Port publicly announced that the name modification would be considered by the Board at its April 2024 meeting.  Simon Decl. ¶ 32.  United Airlines, Japan Airlines, Vietnam Airlines, Aer Lingus, WestJet Airlines and Starlux Airlines objected to the proposed name change, asserting that it would or could cause confusion for travelers.  Declaration of Doug Yakel, ECF No. 41 ("Yakel Decl.") ¶¶ 15-20 & Exs. L-Q.  In addition, tour operators America Unlimited GmbH, American Sky, Ferrara Viajes and CRD Touristik GmbH objected, also citing confusion.  *Id*. ¶¶ 11-14 & Exs. H-K.  On the other hand, Southwest Airlines, Volaris and Spirit Airlines supported the proposed name change.  Simon Decl. ¶ 33 & Ex. B.

On April 11, 2024, the Board of Port Commissioners held a public meeting to consider the first reading of the ordinance to change the full formal name of the airport from the Metropolitan Oakland International Airport to the San Francisco Bay Oakland International Airport.  Wan Decl. ¶ 25 & Ex. G.  The Board held another public meeting and the second reading of the ordinance on May 9, 2024.  *Id*. ¶ 31.  At the May 9 meeting the Board unanimously adopted the ordinance.  *Id*. ¶ 34 & Ex. I (the ordinance).  At that meeting a PowerPoint presentation indicated that the Port would keep the same IATA code for the airport (OAK), and would not change its "I Fly OAK" logo.  *Id*. ¶ 33.

Following Board approval, the Port implemented the airport's new name by taking several steps.  Simon Decl. ¶ 45.  The Port informed industry partners and participants regarding the airport's new name.  *Id*. ¶ 46.  The Port also revised the airport's digital materials, including both the Port and the airport's websites, to reflect the new name and change physical signage at the airport.  *Id*. ¶ 47.  The Port still uses the "I Fly OAK" signage throughout its facilities and has no plans to change those signs.  *Id*. ¶ 48.  In September 2024, the Federal Aviation Administration ("FAA") accepted the modification of the airport's name.  Implementation by the FAA included, for example, updating aeronautical charts and approach plate information.  *Id*. ¶¶ 50-51.

**D.    Procedural Background**

San Francisco filed this lawsuit on April 18, 2024.  ECF No. 1.  The original complaint named the City of Oakland as the Defendant and asserted claims for (1) trademark infringement (Lanham Act, 15 U.S.C. § 1114), unfair competition/false designation of origin (Lanham Act, 15 U.S.C. § 1125(a)), and common law trademark infringement.  *Id*.  San Francisco filed a First Amended Complaint ("FAC") on May 3, 2024, adding the Port of Oakland as another Defendant and keeping the same three claims.  ECF No. 12.  The parties stipulated to a 90-day extension of the case schedule to give them an opportunity to try mediation, which was unsuccessful.  The stipulation provides that the 90-day continuance cannot be used against any party in the litigation, including in seeking or opposing preliminary injunctive relief.  ECF No. 32.

San Francisco filed the present motion for a preliminary injunction on September 19, 2024.  ECF No. 35.  The City of Oakland and the Port of Oakland separately filed oppositions on October 8, 2024.  ECF Nos. 49, 50.  San Francisco filed reply briefs on October 22, 2024.  ECF Nos. 61, 67.

## II.    LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest."  *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008).  Alternatively, "'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest."  *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011); *see also Arc of California v. Douglas*, 757 F.3d 975, 983 (9th Cir. 2014).

## III.    ANALYSIS

To establish infringement of its registered trademark under 15 U.S.C. § 1114 or false designation of origin under 15 U.S.C. § 1125(a), San Francisco must show that (1) it has a valid, protectable interest in a trademark; and (2) the Port is using a mark similar to San Francisco's

trademark in a manner likely to cause confusion.  15 U.S.C. §§ 1114(1), 1125(a); *see Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1046 (9th Cir. 1999) ("To establish a trademark infringement claim under section 32 of the Lanham Act or an unfair competition claim under section 43(a) of the Lanham Act, Brookfield must establish that West Coast is using a mark confusingly similar to a valid, protectable trademark of Brookfield's.)

## A.    San Francisco's Mark Is Valid and Protectable

San Francisco's incontestable federal trademark registration for the Mark is "conclusive evidence of the validity of the registered mark," of San Francisco's "ownership of the mark," and of San Francisco's "exclusive right to use the mark on or in connection with the goods or services specified" in the registration, 15 U.S.C. § 1115(b), i.e., "airport services."  Williams Decl., Ex. E. The incontestability of the Mark means that the Port may not defend this action on the ground that the Mark is merely descriptive.  *See Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 205 (1985) ("We conclude that the holder of a registered mark may rely on incontestability to enjoin infringement and that such an action may not be defended on the grounds that the mark is merely descriptive."); *see also Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1142 n.3 (9th Cir. 2002) ("[T]he incontestable status of EMI's mark serves as conclusive proof that the mark has secondary meaning.") (citing *Park 'N Fly*, 469 U.S. at 205).

## B.    Whether the Port's Use of the Allegedly Infringing Mark Is Likely to Cause Confusion

Courts in the Ninth Circuit evaluate the likelihood of confusion using the non-exhaustive factors identified in *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979):  "1. strength of the mark; 2. proximity of the goods; 3. similarity of the marks; 4. evidence of actual confusion; 5. marketing channels used; 6. type of goods and the degree of care likely to be exercised by the purchaser; 7. defendant's intent in selecting the mark; and 8. likelihood of expansion of the product lines."  "The list is not exhaustive.  Other variables may come into play depending on the particular facts presented."  *Id*. at 348 n.11.  The Ninth Circuit has "long cautioned that applying the *Sleekcraft* test is not like counting beans.  Some factors are much more important than others, and the relative importance of each individual factor will be case-specific."

*Multi Time Machine, Inc. v. Amazon.com, Inc.*, 804 F.3d 930, 936 (9th Cir. 2015) (cleaned up). "The *Sleekcraft* factors are intended as an adaptable proxy for consumer confusion, not a rote checklist." *Network Automation, Inc. v. Advanced Systems Concepts, Inc.*, 638 F.3d 1137, 1145 (9th Cir. 2011).

Before we go into the analysis, we should identify the particular theories of confusion that San Francisco offers. The Court thinks there are three. First, San Francisco argues that the new name for the Oakland airport implies an affiliation, connection or association between OAK and the San Francisco International Airport. *See* Motion at 23 ("Oakland's use of the Infringing Mark has misled and will continue to mislead the public regarding the relationship between the Oakland airport and SFO or the City."); *id.* ("Any problems that travelers have with Oakland's airport will be mistakenly attributed to the City and the SF Mark."). In support of this argument, San Francisco has submitted a declaration by the Director of Aviation Marketing & Development at SFO. She is concerned that "[b]y adopting the trademark SAN FRANCISCO BAY OAKLAND INTERNATIONAL AIRPORT, Oakland is trading on our goodwill and brand recognition, leading travelers to believe that our airports are the same or related to one another." Andretta Decl. ¶ 25. She explains San Francisco's fear that "any issues that travelers have with Oakland's airport will now be mistakenly attributed to the City, SFO, and the SAN FRANCISCO INTERNATIONAL AIRPORT brand. Oakland has much lower customer satisfaction than SFO, evidenced by their lower performance in customer service surveys." *Id.* ¶ 27. She continues: "The Oakland airport simply lacks the infrastructure to provide the same level of services that we are able to at SFO. But this means that travelers who mistakenly believe that SFO and the Oakland airport are controlled by the same city or management are now associating Oakland's lesser services with ours. This is very damaging to our brand and will inevitably harm our bottom line as travelers may be less likely to distinguish SFO from the Oakland airport or forgo traveling to either airport altogether." *Id.*

In this first theory of confusion, customers understand that SFO and OAK are different airports. However, they are confused into thinking that OAK is a branch or division of the San Francisco International Airport, or that SFO and OAK have the same management or ownership.

To give an analogy, suppose you founded an amusement park in North Dakota, and you named it the Disney North Dakota Amusement Park.  Customers who go to that park understand they are in North Dakota and therefore not at Disney World in Florida or at Disney Land in California.  The claimed confusion would be that using the word "Disney" in the name of the park implies an affiliation that is untrue.

This first theory of confusion is therefore not about the point of sale, i.e., buying the wrong thing because the customer was tricked by a confusing name.  Under this theory, customers who buy a ticket to OAK know that OAK and SFO are different airports, just as customers who go to the Disney North Dakota Amusement Park know they are not going to Disney World.  The alleged injury is the implied association.  For similar reasons, this theory is not about initial interest confusion, because this theory does not assume that one airport is mistaken for the other at any point in the sales process.

Second and third, San Francisco argues that the new name for the Oakland airport will cause customers to confuse it with SFO.  This confusion includes point-of-sale confusion, as San Francisco argues that customers will buy tickets to the wrong airport.  Andretta Decl. ¶ 26 ("SFO losing traffic due to mistaken bookings to the 'SAN FRANCISCO BAY' airport will damage us by diverting traffic (and revenue) from SFO to Oakland.").  San Francisco claims that it "is aware of over a dozen individuals that were dropped off at SFO intending to go to 'San Francisco Bay Oakland International Airport' or catch a flight on an airline like Spirit Airlines, which flies out of the Oakland airport but not SFO."  Motion at 10.  But San Francisco also appears to argue that airport confusion also embraces initial interest confusion.  *See* Reply to Port's Opposition at 2 (arguing that "Oakland also construes 'confusion' too narrowly to mean only confusion about whether the Oakland airport *is* the San Francisco airport.  But cognizable confusion includes . . . initial interest confusion (where a defendant's mark creates initial customer interest even if no actual sale occurs as a result.").[3]  The Court will call initial interest confusion the second theory of

---

[3] A potential fourth theory of confusion is suggested by San Francisco's confusion survey, Exhibit A to the Declaration of Sarah Butler, ECF No. 42 (the "survey").  Table 3 of the survey purports to show that the name change for the Oakland airport caused an increase from 16.1% to 25.5% in survey respondents who indicated they believe the Oakland airport is in San Francisco.  This could

United States District Court
Northern District of California

confusion and point of sale confusion the third theory of confusion.

The second and third theories are related in that they posit confusion between OAK and SFO, but they are distinct in terms of when the confusion is cleared up, if at all. Under both theories, customers may initially become interested in OAK because they think it is SFO. Customers who maintain that belief through the point of sale exhibit point of sale confusion. But customers who eventually figure out that OAK is not SFO before they buy the ticket to OAK are still embraced by the initial interest theory.

With these three theories of confusion in mind, let's now turn to the non-exhaustive *Sleekcraft* factors, being mindful that they are really just intended "as an adaptable proxy for consumer confusion." *Network Automation*, 638 F.3d at 1145.

### 1.    Strength of the Plaintiff's Mark

"The stronger a mark – meaning the more likely it is to be remembered and associated in the public mind with the mark's owner – the greater the protection it is accorded by the trademark laws." *Brookfield*, 174 F.3d at 1058. "Two relevant measurements are conceptual strength and commercial strength. Conceptual strength involves classification of a mark along a spectrum of generally increasing inherent distinctiveness as generic, descriptive, suggestive, arbitrary, or fanciful." *Network Automation*, 638 F.3d at 1149 (cleaned up). "Commercial strength is based on actual marketplace recognition, and thus advertising expenditures can transform a suggestive mark into a strong mark." *Id*. (cleaned up).

The Court finds that although San Francisco's Mark is descriptive, it is commercially strong. *See Citibank, N.A. v. City Bank of San Francisco*, 1980 WL 30239, *10 (N.D. Cal. March 23, 1980) ("The fact that a mark was originally descriptive of a geographical location will not

---

suggest a theory of confusion that OAK's new name falsely implies that OAK is in San Francisco. However, in reviewing San Francisco's legal briefs, the Court does not think the City has advanced that argument in support of its motion. To make that argument, San Francisco would have to say that including the words "San Francisco" in the new name of the airport causes customers to believe that the airport is *in* – not just near or owned by – San Francisco. The Court does not see that San Francisco has actually made that legal argument. And the Court thinks it knows why. San Francisco's Mark ("San Francisco International Airport") also contains the words "San Francisco," but SFO isn't in San Francisco either. It's in San Mateo County. Yakel Decl., Ex. G.

1    prevent it from becoming strong by virtue of secondary meaning."); *cf. La Quinta Worldwide LLC*

2    *v. Q.R.T.M., S.A. de C.V.*, 762 F.3d 867, 875 (9th Cir. 2014) ("Quinta Real does not challenge the

3    district court's conclusion that La Quinta's mark is strong because it has extensive secondary

4    meaning and a robust commercial presence.).

5          As described above, the name and trademark San Francisco International Airport is widely

6    known among air travelers and within the travel industry.  Travelers making their way through the

7    airport encounter the Mark in some from.  The Mark appears on signs in and around the airport

8    and in connection with airport parking or other airport related services.  San Francisco displays its

9    Mark in advertising materials promoting the airport.  San Francisco has used its Mark for decades,

10   and the City invests millions of dollars annually to promote its airport services under the San

11   Francisco International Airport trademark.  The San Francisco International Airport brand is

12   routinely ranked among the top 25 airport brands.  This is a strong commercial mark.  *See Century*

13   *21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1179 (9th Cir. 1988) ("Evidence of the strength of

14   Century 21's mark includes the fact that it has expended several million dollars in advertising real

15   estate services rendered in connection with the 'Century 21' mark, and that the mark has been

16   used in connection with real estate sales in excess of one billion dollars.").

17         Airline customers are familiar with strong descriptive marks.  Three of the five largest

18   airlines in the United States (American Airlines, Southwest Airlines, and Alaska Airlines) bear

19   descriptive marks, as do three of the five largest airports in the nation (Dallas/Fort Worth

20   International Airport, Denver International Airport, and Los Angeles International Airport).

21   Williams Decl. ¶¶ 29-35.  Yet these airlines and airports are clearly well known.

22         The Port responds that San Francisco conflates its overall brand spending for SFO with

23   spending on the Mark and observes that San Francisco does not provide information concerning

24   how much of its marketing dollars were spent specifically to promote the Mark.  The Port does not

25   cite any legal authorities to show that a mark-specific apportionment of marketing spend is

26   necessary, and the Court thinks that is an inappropriately demanding standard.  One reason that

27   standard is inappropriately demanding is, as the Port correctly observes, that "SFO's full name is

28   rarely used in isolation."  Port's Opposition at 19.  In its branding, San Francisco generally uses

United States District Court
Northern District of California

San Francisco International Airport (the Mark) together with the IATA code for the airport (SFO) to reinforce the notion that the San Francisco International Airport *is* SFO.  Schuler Decl., Exs. B, D, E, F; Yamasaki Decl., Ex. 32.  It is impossible to identify marketing spend that is exclusive to the Mark and that does not also relate to the rest of the airport's branding because San Francisco normally uses the Mark *with* its other branding.  The Port also argues that the Mark is not the most prominent element of the airport's branding, saying that the IATA code SFO and the SFO logo are at times more prominent.  The Port does not cite any legal authorities in support of the argument that a mark has to be at all times the most prominent part of branding to be considered a strong commercial mark.

### 2.    Proximity of the Goods

"Related goods are generally more likely than unrelated goods to confuse the public as to the producers of the goods."  *Brookfield*, 174 F.3d at 1055.  Here, San Francisco and the Port both use their marks in connection with an airport and related services.  Accordingly, the services are identical.

### 3.    Similarity of the Marks

In evaluating whether the marks are similar, the Ninth Circuit has "developed certain detailed axioms to guide this comparison:  first, the marks must be considered in their entirety and as they appear in the marketplace; second, similarity is adjudged in terms of appearance, sound and meaning; and third, similarities are weighed more heavily than differences."  *GoTo.com v. Walt Disney Co.*, 202 F.3d 1199, 1206 (9th Cir. 2000) (citations omitted).  "When marks would appear on virtually identical goods or services, the degree of similarity necessary to support a conclusion of likely confusion declines."  *Century 21*, 970 F.2d at 877; *see also La Quinta*, 762 F.3d at 876 ("[T]he amount of similarity required to support a likelihood of confusion declines as the services themselves become increasingly identical."); J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 23:20.50 (5th ed.) ("Where the goods and services are directly competitive, the degree of similarity required to prove a likelihood of confusion is less than in the case of dissimilar products.")

Here, San Francisco's Mark is entirely subsumed in the Port's allegedly infringing mark:

| San Francisco's Mark | **SAN FRANCISCO INTERNATIONAL AIRPORT** |
|---|---|
| Port's allegedly infringing mark | **SAN FRANCISCO** BAY OAKLAND **INTERNATIONAL AIRPORT** |

In terms of appearance, sound and meaning, it is impossible to say, write or read the allegedly infringing mark without also saying, writing or reading San Francisco's Mark because the latter is wholly contained within the former.  Notably, the Port's allegedly infringing mark *begins* with the first two words of San Francisco's mark, so the first words the reader encounters heighten the confusion.

The Port argues that "OAK's name begins with 'San Francisco Bay,' which is a distinct geographic feature – a body of water, not the City."  Port's Opp. at 16.  In context, however, that argument is not persuasive.  Airline customers care whether an airport is close to San Francisco or in the San Francisco Bay Area, but they do not likely care whether an airport is close to the waterfront of the bay.  If you were renting a boat, or using the Port's seaport, then you would care about proximity to water.  Accordingly, the words "San Francisco" in OAK's new name are prominent and meaningful for airline customers, but the word "bay" is likely either to be ignored because it has no importance to them, or to be read as a stand-in for the Bay Area.  Either option increases the association with the San Francisco International Airport.  Having said that, the word "Oakland" is certainly in OAK's new name, so the marks have at least one meaningful difference.

Overall, because the two airports offer identical services, the near identity of the marks makes them confusingly similar.

### 4.    Evidence of Actual Confusion

"Evidence of actual confusion is strong evidence that future confusion is likely, but the absence of such evidence is not dispositive."  *Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1393 (9th Cir. 1993) (citation omitted).  "'[T]he failure to *prove* instances of actual confusion is *not* dispositive against a trademark plaintiff, because actual confusion is hard to prove; difficulties in gathering evidence of actual confusion make its absence generally unnoteworthy.'"  *Perfumebay.com v. eBay, Inc.*, 506 F.3d 1165, 1176 (quoting *Au-Tomotive Gold, Inc. v.*

United States District Court
Northern District of California

1    *Volkswagen of America, Inc.*, 457 F.3d 1062, 1077 (9th Cir. 2006)).

2         San Francisco offers two types of evidence that it says show actual confusion.  First, San

3    Francisco says that starting in June 2024, SFO staff logged 15 instances between June 18 and

4    August 23 in which visitors showed up at SFO intending to have traveled to Oakland.  Declaration

5    of Chris Birch, ECF No. 38, ¶¶ 5-6 & Ex. A.[4]  The log is nonhearsay and is admissible because

6    "courts in this circuit hold that the testimony of a plaintiff's employees that consumers were

7    confused is not hearsay at all, because it is not offered to prove the truth of the consumer's

8    assertions, only that the callers made the assertions."  *Kiva Health Brands LLC v. Kiva Brands*

9    *Inc.*, 402 F. Supp. 3d 877, 895 (N.D. Cal. 2019).  Nonetheless, the log suffers from a lack of

10   trustworthiness because it was created as a record for litigation.  *See id.*  Accordingly, the log is

11   some evidence of customer confusion.

12        Second, San Francisco cites Exhibits O through W to the Williams Decl. and Exhibit DD

13   to the Second Declaration of Jessica Williams, ECF No. 66, as evidence of relevant actual

14   confusion.  The Court thinks that the statements in Exhibit O, Exhibit R, the fourth page of Exhibit

15   U, Exhibit T, and Exhibit DD are statements of confusion.  Exhibits O, U and DD are

16   straightforward.  Exhibit R is a collection of Instagram posts where the pictures are of SFO but the

17   posts are tagged as San Francisco Bay Oakland International Airport.  This shows a type of

18   confusion between the airports.  In Exhibit T, the poster does not state that he saw the boarding

19   pass of the confused passenger, but if someone at SFO is told she is at the wrong airport, OAK is a

20   pretty good guess that's where she was supposed to be.  Nonetheless, despite being relevant, these

21   social media posts are substantively "weak evidence" because "the Court lacks information about

22   the people making the social media posts."  *Great Western Air, LLC v. Cirrus Design*

23   *Corporation*, 649 F. Supp. 3d 965, 983 (D. Nev. 2023).

24        Exhibit P is implausible as a statement of confusion.  Commenter Steve Olsch raises the

25   question "SFO/OAK?" but then claims to be confused in reply to a comment that says "it's

26

27   ────────────────

28   [4] In the weeks since the preliminary injunction motion was filed, San Francisco has logged three
     additional instances of this confusion.  Second Declaration of Christopher Birch, ECF No. 63, ¶ 3
     & Ex. A.

United States District Court
Northern District of California

OAKLAND AIRPORT not SF." Further, this same commenter raised the same question and received the same answer on multiple occasions before the post in Exhibit P, suggesting a lack of sincerity. *See* Declaration of Christopher Lindemeier, ECF No. 58 ("Lindemeier Decl.") ¶¶ 6 & 7 & Exs. 1 & 2. In Exhibit Q, a commenter asks if OAK is different from SFO and receives a response that it is. *See* Lindemeier Decl. ¶ 8 & Ex. 3. This shows the potential for confusion, but since the commenter knew to ask the question, it falls short of actual confusion. Exhibit S is a news story about San Francisco's confusion log, so does not add anything to the log. In Exhibit V, the second comment shows a lack of confusion. The first comment ("Someone i know is flying into town tomorrow for the first time and accidentally went to sfo instead of Oakland") does not make any sense temporally. And in Exhibit W, while the comments indicate some confusion, they mostly do not indicate how these posters were confused, and they do not suggest anyone ended up at the wrong airport.

In considering what weight to give to San Francisco's log and the exhibits showing confusion, we must bear in mind that "[e]vidence of only a small number of instances of actual confusion can be dismissed as inconsequential or *de minimis*." McCarthy on Trademarks and Unfair Competition § 23:14 (5th ed.). "Evidence of the number of instances of actual confusion must be placed against the background of the number of opportunities for confusion before one can make an informed decision as to the weight to be given the evidence. If there is a very large volume of contacts or transactions which could give rise to confusion and there is only a handful of instances of actual confusion, the evidence of actual confusion may receive relatively little weight." *Id.*; *see Nutri/System, Inc. v. Con-Stan Indus., Inc.*, 809 F.2d 601, 606-07 (9th Cir. 1987) (proper for district court to conclude a few instances of actual confusion were thin or trivial in light of both parties' high volume of business).

Here, about 19 million passengers flew in or out of SFO between May and August of 2024. Yamasaki Decl., Exs. 23-26. Against that background, San Francisco's showing of actual confusion is *de minimis* or trivial. *See Official Airline Guides*, 6 F.3d at 1393 ("no persuasive evidence of actual confusion" where there were seven instances of confusion out of 80,000 opportunities).

### 5.    Marketing Channels Used

The parties agree both that their marketing channels are identical and that airline tickets are overwhelmingly sold online.  Motion at 19 (citing Andretta Decl. ¶ 12 ("Today the vast majority of airlines tickets are sold online.")); Port's Opp. at 20 ("Airline tickets are marketed and sold online").  The marketing channels factor "becomes less important when the marketing channel is less obscure.  Today, it would be the rare commercial retailer that did not advertise online, and the shared use of a ubiquitous marketing channel does not shed much light on the likelihood of consumer confusion."  *Network Automation*, 638 F.3d at 1151; *see also Playboy Enterprises, Inc. v. Netscape Communications Corp.*, 354 F.3d 1020, 1028 (9th Cir. 2004) ("Given the broad use of the Internet today, the same could be said for countless companies.  Thus, this factor merits little weight.").  Accordingly, this factor favors neither party and carries no weight.

### 6.    Type of goods and the Degree of Care Likely to be Exercised by the Purchaser

"[T]he standard used by the courts is the typical buyer exercising ordinary caution."  *Sleekcraft*, 599 F.2d at 353.  "Low consumer care . . . increases the likelihood of confusion."  *Playboy*, 354 F.3d at 1028.  Here, the Court thinks it is appropriate to evaluate this factor separately for each theory of confusion.

#### a.    Affiliation, Connection or Association

The inclusion of the entirety of San Francisco's Mark in the name of a second airport that is nearby (*see* Simon Decl. ¶ 7) is highly likely to imply affiliation, connection or association to the typical airline customer.  "[I]t is extremely rare for a major U.S. airport to bear the name of a different city than the one that owns it."  Andretta Decl. ¶ 24.  "For example, Chicago Midway and Chicago O'Hare are both owned by the city of Chicago.  Similarly, Dallas Love and Dallas / Fort Worth are both owned (or in the case of Dallas / Fort Worth, partially owned) by Dallas.  Likewise, Washington Dulles and Washington Reagan International Airport are owned by the federal government," *id*.; *see also* Second Declaration of Charles Schuler, ECF No. 62 ("Second Schuler Decl.") ¶ 12 ("[T]ypically an airport named after a city is owned and operated by that city.  That is the case for SFO and, previously, the Port, but also for the airports in Chicago, New York, Dallas, and so on.").  The Port submits no evidence to the contrary.  Therefore, the only evidence

1    before the Court is that including the name of a city in the name of an airport is normally a reliable

2    indicator in the United States that the city owns or at least partially owns that airport.  This means

3    that including "San Francisco" in the name of the Oakland airport when there is in fact no

4    affiliation, connection or association between the Oakland airport and San Francisco is contrary to

5    how airports in the United States are normally named and is highly likely to be confusing.

6        As for the degree of customer care, the Court thinks it is obvious that customers rarely, if

7    ever, do their own research to determine who owns or manages a particular airport, and whether

8    that owner or manager is affiliated or associated with other airports.  Customers can be expected to

9    form whatever assumptions they form based on the name of an airport and any other visual

10    indications of ownership and affiliation, if there are any.  Thus, when it comes to affiliation,

11    connection or association, there is a low degree of consumer care and a high degree of likelihood

12    of confusion.

13        The Port devotes essentially its entire opposition brief to defending against the accusation

14    of point of sale confusion, even though San Francisco's moving papers clearly articulate a theory

15    of confusion about affiliation, connection or association.  The Port argues that full airport names

16    are not often used in ticket sales (or not often used by themselves) and that IATA codes (e.g., SFO

17    or OAK) are often included in the sales process.  The Port argues that airplane tickets are an

18    expensive purchase, so customers exhibit a high degree of care in buying them.  And the Port

19    argues that the Oakland airport's "I Fly OAK" branding distinguishes it from SFO.  However,

20    none of the Port's arguments address San Francisco's showing of confusion concerning affiliation,

21    connection or association.  Remember:  Customers who think that OAK and SFO are affiliated

22    understand that they are two different airports.  The slightly different names for the two airports,

23    the different IATA codes, the price of tickets, and the different branding at OAK do not negate

24    implied affiliation.

25                    **b.        Initial Interest Confusion**

26        "[I]nitial interest confusion . . . occurs when an alleged infringer uses a competitor's mark

27    to direct consumer attention to its product."  *Lerner & Rowe PC v. Brown Engstrand & Shely*

28    *LLC*, 119 F.4th 711, 718 (9th Cir. 2024).  "Although dispelled before an actual sale occurs, initial

interest confusion impermissibly capitalizes on the goodwill associated with a mark and is therefore actionable trademark infringement." *Playboy*, 354 F.3d at 1025. "Such a claim applies, however, only to 'misleading and deceptive' uses of a mark, not to 'legitimate comparative and contextual advertising.'" *Lerner & Rower*, 119 F.4th at 718-19 (quoting *Network Automation*, 638 F.3d at 1148).

San Francisco's evidentiary showing of initial interest confusion is unpersuasive. For example, Exhibit M to the Williams Decl. shows the Google search results for "San Francisco Bay Airport." (*See* Williams Decl. ¶ 16.) The top result is neither SFO's nor OAK's websites but the Wikipedia entry for San Francisco International Airport. The next entry is "Home-page – San Francisco Bay Oakland International Airport." But immediately above those words are two versions of the website's domain name (oaklandairport.com and https://www.oaklandairport.com), as well as the airplane logo associated with the "I Fly OAK" branding. The third entry is the San Francisco International Airport's home page. The fourth is a Wikipedia entry for "List of airports in the San Francisco Bay Area." And there is other information on the page.

San Francisco also submits Exhibit L to the Williams Decl., which is a collection of web site images for websites used for booking flights and renting cars. On these documents, the IATA codes typically accompany the airport name. San Francisco includes an excerpt from a post on the Oakland airport's X account, in which the airport's name in truncated to "San Francisco Oa." Williams Decl. ¶ 17 & Ex. N. And San Francisco shows the press release page from the Oakland airport's website, where the titles of the press releases contain the full name of the airport without an IATA code. Williams Decl. ¶ 14 & Ex. K.

The Court thinks that the press release page from the Oakland airport's website and the post from the Oakland airport's X account are poor candidates for initial interest confusion. Internet users do not go to those places if they are initially interested in the San Francisco International Airport.[5] However, including the Mark in the name of the airport means that

---

[5] Similarly, Exhibit H to the Andretta Decl. is screenshots from the Oakland airport's website and social media profiles showing the use of the new airport name. Going to that airport's website and social media pages does not show an initial interest in San Francisco International Airport. For the same reason, Google search results for the San Francisco Bay Oakland International Airport,

United States District Court
Northern District of California

1    searches on Google or on websites that sell plane tickets could be efforts to direct customer

2    attention from San Francisco International Airport to the Oakland airport.

3           Based on the current record, the Court concludes that San Francisco is not likely to

4    succeed on its claim of initial interest confusion, and has not raised serious questions going to the

5    merits either.  As an initial matter, San Francisco offers no evidence that the Port does anything

6    with the Mark to affect internet searching other than including the Mark in its name.  The Ninth

7    Circuit's internet initial interest cases involved conduct such as purchasing or using a competitor's

8    trademark as an advertising keyword or using a competitor's mark as a website domain name

9    (*Network Automation*, 638 F.3d at 1142; *Lerner & Rowe*, 119 F.4th at 717; *Playboy*, 354 F.3d at

10   1022-23; *Brookfield*, 174 F.3d at 1041-43).  There is no evidence the Port did this.

11          In any event, the Ninth Circuit has explained that for internet searches, initial interest

12   confusion requires confusion, not merely diversion.  *See Network Automation*, 638 F.3d at 1149

13   ("[B]ecause the *sine qua non* of trademark infringement is consumer confusion, when we examine

14   initial interest confusion, the owner of the mark must demonstrate likely confusion, not mere

15   diversion.").  The Ninth Circuit has also explained that "consumers who use the internet for

16   shopping are generally quite sophisticated about how the internet functions."  *Lerner & Rowe*, 119

17   F.4th at 722.  "For example, regular internet users can readily distinguish domain names

18   associated with the companies they are searching for from those they are not.  Additionally,

19   Google's search engine is so ubiquitous that we can be confident that the reasonably prudent

20   online shopper is familiar with its layout and function, knows that it orders results based on

21   relevance to the search term, and understands that it produces sponsored links along with organic

22   search results."  *Id.*  In addition, "clear labeling can eliminate the likelihood of initial interest

23   confusion in cases involving internet search terms."  *Multi Time Machine*, 804 F.3d at 937.

24          The Google search result in Exhibit M to the Williams Decl. is not confusing.  The results

25   are clearly labeled.  While the name "San Francisco Bay Oakland International Airport" is in

26

27   _____

28   screen shots for the Port's YouTube and Yelp pages and Mapquest and Apple Maps results for
     "San Francisco Bay Oakland International Airport" (Second Declaration of Melissa Andretta, ECF
     No 64, ¶¶ 6-10) are not evidence of initial interest confusion.

United States District Court
Northern District of California

larger font than the surrounding text, the Oakland airport domain name appears twice above it. The Court therefore thinks that initial interest confusion is quite unlikely. The Court also observes that the search term that was entered ("san francisco bay airport") is not San Francisco's Mark, and including the word "bay" in the search term seems designed to have the Oakland airport rank high in the Google search results.[6]  For the flight and rental car searches in Exhibit L to the Williams Decl., it looks like the search term used was "Oakland." Not only is that not San Francisco's Mark, that search term does not indicate an initial interest in the San Francisco International Airport.[7]  Three of the flight searches in Exhibit I to the Andretta Decl. use "san francisco" as a search term, but the results are clearly labeled.[8]  In the first search, the Oakland airport comes up second, with its IATA code in all caps and bold and "Oakland, California" beneath it. In the second search, the first result is "Oakland/San Francisco Bay, CA (OAK)," and the second is "San Francisco, CA (SFO)," meaning that neither airport is referred to by its full name or by the Mark, and the two are clearly differentiated by their IATA codes. In the third search, each airport is identified by its full name (and thus the Mark) but also by its IATA code, and beneath the Oakland airport are the words "International airport in Alameda County, California." If internet shoppers were incapable of distinguishing between things with similar names, then perhaps this third search result would show confusion (and the customer better be careful because the next listed airport is the San Francisco d'Assisi Airport in Italy!), but as noted above, the Ninth Circuit has explained that courts should treat internet shoppers as sophisticated.

Accordingly, on the current record, San Francisco has not made a showing of likely initial interest confusion. Given the degree of care the Ninth Circuit has explained that we may assume

---

[6] Exhibit C to the Williams Decl. is the Google search result for "san francisco international airport travel blog." The Oakland airport does not come up in any of the results listed in the exhibit.

[7] In Exhibit J to the Andretta Decl., the flight searches are mostly variations on the word "Oakland," again not demonstrating an initial interest in the San Francisco International Airport. The Court can't tell what search was done on Southwest Airlines in this exhibit. Regardless, the search results refer to OAK and SFO by their IATA codes and do not use the Mark for either airport's name. They are not confusingly similar.

[8] The fourth search looks like an alphabetical drop down list of airports. That does not show initial interest in the San Francisco International Airport, and regardless, the Oakland airport is not referred to by its name or the Mark.

United States District Court
Northern District of California

internet users have, the proffered websites do not show likely initial interest confusion, or even serious questions going to the merits.

### c.    Point of Sale Confusion

In the internet context, "we have found particularly important an additional factor that is outside of the eight-factor *Sleekcraft* test:  the labeling and appearance of the advertisements and the surrounding context on the screen displaying the results page."  *Multi Time Machine*, 804 F.3d at 936 (cleaned up).

San Francisco's efforts to show the context and labeling surrounding the point of sale for an airplane ticket consists of website screenshots for Booking.com, Sun Country Airlines, Google Flights, Allegiant, Priceline.com, Expedia, Skyscanner, Kayak, Alaska Airlines, Southwest Airlines, and Hawaiian Airlines.  Andretta Decl., Exs. I, J.  The full name for the Oakland airport shows up in the searches on Booking.com and Google Flights.  The search on Priceline.com retrieves the previous full name of the Oakland airport ("Metropolitan Oakland Int'l Airport"), so the Court assumes that if OAK is allowed to continue using its new name, Priceline.com will at some point change that reference to the new full name.

The search on Booking.com for "san francisco" lists SFO, OAK and SJC as the first three airports.  Each begins with its IATA code in bold, and beneath the full name of each airport states the city it is associated with (San Francisco, Oakland, San Jose).  These are clearly three different airports in three different places, and point of sale confusion seems implausible.  Google Flights puts the IATA code after the airport name and not in bold, but also states beneath OAK's full name that it is an "International airport in Alameda County."  Moreover, because the San Francisco International Airport and the San Francisco Bay Oakland International Airport are listed next to each other with different IATA codes, they are clearly different airports.  Any internet shopper would understand that the search on Google Flights has returned a *list* of airports, not the *same* airport multiple times.  The search on Priceline.com returns "Oakland, CA – Metropolitan Oakland Intl Airport (OAK)."  Even if the name of the airport is updated, the entry begins with the airport's location (Oakland, CA) and includes the airport's IATA code.  It is difficult to believe an internet shopper would be confused into thinking this is a reference to the San Francisco

International Airport.

Sun Country Airlines does not use either airport's full name, and the search result yields "Oakland/San Francisco Bay, CA (OAK)" and "San Francisco, CA (SFO)."  Again, an internet shopper would understand these to be different options for airports, not the same airport (and notice that San Francisco's Mark is not in either description).  Allegiant refers to the Oakland airport as "Oakland/San Francisco CA (OAK)," which also does not use the Mark.  Expedia calls the Oakland airport "Oakland (OAK – Oakland Intl.)," which is basically the word "Oakland" three times.  Skyscanner calls it "Oakland Metropolitan Oak, CA (OAK)."  That looks like a shortened reference to the previous full name for the Oakland airport, so it may get updated to include portions of the Mark.  The reference to SFO is "San Francisco International, CA (SFO)."  Again because an internet shopper would understand that the search has returned a list of airports, they would realize these airports are alternatives to each other.  Also, Skyscanner states the distance each airport is from the searched location.  Here, for example, the search was for "Oakland Metropolitan," so underneath SFO the website says "14 miles from Oakland, CA," and the reference to SJC says "36 miles from Oakland, CA."  Thus, the website is clear that these are different airports in different places.  Kayak refers to the Oakland airport as "Oakland, California, United States OAK."  Alaska Airlines calls it "Oakland, CA (OAK – Oakland Intl.)," again just three references to Oakland.  Southwest calls it "Oakland, CA – OAK," and Hawaiian Airlines calls it "Oakland, California (OAK)."  Looking at the evidence San Francisco has submitted in support of its motion, it is very difficult to see how an internet shopper would confuse OAK and SFO and buy a ticket to the wrong airport.

The Port's opposition further cements the view that point of sale confusion is unlikely.  The Port submits the Declaration of Jennifer Bridie, the vice president of marketing for Southwest Airlines, ECF No. 51 ("Bridie Decl.").  She explains that Southwest does not display any airport's full legal name on the search display for "depart" or "arrive" or on the results page on its website.  *Id*. ¶¶ 16, 19, 22.  Instead, where multiple airports serve the same metropolitan area or region, Southwest shows either (a) the airport's IATA code and the city in which it is located (or the city that owns the airport); or (b) the airport's IATA code and other unique identifying information.

*Id.* ¶ 10.  Likewise, searches on Southwest's app shows IATA codes, city information, and metropolitan areas – not full airport names.  *Id.* ¶ 23.  In the case of a search for San Francisco area airports, Southwest returns the results:  "Oakland, CA – OAK," "San Francisco, CA – SFO," and San Jose, CA – SJC."  *Id.* ¶ 11.  The Port has also submitted a similar declaration from the senior director of schedule planning and distribution for Spirit Airlines, Piotr Rolek.  ECF No. 52.

The Port has also submitted evidence that online airline ticket booking sites generally show the airport's IATA code during the booking process.  Reim Decl. ¶ 13.  "It is not standard industry practice to display a departure or arrival airport by using only the airport's full name."  *Id.* ¶ 14.  Moreover, airline customers in the United States must routinely distinguish between airports that are near each other, as "many major metropolitan regions or distinct geographic areas are served by more than one airport."  *Id.* ¶ 19 (listing New York, Los Angeles, Chicago, Washington D.C., Dallas Fort Worth, Seattle, and the San Francisco Bay Area as examples).  The Port submits additional screenshots as Exhibits 14-17 to the Yamasaki Decl.  Exhibits 14, 15 and 16 show the presence of IATA codes during the booking process, and Exhibit 17 is broadly consistent with Exhibits I and J to the Andretta Decl., except that it also includes rental cars and ride shares.

In sum, the evidence of context and labeling does not support a claim that the new name for the Oakland airport will lead to point of sale confusion.

Now let's turn to the related issue of degree of care.  The average airfare for a domestic flight from SFO is $444.09, and from OAK is $303.55.  Yamasaki Decl. ¶ 22 & Ex. 19.  That is a relatively expensive purchase.  *See Multi Time Machine*, 804 F.3d at 937 ("The goods in the present case are expensive.  It is undisputed that the watches at issue sell for several hundred dollars.").  And, in addition to the cost of the plane ticket, the ticket is also a travel plan.  The customer is highly invested in knowing which airport she bought a ticket for because she has to go there to get her flight.  Does she drive?  Where will she park?  What time should she leave?  A customer is highly motivated to know what airport she is buying a ticket for.

Given the high degree of customer care and the low likelihood of confusion at point of sale, the Court concludes that San Francisco is unlikely to prevail on its point of sale confusion theory, and that it has also not raised serious questions going to the merits.

### 7.    Defendant's Intent in Selecting the Mark

"[A]n intent to confuse consumers is not required for a finding of trademark infringement." *Brookfield*, 174 F.3d at 1059 (9th Cir. 1999).  However, "[w]hen an alleged infringer knowingly adopts a mark similar to another's, courts will presume an intent to deceive."  *Official Airlines Guides*, 6 F.3d at 1394.  Here, as described above, San Francisco objected to the proposed new name for the Oakland airport, citing trademark infringement concerns.  As discussed above, the Court also finds that the allegedly infringing mark is similar to San Francisco's Mark.  The Court thinks that the new name for the Oakland airport does imply an association or affiliation with the San Francisco International Airport.  Thus, under the case law, it appears the Court is required to at least presume an intent to deceive.  Even so, the Court finds the Port has rebutted that presumption.  As summarized above, the Port has submitted multiple declarations stating that the new name for the airport was intended to address the problem that many air travelers don't know where Oakland is.  The Port's solution to that problem – putting the entirety of San Francisco's Mark into the new name of the Oakland airport – was misguided and improperly implies affiliation between the airports.  But the Court is unable to conclude that the Port actually wanted to deceive anyone.

### 8.    Likelihood of Expansion of the Product Lines

This factor does not carry any weight here because the parties already directly compete. *See Network Automation*, 638 F.3d at 1153 ("Where two companies are direct competitors, this factor is unimportant.").

### 9.    Survey

San Francisco has submitted a survey.  Respondents in the test group and the control group were shown mock ups of Southwest's website or Google Flights for airports in the San Francisco area, with the test group having the new name for the Oakland airport.  Each group was then asked three questions, summarized in tables 3, 4 and 5 in the survey.  Table 3 shows that the percentage of survey respondents who thought the Oakland airport was in San Francisco increased from 16.1% to 25.5% from the control group to the test group.  Table 4 shows that the percentage of respondents who thought the Oakland Airport is the same as the San Francisco International

United States District Court
Northern District of California

Airport increased from 18.7% to 31.1% from the control to the test group. And table 5 shows that the percentage of respondents who thought the Oakland airport was the primary airport serving the San Francisco Bay increased from 11.7% to 26.4% from the control group to the test group.

As explained above in footnote 3, the Court does not think San Francisco has presented any legal arguments that including "San Francisco" in the new name of the Oakland airport causes customers to believe the airport is in San Francisco. The Court therefore disregards that survey question.

The Court cannot make heads or tails of table 5. Only respondents who said in table 4 that the Oakland airport was not the same as the San Francisco International Airport, or were unsure, were asked the question in table 5. Survey ¶ 46. Importantly, in both the test and control groups, the overwhelming majority of such respondents said the Oakland airport was not the same as the San Francisco International Airport (in other words, very few people said they were unsure). This means that the overwhelming majority of the respondents who answered the question in table 5 thought that the Oakland airport was *not* the San Francisco International Airport. The Court therefore has no idea what it means that the change in the name of the airport caused more people to think the Oakland airport is the "primary" airport serving the San Francisco Bay. That seems to be asking a question about primariness to people who mostly do not have these airports confused. The Court cannot understand what the respondents might have thought they were being asked, nor what their answers mean.

That leaves table 4. A flaw in table 4 is that for the control group, the Southwest mock up lists the airports in the way that Southwest does ("San Francisco, CA – SFO," "Oakland, CA – OAK," "San Jose, CA – SJC"), but the Southwest mock up for the test group only does that for SFO and SJC. For the test group, the Southwest mock up lists the Oakland airport by its full new name ("San Francisco Bay Oakland International Airport, CA – OAK"). As a result, when the Southwest control group was asked if the Oakland International Airport is the same as the San Francisco International Airport, they had not been previously shown the names of any airports, just cities and IATA codes. But when the Southwest test group was asked if the San Francisco Bay Oakland International Airport is the same as the San Francisco International Airport, they had

been shown the name of just one airport: the San Francisco Bay Oakland International Airport. Showing the test group the airport options as "San Francisco, CA – SFO," "San Francisco Bay Oakland International Airport, CA – OAK," and "San Jose, CA – SJC" probably increased the odds that the respondents identified the Oakland airport as the San Francisco International Airport because it expressly linked the words "San Francisco International Airport" to the Oakland airport (because they are all in the new name of the Oakland airport), without doing the same for SFO.

Butler argues this approach was proper because she adhered to "the scientific principle of holding everything constant between the Test and Control groups." Reply Report of Sarah Butler, ECF No. 65, ¶ 36. But she is wrong. The Southwest mock ups did not measure the change from "Oakland International Airport" to "San Francisco Bay Oakland International Airport" because the control group was told the airport was "Oakland, CA – OAK." If Butler had held everything constant between the test and control groups, then because the control group was not shown the name of the Oakland airport, the test group wouldn't have been shown that either. In other words, a properly constructed survey designed to test the effect of the new name should have a control group that is shown the *old* name and a test group that is shown the *new* name. Butler didn't do that. *See* Declaration of Dr. Carol A. Scott, ECF No. 59, ¶¶ 24, 28.

The Court realizes that this problem relates only to the Southwest mock ups, not the Google Flights mock ups. However, table 4 presents the results for both together, and neither Butler's survey nor her reply report present an analysis of what table 4 would look like if the respondents who were shown the Southwest mock ups were disregarded. Thus, all that the Court can glean from table 4 is that there is a meaningful error in the way some portion of the respondents were polled, but the dimensions and effect of this error are unclear. San Francisco has therefore not established that the Court can rely on table 4 at all.

In summary, the Court thinks that table 3 does not demonstrate anything relevant, table 5 is incomprehensible, and table 4 has not been shown to be reliable. The Court therefore declines to give any weight to this survey.

### 10.    Summary of Confusion Analysis

The Court concludes that San Francisco is likely to prevail on its claim for affiliation,

26

connection or association confusion, but is not likely to prevail, and has not raised serious

questions going to the merits, on its claims for initial interest or point of sale confusion.

## C.    Fair Use Defense

The Port argues that San Francisco's claims are barred by a fair use defense.  Specifically,

an incontestable mark is subject to the defenses listed in 15 U.S.C. § 1115(b).  Here, the Port

asserts the defense in (b)(4):  "That the use of the name, term, or device charged to be an

infringement is a use, otherwise than as a mark, of the party's individual name in his own

business, or of the individual name of anyone in privity with such party, or of a term or device

which is descriptive of and used fairly and in good faith only to describe the goods or services of

such party, or their geographic origin . . ."  Specifically, the Port says that "San Francisco Bay" is

a "term" that is descriptive of and used fairly and in good faith to describe the "geographic origin"

of the Port's airport services.  *See Fortune Dynamic, Inc. v. Victoria's Secret Brand Management,*

*Inc.*, 618 F.3d 1025, 1031 (9th Cir. 2010).

The Court concludes that the Port's fair use defense will likely fail.  The defense applies

only if the term is used "otherwise than as a mark."  "The Lanham Act defines a trademark as

something used 'to identify and distinguish . . . goods . . . and to indicate the source of the goods.'

To determine whether a term is being used as a mark, we look for indications that the term is being

used to associate it with a manufacturer."  *Fortune Dynamic*, 618 F.3d at 1040.  Here, the Port has

a registered mark in the Oakland airport's previous same ("Oakland International Airport").

Williams Decl., Ex. H.  On October 1, 2019, the USPTO issued an office action against the Port's

trademark application, initially refusing to register the Oakland International Airport mark on the

ground that it is primarily geographically descriptive.  Williams Decl. ¶ 10.  On April 20, 2020,

the Port submitted a response to the Office Action stating that "Oakland International Airport has

become distinctive of the goods/services through the applicant's substantially exclusive and

continuous use of the mark that the U.S. Congress may lawfully regulate for at least the five years

immediately before the date of this statement."  Williams Decl. ¶ 10 & Ex. I.  The USPTO

accepted that response, and the application proceeded to registration.  *Id*. ¶ 10.  Thus, the previous

name of the Oakland airport was indeed a mark and was used as one.

1    The Court thinks the Port will likely fail to prove that the airport's new name is somehow

2    being used for a different purpose or in a different fashion than the old name was.  The Port itself

3    argued that the previous name was not primarily geographically descriptive because of the Port's

4    exclusive and continuous use of the mark, which gave it secondary meaning.  Every indication is

5    that the new name is simply a replacement for the old one.  There is no reason to think the Port

6    (unless it is enjoined) does not plan to exclusively and continuously use the new airport name to

7    give it secondary meaning.[9]  *See Humboldt Wholesale, Inc. v. Humboldt Nation Distribution*,

8    LLC, 2011 WL 6119149, *5 (N.D. Cal. Dec. 8, 2011) ("Fair use only allows use of another's

9    mark where the use is otherwise than as a trade or service mark.").

10   **D.    Irreparable Harm**

11   "A plaintiff seeking [an] injunction shall be entitled to a rebuttable presumption of

12   irreparable harm . . . upon a finding of likelihood of success on the merits . . . in the case of a

13   motion for a preliminary injunction . . ."  15 U.S.C. § 1116(a); *see Vineyard House, LLC v.*

14   *Constellation Brands U.S. Operations, Inc.*, 515 F. Supp. 3d 1061, 1081 n.16 (N.D. Cal. 2021)

15   (noting that this presumption was added by the Trademark Modernization Act of 2020).  Here, San

16   Francisco has shown a likelihood of success on the merits.  Therefore, it is entitled to a rebuttable

17   presumption of irreparable harm.

18   In addition, and wholly apart from the presumption, San Francisco has shown that it will

19   suffer irreparable harm if a preliminary injunction is denied.  The Court has determined that San

20   Francisco is likely to prevail on its claim that the new name of the Oakland airport uses San

21   Francisco's Mark in a way that falsely implies affiliation, connection and association.  "The loss

22   of control over one's trademarks, reputation, and goodwill is a quintessentially irreparable injury."

23   *Vineyard House*, 515 F. Supp. 3d at 1081; *see Herb Reed Enterprises, LLC v. Florida*

24   *Entertainment Management, Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013) ("Evidence of loss of

25   control over business reputation and damage to goodwill could constitute irreparable harm.");

26   *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush and Co., Inc*., 240 F.3d 832, 841 (9th Cir. 2001)

27   _____

28   [9] Indeed, as discussed above, the new name already has secondary meaning because of the implied
affiliation, connection or association to San Francisco and the San Francisco International Airport.

United States District Court
Northern District of California

United States District Court
Northern District of California

1  ("Evidence of threatened loss of . . . goodwill certainly supports a finding of the possibility of

2  irreparable harm.").

3       As discussed above, San Francisco has spent many millions of dollars to develop a brand

4  for its airport that includes use of the Mark. *See also* Second Schuler Decl. ¶ 11 ("Our airport's

5  name, SAN FRANCISCO INTERNATIONAL AIRPORT, is a brand. Like any other brand, it

6  embodies the goodwill that consumers associate with the services that we provide."). It has made

7  substantial investments in the airport's infrastructure and facilities to provide a first-class

8  experience, including having dozens of restaurants, high-end shopping, prestigious club lounges,

9  an on-airport hotel, and a museum. SFO has won many awards and recognitions. SFO is one of

10  the busiest airports in the nation. The San Francisco International Airport brand is routinely

11  ranked among the top airport brands. By contrast, the Oakland airport is much smaller than SFO,

12  with more limited infrastructure, and far fewer flights. It is rated worse in terms of customer

13  satisfaction.

14       The Port has taken San Francisco's valuable Mark and applied it to a smaller, less

15  successful, and lower rated airport. San Francisco's Mark is now literally in the name of the

16  Oakland airport. Because in the United States the name of a city is normally in the name of an

17  airport only if the city owns or partially owns that airport, the new name for the Oakland airport

18  strongly implies affiliation with San Francisco and the San Francisco International Airport. This

19  damages the goodwill and value of San Francisco's Mark and deprives San Francisco of control

20  over its Mark. Further, this type of damage is likely to be difficult or impossible to quantify in a

21  way that would support a jury verdict for damages. *See* McCarthy on Trademarks and Unfair

22  Competition § 30:46 (5th ed.) ("[A] likelihood of damage to reputation is by its nature

23  'irreparable' in the legal sense. Like trying to un-ring a bell, trying to 'compensate' after the fact

24  for damage to business goodwill and reputation cannot constitute a just or full compensation.");

25  *SunEarth, Inc. v. Sun Earth Solar Power Co., Ltd.*, 846 F. Supp. 2d 1063, 1083 (N.D. Cal. 2012)

26  ("The Ninth Circuit has recognized that the potential loss of good will or the loss of the ability to

27  control one's reputation may constitute irreparable harm for purposes of preliminary injunctive

28  relief.") (citation omitted).

United States District Court
Northern District of California

1    Accordingly, San Francisco will suffer irreparable harm if a preliminary injunction is not

2    issued.

3    **E.    Public Interest**

4    "In addition to the harm caused the trademark owner, the consuming public is equally

5    injured by an inadequate judicial response to trademark infringement." *Playboy Enterprises, Inc.*

6    *v. Baccarat Clothing Co., Inc*., 692 F.2d 1272, 1275 (9th Cir. 1982).  The public interest is best

7    served by not confusing customers.  Further, "[t]he public has an interest in vindicating

8    intellectual property rights, and in prohibiting unfair competition." *Niantic, Inc. v. Global++*,

9    2019 WL 8333451, *9 (N.D. Cal. Sept. 26, 2019) (citation omitted).  This factor therefore favors

10    granting an injunction.

11    **F.    Balance of Hardships**

12    This factor also favors an injunction.  A preliminary injunction "would do no more than

13    require Defendant to comply with . . . laws." *Dish Network L.L.C. v. Ramirez*, 2016 WL 3092184,

14    *7 (N.D. Cal. June 2, 2016).  The harms facing San Francisco and the Port are not comparable.

15    San Francisco faces irreparable damage to its valuable Mark.  But the Port is merely being

16    enjoined from breaking the law, which it is not supposed to be doing anyway. *See Disney*

17    *Enterprises, Inc. v. VidAngel, Inc.*, 869 F.3d 848, 866-67 (9th Cir. 2017) (district court did not

18    abuse discretion in determining that the financial hardship from ceasing infringing activities did

19    not outweigh the irreparable harm likely faced by the plaintiff).

20    In addition, the Court is skeptical that the Port will face any substantial expense from a

21    preliminary injunction.  Most of the evidence before the Court concerning the Port's use of the

22    Mark comes from websites.  While modifying websites is not costless, the Court does not think it

23    is very expensive.  At the hearing the Court expressed the view that physical signage at the airport

24    is probably the more expensive item.  Counsel for the Port explained that while signs with the new

25    name have been ordered, they for the most part have not yet been installed at the Oakland airport.

26    *See* Simon Decl. ¶ 48 ("[T]here are two prominent physical signs that do contain the Airport's

27    prior name, and those are in the process of being updated and replaced.").  A preliminary

28    injunction doesn't mean that the Port has to return the new signs – just that it can't put them up.

United States District Court
Northern District of California

But it also sounds like there are not many signs right now that would have to be taken down or altered. The Court concludes that complying with a preliminary injunction likely isn't expensive for the Port.

Finally, the harm to the Port is minimal when it remains free to use the well-known name for the Oakland airport that it has used for 60 years.

**G.    Conclusion Regarding Whether to Issue a Preliminary Injunction**

The Court concludes that a preliminary injunction should issue. San Francisco is likely to prevail on the merits on one of its core theories of liability, it will suffer irreparable harm if there is no injunction, and the public interest and the balance of hardships also favor an injunction.

**H.    Whether a Bond Should Be Required**

San Francisco argues in its motion that no bond is necessary, and that if one is required, it should be minimal. Motion at 25. In its opposition, the Port includes a footnote on the last page of its brief stating that "[a]ny grant of the City's Motion would require a substantial bond and briefing on this issue." Port's Opposition at 25. But San Francisco did brief this issue in its motion. The Port was obligated to put its opposition arguments in its opposition brief, and to file supporting declarations. The Port is not allowed to file a first opposition brief, and then if that one fails and the Court decides to issue a preliminary injunction, file a second opposition brief about whether there should be a bond, and if so, in what amount. The parties stipulated to a briefing schedule, which the Court approved, that provided for a single round of briefing (motion, opposition, reply) before the hearing on the preliminary injunction motion. ECF No. 47. The Port is not allowed to give itself an additional opportunity for briefing, in violation of the parties' stipulation and the Court's order, by declining to argue a point in its opposition brief that was squarely raised in San Francisco's motion.

Further, any arguments by the Port about what the bond amount should be would have been very short and could easily have been included in the opposition brief. The important part of the argument is not what the legal standard is, as the Court is familiar with that. Rather, the important point is the supporting declaration documenting the expenses the Port would incur if a preliminary injunction were issued. The Port submitted eight declarations in support of its

1   opposition brief, together with more than 60 exhibits, demonstrating that the Port understood this

2   was an evidentiary motion in which it was expected to substantiate its arguments with evidence.

3   However, the only evidence the Port chose to put before the Court concerning a bond amount is

4   paragraph 56 of the Simon Decl.:

> If the Court grants the City's motion for a preliminary injunction, the
> Port will lose its investments made, incur additional costs, and be
> harmed with its industry partners and the public.  It will be
> exceptionally difficult and cause harm to the Port's industry
> relationships if the Port is forced to immediately implement a change
> back to the Airport's old name, and then later change back to its
> current name after conclusion of this lawsuit.

9   The Port's already-incurred costs as part of its name change are not a cost of complying

10  with a preliminary injunction.  Those are sunk costs already spent.  The "additional costs" the Port

11  will incur are costs of compliance, but the Port does not describe those costs or provide any

12  estimate of what they are.  As San Francisco points out in its reply brief, the Port has provided

13  scant evidence of any hardship that an injunction would occasion.  San Francisco's Reply to Port's

14  Opp. at 15.  Further, as discussed above in connection with the balance of the hardships, the

15  evidence before the Court concerning the use of the new name in the branding of the Oakland

16  airport is screenshots of websites.  While websites are not costless to modify, neither is that likely

17  a significant expense.  The Port's counsel also indicated at the hearing that the more expensive

18  part of the new branding (physical signs) is mostly not in place yet.

19  The Ninth Circuit has held that "Rule 65(c) invests the district court with the discretion as

20  to the amount of security required, *if any*."  *Johnson v. Couturier*, 572 F.3d 1067, 1086 (2009)

21  (emphasis original, citations and quotation marks omitted).  Here, the Port has not provided

22  evidence of what additional costs a preliminary injunction would cause it to incur, or how large

23  those costs would be.  To set a bond amount, the Court would have to pick a number at random,

24  having no idea if it would even be in the right order of magnitude.  The Court declines to do that.

25  Because the Port has not put forth any evidence of what an appropriate bond amount would be, the

26  Court declines to require one at all.

27  **I.      Whether a Preliminary Injunction Should Run Against the City of Oakland**

28  As you may recall, there are two Defendants in this case:  the Port of Oakland and the City

of Oakland.  Thus far, the Court has been addressing the arguments advanced by San Francisco and the Port.  The City of Oakland, by contrast, did not take a position on the merits of the preliminary injunction.  Rather, the City of Oakland argues that if there is a preliminary injunction, it should be issued only against the Port.

By way of background, the Port of Oakland was established in 1927 by a voter-approved amendment to the Charter of the City of Oakland, "assigning and placing said department and all matters, employments, contracts, and properties of the city relating to the port and harbor under the control and management of a Board of Port Commissioners."  Declaration of Christina Lum, ECF No. 49-2 ("Lum Decl."), Ex. 1 at 1.[10]  The ordinance also stated that the Board "shall have and exercise full control and jurisdiction over all lawful ordinances, resolutions, regulations, employments, duties, contracts, claims, leases, and obligations pertaining to or related to harbor work or harbor construction, port development, its management and operation, and any and all other matters included in the said ARTICLE XXV [of the Charter]."  *Id*. at 2-3.  In addition, the Board "shall have and exercise full control and jurisdiction over all litigation, proceedings or actions, at law or equity, and special proceedings, for or against the city, pertaining or related to any matters within its jurisdiction."  *Id*. at 5.  Simultaneously, Ordinance 3826 N.S. officially "conferred upon, delegated to, and vested exclusively in the Board of Port commissioners, subject to its approval, the power and authority in its discretion to acquire, establish, equip, maintain and operate an airport within the port area of the City of Oakland . . ."  Lum Decl., Ex. 2.  To this day, the Port remains controlled by its Board of commissioners.  Lum Decl., Ex. 3 (Charter of the City of Oakland §§ 700, 701, 706).

The Port owns the Oakland airport.  Wan Decl. ¶ 10.  In its answer to the First Amended Complaint, the Port "admits that it owns and operates the Oakland Airport, through which the Port of Oakland provides airport services to people traveling domestically and/or internationally."  ECF No. 15, ¶ 9.  Port Ordinance No. 4746 that adopted the new name for the Oakland airport was adopted by the Port's Board of commissioners.  Wan Decl., Ex. I.

---

[10] The Court **GRANTS** the City of Oakland's unopposed request for judicial notice of the exhibits attached to the Lum Decl.  ECF No. 49-1.

United States District Court
Northern District of California

United States District Court
Northern District of California

To obtain a preliminary injunction, San Francisco must show that it is likely to suffer irreparable harm in the absence of preliminary relief. *See Winter*, 555 U.S. at 20. San Francisco has not made that showing as to the City of Oakland as a whole (meaning, the portions of the City of Oakland outside of the Port). There is no evidence that City of Oakland departments outside of the Port have any control over the name of the Oakland airport. Accordingly, the Court limits injunctive relief to the Port of Oakland (and other appropriate persons per Fed. R. Civ. Proc. 65(d)(2)).

## IV.    CONCLUSION

San Francisco's motion for a preliminary injunction is **GRANTED IN PART** and **DENIED IN PART**. The Court **PRELIMINARILY ENJOINS** the Port of Oakland and its officers, directors, agents, servants, employees, and all other persons who are in active concert or participation with them who receive actual notice of this order by personal or other service, from using, displaying, or registering the name or trademark "San Francisco Bay Oakland International Airport" in connection with any products or services, including in connection with advertising, marketing, or other promotion, distribution, offering for sale, or sale, of any products or services.

**IT IS SO ORDERED.**

Dated: November 12, 2024

THOMAS S. HIXSON
United States Magistrate Judge